# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ANCHOR SAVINGS BANK, FSB, ) | |
| ) | |
| Plaintiff ) | No. 95-39C |
| ) | (Judge Block) |
| v. ) | |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant ) | |
| ) | |

Report of Kenneth J. Malek, CPA, CIRA, CDBV, CFF
On Tax Gross-Up Award
Submitted August 26, 2010

1

Index to the Report of Kenneth J. Malek, CPA, CIRA, CDBV, CFF
On Tax Gross-Up Award
Submitted August 26, 2010

| | |
|---|---|
| I | Qualifications |
| II | Key Facts and Summary of Conclusions |
| III | Background |
| IV | Tax Gross-Up Discussion |
| V | Change in Period for Tax Loss Carrybacks Under Worker, Homeownership, and Business Assistance Act of 2009 and Estimate of Possible Tax Losses Remaining After Carrybacks |
| VI | Relevant Documents Provided in Discovery and Publicly Available Documents |
| VII | Litigation Among Certain Stakeholders in the Bankruptcy Case and the FDIC Receivership |
| VIII | Tax Accounting Rules for Recognition of Income from Litigation Awards |
| IX | Tax Accounting Rules for Backdating and Other Retroactive Transactions |
| X | Tax Accounting Rules for Sellers and Buyers of a Trade or Business |
| XI | Tax Accounting Treatment for Receivers of Corporate Taxpayers |
| XII | Analysis |
| XIII | Conclusion |
| XIV | List of Exhibits |

Exhibits

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ANCHOR SAVINGS BANK FSB, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 95-39C |
| v. | ) | (Judge Block) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

Report of Kenneth J. Malek, CPA, CIRA, CDBV, CFF
On Tax Gross-Up Award
Submitted August 26, 2010

Kenneth J. Malek states as follows:

## I. Qualifications

1.      I am a Shareholder and Senior Managing Director of Conway MacKenzie, Inc., and I have provided financial, transactional, and operational advisory services in bankruptcy and distressed transactions for over 30 years.  Exhibit 7 to this report contains my curriculum vitae and statement of prior testimony.  My prior engagements include a number of transactions for which I was the principal architect of tax structures and tax-related financial analyses that created significant enhancements of transaction values for creditors and/or shareholders.  I have served as an expert on distressed company tax issues in a number of cases, including *In re TXCO* (Bankr. W.D. Tex. – consulting expert on value to creditors of tax losses vs. value to creditors of step-up in tax basis); *In re Funding Systems Railcars* (Bankr. N.D. Ill. – testified on plan structure that significantly enhanced creditor

3

recoveries through benefits of tax losses); *In re Ironton Coke* (Bankr. E.D. Mich. – testified on plan

structure and rifle-shot tax law transition rule that provided potential benefit to reorganized debtor); *In*

*re Wildman, et al.* (Bankr. N.D. Ill. – testified on change in tax accounting methods and deferred

payment tax rules); and *In re Goldblatt Stores* (Bankr. N.D. Ill. – testified on and recommended

methodology to resolve tax problem of so-called "homeless income" of creditors' liquidating trust). I

have testified previously in the United States Court of Federal Claims, on the tax shelter considerations

of certain low income housing projects (*Cienega Gardens*, *Claremont Village Commons*, and *CCA*

*Associates* cases). I have secured favorable private letter rulings from the Internal Revenue Service

approving the tax consequences for distressed-company transactions I have structured. During the

period I was a partner with two international CPA firms, I was the "preparer," within the meaning of 26

CFR §301.7701-15, of consolidated federal income tax returns in which utilization or preservation of tax

losses was involved. I have also provided advice to clients regarding the federal income tax treatment of

receipts that are capital contributions or reimbursements of capital versus receipts that are ordinary

income, as well as whether income should properly be characterized as ordinary income versus capital

gain. I have testified before the Select Revenue Measures Subcommittee of the House Committee on

Ways and Means, before the United States Treasury Department on bankruptcy tax policy issues, and

before the Commission on the Bankruptcy Laws on bankruptcy policy matters. I have spoken before

numerous professional groups on tax structuring for distressed-company transactions, including the

Practising Law Institute, the American Institute of Certified Public Accountants, the University of Chicago

Tax Conference, and the Association of Insolvency and Restructuring Advisors.

        2.      I am licensed as a Certified Public Accountant. In making the analysis herein, I

have applied standards applicable to tax return preparers issued by the Tax Executive Committee of the

American Institute of Certified Public Accountants. Those standards, which are part of the Statements

on Standards for Tax Services (November 2009), require that a member should determine and comply

with the rules imposed by the applicable taxing authority with respect to recommending a tax return position, or preparing or signing a tax return.[1] The Internal Revenue Code penalizes a preparer for undisclosed tax return positions as to which the preparer did not have a reasonable belief would more likely than not be sustained on its merits.[2] Disclosed positions are exempt from this penalty only if there is proper disclosure and the position meets a reasonable basis standard.[3] These rules require a member recommending one or more tax positions, or preparing or signing a tax return, to determine whether tax positions meet the more likely than not or reasonable basis standards. The member must make this determination by reviewing and weighing the tax cases, administrative pronouncements, and other tax authorities relevant to the tax treatment of transactions reported on the tax return.

## II. Key Facts and Summary of Conclusions

3.     The timeline attached as Exhibit 1 to this report summarizes the facts described in paragraphs 3 through 11 of this report.

4.     On March 14, 2008, as corrected by the Order of July 16, 2008,[4] the United States Court of Federal Claims ("Court of Federal Claims") issued an opinion in *Anchor Savings Bank, FSB v. United States*, 81 Fed. Cl. 1, 153 (2008), holding that Washington Mutual Bank ("WMB"), as successor to Anchor Savings Bank, FSB ("Anchor" or "Plaintiff") is entitled to a total of $356,454,910.91 in damages (the "Anchor Award") resulting from the disallowance of supervisory goodwill as a component of bank regulatory capital. The March 14, 2008, opinion also holds that WMB is entitled to a tax gross-up award (the "Tax Gross-Up Award") to offset certain tax implications of the Anchor Award and make such award tax-neutral.

5.     In a related order dated June 27, 2008 (the "June 27, 2008, Order," attached as Exhibit 2), the Court of Federal Claims recognized that the existence of net operating losses, tax credits,

and carryovers of these favorable tax attributes of WMB and affiliates could reduce the tax cost of the

Anchor Award and thus could reduce the Tax Gross-Up Award. The Court of Federal Claims further

indicated that if the trial court is unable to determine to a reasonable certainty the rate at which the

Anchor Award would be taxed and/or the tax year for which WMB would pay income tax on the Anchor

Award, the appropriate approach is to allow WMB to petition for the Tax Gross-Up Award when the

reasonable certainty criterion is met.

      6.    The United States filed a Notice of Appeal of the Anchor Award on September 8,

2008 (the "Government Appeal"), but did not prevail on the appeal, pursuant to a judgment of the

United States Court of Appeals for the Federal Circuit (the "Court of Appeals") issued as a mandate on

May 3, 2010.[5] The United States did not petition for a *writ of certiorari*, and, accordingly, the order of

the Court of Appeals became final and nonappealable on August 2, 2010.[6] During the pendency of the

appeal, the Anchor Award was worth less than 100 cents on the dollar due to the possibility that the

Court of Appeals might decide one or more issues in favor of the United States.

      7.    On September 25, 2008, the Office of Thrift Supervision, by order number 2008-

36, closed WMB, appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver, and advised

that the FDIC was immediately taking possession of the assets of WMB.[7] Pursuant to a Purchase and

Assumption Agreement Whole Bank dated September 25, 2008 (the "Purchase and Assumption

Agreement"), JPMorgan Chase Bank, National Association ("JPMC") acquired from the FDIC (the "WMB

Acquisition") specified assets of WMB, subject to specified liabilities of WMB.[8] Section 3.5 and Schedule

3.5(2) of the Purchase and Assumption Agreement state that assets not sold to JPMC include "any

interest, right, claim, or judgment against ... any other Person whose action or inaction may be related

to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed

bank) incurred by the Failed Bank ... ." The Purchase and Assumption Agreement defines "Person" as

"any individual, corporation, partnership, joint venture, association, joint-stock company, trust,

unincorporated organization, or *government or political subdivision thereof,* excluding the Corporation [emphasis added]"[9] and defines "Corporation" as the FDIC, acting in its corporate capacity.[10] The Purchase and Assumption Agreement is effective on September 25, 2008, whereas the Settlement Agreement described in paragraph 10 of this report, when and if effective and legally enforceable, would call for JPMC to have acquired the Anchor Award as of September 26, 2008. See, paragraph 43, below. A possible explanation (and I believe a likely explanation) for this difference in dating relates to concept of prepetition transfers that are voidable as preferences under 11 USC §547. The Settlement Agreement calls for various rights and claims to be given up by chapter 11 debtors Washington Mutual, Inc. ("WMI," the former bank holding company for WMB) and WMI Investment Corporation ("WMII," a wholly owned subsidiary of WMI). The bankruptcy cases of WMI and WMII commenced on September 26, 2008. Were WMI and WMII to give up rights effective one day earlier, on September 25, 2008, presumably the debtors (and potentially other parties in interest) could assert an ability to avoid the transfers of rights pursuant to the Settlement Agreement, as voidable prepetition preferences.[11]

8.      On September 26, 2008, WMI and WMII commenced voluntary cases (the "Delaware Bankruptcy Cases") pursuant to chapter 11 of title 11 of the United States Code for reorganization in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). The Delaware Bankruptcy Cases do not include WMB, which is the subject of the FDIC receivership.[12]

9.      On July 1, 2010, WMI and WMII filed their Fifth Amended Joint Plan of Affiliated Debtors pursuant to chapter 11 of the Bankruptcy Code (the "Fifth Amended Plan"). The Fifth Amended Plan incorporates the terms of the Settlement Agreement described in paragraph 10 of this report.[13]

10.      Commencing in March 2009, JPMC, WMI, WMII, the FDIC, and certain other interested parties in these bankruptcy cases commenced litigation (the "Asset Ownership Dispute") over the alleged ownership of certain significant assets (including tax carryback refunds and the Anchor

Award), the alleged taking of property without just compensation, the alleged conversion of property, alleged improper asset sales, the alleged failure to maintain adequate capitalization, and alleged fraudulent transfers, among a number of allegations. Due to the complexity, inherent delay, and substantial expense of litigating the issues associated with Asset Ownership Dispute, as of May 21, 2010, JPMC, WMI, WMII, and the FDIC, among others, signed a global settlement agreement (the "Settlement Agreement") that assigned to JPMC a number of assets including any and all rights, title, and interest in the Anchor Award.[14] However, the provisions of the Settlement Agreement will not become effective and legally enforceable until, among other conditions, (i) the entry of a confirmation order by the Delaware Bankruptcy Court confirming the Fifth Amended Plan, (ii) such confirmation order becomes a final order, and (iii) the occurrence of the effective date of the Fifth Amended Plan. The Settlement Agreement may be terminated by any party thereto in the event the confirmation order is not entered by the Delaware Bankruptcy Court on or before August 31, 2010.[15] Exhibit 3 hereto summarizes the litigation among the parties and the Settlement Agreement.

11.     On July 28, 2010, the Delaware Bankruptcy Court entered an order approving the appointment of Joshua R. Hochberg as examiner (the "Examiner") to, among other things, investigate the claims and assets that may be property of the bankruptcy estates of WMI and WMII that are proposed to be conveyed, released, or compromised under the Settlement Agreement and the Fifth Amended Plan. Further, the Delaware Bankruptcy Court directed the Examiner to file a preliminary report with respect to his investigation of the Settlement Agreement on or before September 7, 2010, and a final report on or before October 8, 2010. In the Agreed order Directing the Appointment of the Examiner, the Delaware Bankruptcy Court has scheduled November 1, 2010 for a hearing to consider confirmation of the Fifth Amended Plan of Reorganization.[16] It is unclear whether WMI and WMII would be able to satisfy all conditions required to confirm the Fifth Amended Plan of Reorganization by November 1, 2010, or whether the Examiner will recommend approval of the Settlement Agreement.

12.     On June 11, 2010, Anchor filed a Rule 60(b) Motion for Award of a Tax Gross-Up, with respect to a portion of the Anchor Damages in a lower net amount of $164,900,000 and a higher net amount of $228,091,000.[17] The motion requests a lower Tax Gross-Up Award of $104,355,260 and a higher Tax Gross-Up Award of $144,345,030. In the motion, counsel for Anchor Bank alleges that JPMC "acquired substantially all the assets of [WMB], including the Anchor judgment and cause of action. [JPMC] is thus now the real party in interest in the case, and will receive the judgment proceeds."[18] In the motion, Anchor does not apply any tax rates based on the blended corporate rates that would be applicable to income recognized by WMB, but rather applies a 38.757% blended corporate tax rate applicable to JPMC. The motion attaches the affidavit of James T. Weyant, Managing Director in the Corporate Tax Department of JPMC ("Weyant Affidavit"). The Weyant Affidavit computes the blended corporate tax rate of JPMC that Anchor uses to compute the alleged Tax Gross-Up Award. The Weyant Affidavit does not compute the blended corporate tax rate of WMB, nor does it take into consideration tax loss carryforwards available to offset taxable income of WMB.

13.     The higher alleged Tax Gross-Up Award is based on additional damages Anchor is seeking in the amount of $63,191,000, pursuant to its Motion on Remand for Correction of Award of Mitigation Damages (June 11, 2010).[19] In Exhibit 4, I analyze whether the additional $63,191,000 sought should be viewed as a recovery of lost capital or a recovery of lost profits. If the additional damages would be a recovery of lost profits, then Anchor would not be entitled to recover an additional Tax Gross-Up Award with respect to these damages.

14.     I believe that these computations of alleged amount for the Tax Gross-Up Award are materially overstated, by reason of not applying the tax rate applicable to income properly recognized by WMB. The tax rate applicable to income properly recognized by WMB is materially less than 38.757%, by reason of significant tax losses and potentially other tax attributes that I believe are available to offset such income or the tax thereon.

9

15.    The United States has asked me to develop and set forth in this report my opinions regarding the rate of income tax on the Anchor Award, the computation of the Tax Gross-Up Award, and the extent, under the particular facts of this case, to which I can determine to a reasonable certainty the rate of tax and the tax year for which the income tax attributable to the Anchor Award will be paid.

16.    The proper determination of the rate of income tax on the Anchor Award, the entity required to pay tax on the Anchor Award, the time when the tax on the Anchor Award will become due, and the ability to reduce any otherwise applicable tax liability by current year or carryover tax losses or tax credits are subject to complexity and uncertainty, as described in this report, by reason of the Government Appeal, the WMB Acquisition, the Asset Ownership Dispute, and the possible confirmation of the Fifth Amended Plan.

17.    The possible tax consequences analyzed in this report are the following:

(a)    Whether WMB should recognize as taxable income the entire $356,454,910.91 of the Anchor Award on August 2, 2010, and whether JPMC should recognize as taxable income none of the Anchor Award.

(b)    Whether WMB should recognize as taxable income for the 2008 tax year the fair market value of the Anchor Award as of September 25, 2008, and whether JPMC should recognize as taxable income the remainder of the Anchor Award on August 2, 2010.

(c)    Whether WMB should recognize as taxable income for the 2010 tax year the fair market value of the Anchor Award as of January 1, 2010 (or some other date later in 2010) and JPMC should recognize as taxable income the remainder of the Anchor Award on August 2, 2010 or such later tax year for which the Settlement Agreement becomes effective and legally enforceable.

(d)    Whether JPMC should recognize as taxable income the entire $356,454,910.91 of the Anchor Award on August 2, 2010, and whether WMB should recognize as taxable income none of the Anchor Award.

(e)    If the existence of the Asset Ownership Dispute defers the time for recognizing income on the Anchor Award beyond August 2, 2010, whether such deferral would increase the portions of the Anchor Award that would be taxable to JPMC.

(f)    In the case of alternatives (a), (b), and (c), the taxable income to be recognized by WMB would be offset by any net operating losses available for such purpose that have been generated by one or more of WMB, WMI, or WMII. Based solely on publicly available information, I have made an estimate of a possible approximate amount of these tax losses that would be available.

(g)    Alternative (a) will result if JPMC is not treated as the owner of the Anchor Award until a date in 2011 when it may ultimately be awarded ownership of the Anchor Award pursuant to the effective date of an adjudication or settlement of the Asset Ownership Dispute. This treatment is consistent with the tax authorities described hereinafter and the statement by Anchor's counsel in response to discovery requests, that, as of the acquisition date of September 25, 2008, JPMC "did not specifically allocate any portion of the sales price to the Anchor judgment" (Anchor Award).[20] Moreover, no adjudication or settlement of the Asset Ownership Dispute has yet occurred, and the Examiner will investigate issues relating to the Settlement Agreement and report to the Delaware Bankruptcy Court on September 7, 2010 and October 8, 2010.

(h)    Alternative (b) will result if JPMC is treated as originally purchasing, as of September 25, 2008, the Anchor Award without need for the Settlement Agreement. Alternative (b) cannot occur if JPMC needs the Settlement Agreement to perfect its ownership of the Anchor Award. In view of the competing claims to the Anchor Award and the fact that JPMC is attempting to resolve those claims through the Settlement Agreement, it is doubtful for federal income tax purposes that JPMC

11

would be treated as originally purchasing, as of September 25, 2008, the Anchor Award without need for the Settlement Agreement.

(i)     Alternative (c) will result if JPMC is treated as retroactively purchasing the Anchor Award pursuant to the Settlement Agreement, but the Settlement Agreement is treated for income tax purposes as not being retroactively effective across tax years. Alternative (c) would not be possible if the Settlement Agreement does not become effective and legally enforceable until 2011.

(j)     Alternative (d) will result if JPMC is treated as stepping into the tax shoes of WMB as it relates to the Anchor Judgment or if the Anchor Award had no value as of September 25, 2008. Stepping into the shoes of WMB as it relates to the Anchor Award would occur only if JPMC acquired assets and liabilities of WMB in a nontaxable reorganization. Counsel for Anchor has informed the United States that the WMB Acquisition was in the form of a taxable purchase of assets and not a nontaxable reorganization.[21] The possibility that the Anchor Award had no value as of September 25, 2008 is _inconsistent_ with the facts of this case and with the current market for litigation awards and causes of action.[22]

18.     In this report, I also analyze the treatment of the additional damages Anchor is seeking in the amount of $63,191,000, pursuant to its Motion on Remand for Correction of Award of Mitigation Damages (June 11, 2010). Based on my understanding of the facts, the adjudication of whether Anchor is entitled to this portion of damages would likely not occur until after 2010. The possible tax treatments are similar to those discussed in paragraph 17(a) through (e) above, except that the date on which the tax owner of the Anchor Award should recognize the portion of the $63,191,000 not previously recognized as income pursuant to a sale or exchange would be pushed back, to no earlier than the date on which an award, if any, of these additional damages, would become final and nonappealable.

19.     Exhibit 5 comprises Plaintiff's Responses to Discovery Requests, to Defendant's Motion for Enlargement of Time to File Response to Plaintiff's Rule 60(b) Motion for Award of a Tax Gross-Up Plaintiff's Objections, and Responses to Defendant's Revised Request for Supplementation of Defendant's First Phase II Case-Specific Requests for Production of Documents.[23] I base my analysis and conclusions on that information and the information I have been able to gather to date through compiling and analyzing documents that are in the public record.

20.     I reserve the right to supplement or modify this report, including the opinions and the bases for these opinions for any of the following reasons:  (a) the need to provide rebuttal; (b) the need to respond to new facts or new or additional information that become known to me; or (c) the need to incorporate information from additional discovery or trial materials, including deposition transcripts, evidence, and exhibits. I also may use as exhibits any statements, records, documents, evidence, or other exhibits made, used, or introduced by any party.

21.     Based upon the information that has been produced by legal counsel for Anchor, the publicly available information I have compiled and analyzed, the current status of the Settlement Agreement, and the overall facts of this case, I believe, to a reasonable degree of certainty, that (a) there is not yet any basis upon which JPMC should report the taxable income from the Anchor Award, and either (b) no taxpayer should currently report income from the Anchor Award, or (c) unless the Settlement Agreement becomes effective and legally enforceable during 2010, WMB should report the entire taxable income from the Anchor Award when it files a tax return for 2010 or when its taxable income and deductions are included in a consolidated return filed by WMI for 2010, and (d) the taxable income from WMB reporting the Anchor Award should be reduced by any tax losses available for such purpose that have been generated by one or more of WMB, WMI, or WMII. Moreover, the resulting tax obligation, if any, relating to the Anchor Award would be subject to reduction by any general business

13

tax credits or any other tax credits available for such purpose that have been generated by one or more of WMB, WMI, or WMII.

22.   The reason for my conclusion in paragraph 21 is that the Settlement Agreement has not yet become effective, and the time for the tax owner of the Anchor Award to recognize taxable income from the Anchor Award is 2010.  If the Settlement Agreement does not become effective during 2010, either there will be no tax owner due to the Asset Ownership dispute or WMB will be the tax owner on the date the Anchor Award became final and nonappealable, and the Settlement Agreement would not be treated for tax purposes as being retroactive from 2011 or later back into 2010.

### III.   Background

23.   *Anchor Savings Bank v. United States* represents one of a series of cases, commonly called *"Winstar* Cases," arising out of problems in the savings and loan industry during the late 1970s and early 1980s.  *See, United States v. Winstar Corp.*, 518 U.S. 839 (1996).  The combination of high inflation and high interest rates placed hundreds of savings and loan institutions in financial distress.  To help prop up the industry, the federal government, which insured many of the thrifts' depositors, developed a plan to encourage healthy institutions to take over the troubled and failing institutions in either so-called "supervisory transactions" or "assisted transactions."  Part of the package of incentives offered for these transactions allowed the acquiring institutions to treat the negative net worth ("supervisory capital") of the institutions acquired as part of regulatory capital, which the acquiring institutions could defer and amortize over up to 40 years.  In the meantime, the acquiring institutions could count the supervisory capital as part of the minimum capital base required to support many profitable activities, such as acquiring other institutions, engaging in the mortgage brokerage business, expanding branch networks, and engaging in insurance brokerage or other financial services.[24]

14

27.     During the pendency of the appeal, the Anchor Award was worth less than 100 cents on the dollar due to the possibility that the Court of Appeals might decide one or more issues in favor of the United States. There is recent history demonstrating that litigation awards at the trial court level have significant value during the period that such awards are subject to being overturned or reduced by appeal.[32]

28.     In Plaintiff's Opposition to Defendant's Motion for Enlargement of Time to File Response to Plaintiff's Rule 60(b) Motion for Award of a Tax Gross-Up, at page 3, counsel for Anchor stated "as will be shown by documents that Anchor is producing to the government, JP Morgan [(JPMC)] did not specially allocate any portion of the sales price to the Anchor judgment." An explanation for not allocating any portion of the sales price to the Anchor Award is that, consistent with Section 3.5 and Schedule 3.5(2) of the Purchase and Assumption Agreement, JPMC did not acquire ownership of the Anchor Award at that time, but may acquire it in the future, should the Settlement Agreement ultimately become effective and legally enforceable. The treatment of retroactive adjustments of transactions and "as of" dating of transactions for tax purposes are discussed in detail in Section IX of this report. However, if, as Plaintiff asserts, JPMC had acquired this asset from WMB on September 25, 2008, then for tax purposes JPMC should have reported a purchase of the Anchor Award, at fair market value, on September 25, 2008, and WMB should have reported income from sale of an asset with zero tax basis, with proceeds realized in the sale equal to the same fair market value. The tax losses and credits otherwise available to WMB and the affiliated tax group including WMI, WMB, and WMII would have been available to reduce the rate of tax on this income reported by WMB.

29.     In its complaint filed March 24, 2009, captioned JPMC v. WMI and WMII, Adversary Pro. No. 09-5-551(MFW), JPMC states as follows: "[JPMC] had only two days after being briefed by the FDIC to submit a bid and then only twenty-four hours from the time that its bid was accepted by the FDIC until the time the acquisition closed to complete the single largest acquisition of a

failed institution in United States history. The circumstances which led to execution of the [Purchase and Assumption Agreement] meant that [JPMC] had limited opportunity to prepare for this unprecedented transaction." The need to renegotiate the transaction and obtain the allocation of additional assets, now memorialized in the pending Settlement Agreement, are not inconsistent with the circumstances described by JPMC in its March 24, 2009 complaint.

### IV.     Tax Gross-Up Discussion

30.     In this case and in prior Winstar cases, the Court of Federal Claims and the Federal Circuit have held that plaintiffs are entitled to a tax gross-up on the portions of the damages awards representing recoveries of capital that would <u>not</u> have been subject to tax if received in the absence of the breach. For example, this would include lost capital contributions from planned equity capital raises. As to portions of the damages awards representing lost income that would have been subject to tax in absence of the breach (e.g., lost profits from operations), the Court of Federal Claims has held that no tax gross-up is appropriate. *See, e.g., Anchor Savings Bank, FSB, v. United States*, 81 Fed. Cl. 1, 134 (2008); *Home Savings of America, FSB, v. United States,* 399 F.3d 1341, 1356 (Fed. Cir. 2005).

31.     The appropriate approach in calculating the Tax Gross-Up Award is to divide the portion of the award to which the gross-up applies by one minus the tax rate applicable to such portion. I compute the tax rate on a "with and without basis," by comparing the tax that would be paid on taxable income including the Anchor Award as taxable income, to the tax that would be paid without recognizing the Anchor Award as taxable income. This comparison results in the effective tax rate on the Anchor Award. As discussed in paragraph 5 of this report, the Court of Federal Claims has instructed that tax losses and other favorable tax attributes should be taken into account in making the calculation of effective tax rate.[33]

17

32.     For illustration, assume there are no net operating loss carryovers available for the taxable year in which the award will be taxed, that the taxpayer has $20 million of lost capital damage award after gross-up ($12.6 million before the gross-up),[34] $30 million of lost profits damage award, $100 million of other taxable income, and a federal tax rate of 35%.[35]  Further assume that the state tax rate (after federal benefit) is 2%.  The computations would be as follows:

| | |
|---|---|
| Tax on $150 million taxable income at 37% | $55.5 million |
| Tax on $130 million taxable income at 37% | ($48.1 million) |
| Tax on lost capital damage award | $7.4 million |
| Divided by lost capital damage award | ÷20.0 million |
| Tax rate applicable to the lost capital damage award | 37.0% |

| | |
|---|---|
| Lost capital award prior to the tax gross-up | $12.6 million |
| Divide by one minus blended federal and state corporate tax rate | ÷ (1-63%) |
| Grossed up lost capital award | $20.0 million |
| Lost capital award prior to the tax gross-up | ($12.6 million) |
| Amount of the tax gross-up | $7.4 million |

33.     However, assume that the taxpayer in the illustration had available to it $200 million of tax loss carryovers that were available to be applied in reduction of the lost income award, the lost capital award, and the other taxable income.  In this case, the computations would be as follows:

| | |
|---|---|
| Tax on $150 million taxable income, less $200 million tax loss carryover, at 37% | $0.0 million |
| Tax on $130 million taxable income, less $200 million tax loss carryover, at 37% | ($0.0 million) |
| Tax on lost capital damage award | $0.0 million |
| Divided by lost capital damage award | ÷20.0 million |
| Tax rate applicable to the lost capital damage award | 00.0% |

| | |
|---|---|
| Lost capital award prior to the tax gross-up | $12.6 million |
| Divide by one minus blended federal and state corporate tax rate | ÷ (1-0.00%) |
| Grossed up lost capital award | $12.6 million |
| Lost capital award prior to the tax gross-up | ($12.6 million) |
| Amount of the tax gross-up | $0.0 million |

34.     As I describe herein below, it is this latter situation, namely availability of

material tax loss carryovers to offset the tax on the Anchor Award, which applies to the Anchor Award in

*Anchor v. United States.*

V.     Change in Period for Tax Loss Carrybacks Under Worker, Homeownership, and Business
       Assistance Act of 2009 and Estimate of Possible Tax Losses Remaining After Carryback

35.     Section 13 of the Worker, Homeownership, and Business Assistance Act of 2009,

Pub. L. No. 111-92, amends the Internal Revenue Code (title 26, United States Code) to allow taxpayers

to elect to carry back certain net operating losses for periods up to five taxable years to offset taxable

income in those preceding taxable years.  This is an increase from the carryback period of generally two

taxable years that applies under 26 USC §172(b)(1)(A)(i).

36.     Page 10 of the Disclosure Statement for the Fifth Amended Plan describes the

allocation, pursuant to the Settlement Agreement, of an aggregate of $5.5 to $5.8 billion of the Tax

Refunds[36] generated from carryback of tax losses of WMU, WMI and WMII.[37]   Under the Settlement

Agreement, the tax refund amounts applicable to the two-year carryback would be divided when

received, 20% to WMI and 80% to JPMC; the incremental tax refund amounts applicable to the five-year

carryback would be divided 65.178% to WMI and 34.822% to the FDIC, subject to dilution by up to

5.357% to a class of certain bondholders if the class votes in favor of the Fifth Amended Plan.[38]

37.     Pages 142 through 147 of the Disclosure Statement for the Fifth Amended Plan

describe the usual statutory provisions of the Internal Revenue Code that could apply to reduce or limit

the utilization of tax loss carryovers of WMU, WMI and WMII.[39] The discussion in pages 142 through

147 comprises boilerplate text, without providing insight into the amount of tax loss carryovers that will

remain after the carrybacks and will be useable against taxable income, either currently or in the future.

However, the assumptions underlying the debtors' financial projections state that "[n]o provision for

federal tax expense has been made during the projection period as it is assumed that the entity would

be able to take advantage of retained WMI tax attributes providing for net operating loss (NOL)

carryforwards sufficient to cover projected earnings streams (i.e., at least approximately $75 to $100

million of Reorganized WMI NOLs)."[40]

        38.    As of August 2, 2010, I am aware of no information indicating that WMB has

disaffiliated from WMI and WMII for consolidated federal income tax purposes. In view of the limited

information provided in the Disclosure Statement for the Fifth Amended Plan, I have used publicly

available information to compute my own estimate of the tax losses on a consolidated basis that would

be available to offset the income from the Anchor Award. My methodology for making this estimate is

derived from the basic accounting equation, namely assets = liabilities + owners' equity. The objective is

to compare the owners' equity at the end of 2007 to the owners' equity for the most current period for

which information is publicly available. The reduction in the owner's equity from the end of 2007 to the

current date, with some adjustments, will be a measure of the aggregate tax losses. After a little

algebra, this reduces to the following:

>   + Assets as of December 31, 2007 – liabilities as of December 31, 2007
>   – (Assets as of current date – liabilities as most current date)
>   + April 2008 equity capital infusion
>   + / – adjustments for book vs. tax reporting differences and other items
>   = 2008 through current date (approximately) estimated net consolidated tax losses
>
>   – Estimated taxable income offset by carryback claims
>
>   = Estimated remaining tax losses available to shelter Anchor Award

My analysis shows a material likelihood that tax losses available (estimated at approximately $15.2

billion) will be far in excess of the taxable income realized on August 2, 2010 from the Anchor Award

(approximately $356.4 million under the tax reporting described in paragraph 17(a)).

**VI.    Relevant Documents Provided In Discovery and Publicly Available Documents**

39.    Exhibit 5 comprises Anchor's responses to the United States' discovery requests and to Defendant's Motion for Enlargement of Time to File Response to Plaintiff's Rule 60(b) Motion for Award of a Tax Gross-Up. These documents enabled me to receive confirmation from the Plaintiff's counsel of the following:

(a)    That JPMC did not apportion any of its purchase price for the WMB assets to the contingent asset representing the Anchor Award, as of September 25, 2008;[41]

(b)    That JPMC acquired the assets of WMB in a taxable purchase and sale and not in a carryover basis transaction in which JPMC would inherit tax losses from WMB or otherwise step into the tax shoes of WMB with respect to WMB's assets;[42] and

(c)    That JPMC and WMB each report their income and deductions for federal income tax purposes on the accrual method of accounting.[43]

40.    These disclosures by Anchor, coupled with the other facts of the case, lead to the following:

(a)    If WMB sold the Anchor Award to JPMC on September 25, 2008, as counsel to Anchor asserts, WMB would be required to report gain on sale of the Anchor Award to the extent of the value of the Anchor Award as of September 25, 2008. Therefore, the tax losses and other tax attributes of WMB (and members of its affiliated tax group) available in 2008 would be available to reduce the tax[44] on that income recognition event. Of course, this presupposes that there was a sale of the Anchor Award for federal income tax purposes on September 25, 2008 and not at a later date when the Settlement Agreement would become effective for federal income tax purposes.

(b)    If WMB sold the Anchor Award to JPMC retroactively as of September 26, 2008, or such later date on which the Settlement Agreement would be allowed to be retroactively effective for federal income tax purposes, the result would be almost identical, so long as the retroactivity date for

federal income tax purposes would be on or before August 2, 2010: (i) WMB would be required to report gain on sale of the Anchor Award to the extent of the value of the Anchor Award as of the effective date for federal income tax purposes of its sale of the Anchor award to JPMC; and (ii) the tax losses and other tax attributes of WMB (and members of its affiliated tax group) available for the year in which sale is treated as occurring for tax purposes would be available to reduce the tax[45] on that income recognition event.

      (c)     If the retroactivity date for federal income tax purposes would be after August 2, 2010, or if the Settlement Agreement never becomes effective, then WMB is the owner of the Anchor Award on August 2, 2010, and it must recognize 100 percent of the taxable income from the Anchor Award, offset by available tax loss carryovers.

      (d)     The foregoing conclusions are not substantively changed except for deferral, if the uncertainty caused by the Asset Ownership Dispute defers the date for recognizing the taxable income from the Anchor Award to a date beyond August 2, 2010. *See*, table in paragraph 75.

      41.     As mentioned in paragraph 12, the Weyant Affidavit computes the blended corporate tax rate of JPMC that Anchor uses to compute the alleged Tax Gross-Up Award, arriving at 38.757%. The Weyant Affidavit does not compute the blended corporate tax rate of WMB, nor does it take into consideration tax loss carryovers available to offset taxable income of WMB as instructed by the Court of Federal Claims.[46] The fundamental flaw in the Weyant Affidavit is that it fails to consider that all or a material portion of the Anchor Award would be recognized as taxable income by WMB and not by JPMC, and therefore that he needs to take into consideration the blended corporate tax rate of WMB.

VII.    Litigation Among Certain Stakeholders in the Bankruptcy Case
        and the FDIC Receivership

42.    The Bankruptcy Disclosure Statement describes the many disputes among WMI, WMII, the FDIC (both in its capacity as receiver and in its corporate capacity), and JPMC, "with each asserting claims for billions of dollars against one or more of the others in various forums each of the parties contended had jurisdiction over the issues, including the Receivership and multiple litigations in the Bankruptcy Court and various federal district courts."[47] These disputes include those relating to the ownership of over $4 billion of WMI and WMII's funds on deposit in accounts now held by JPMC, approximately $5.5 to $5.8 billion of tax refunds from carryback of tax losses to the five taxable years preceding 2008, and ownership of the Anchor Award and a similar award relating to another depository institution, American Savings Bank. Exhibit 3 to this report summarizes certain aspects of the litigation.

43.    Page 37 of the Settlement Agreement provides as follows:

"Section 2.13. Goodwill Litigation.

(a)    American Savings Litigation. . . .

(b)    Anchor Litigation. On and effective as of the Effective Date, and pursuant to the 363 Sale and Settlement, (i) the WMI Entities, the FDIC Receiver and FDIC Corporate shall be deemed to have sold, transferred and assigned, as of September 26, 2008, to JPMC any and all right, title and interest such Parties may have in the Anchor Litigation, free and clear of the liens, Claims, interests and encumbrances of any person, including, without limitation, any liens, Claims, interests and encumbrances of holders of Litigation Tracking Warrants ... , (ii) the WMI Entities, the FDIC Receiver and FDIC Corporate shall be deemed to have waived and released any and all rights and claims associated with the claims, causes of action, damages, liabilities and recoveries associated with the Anchor Litigation and (iii) the WMI entities shall file such notices as may be reasonably requested by JPMC evidencing this Agreement with respect to the Anchor Litigation [emphasis added]."

Thus, the Settlement Agreement, if and when it would become effective, would retroactively modify the assets JPMC acquired pursuant to the Purchase and Assumption Agreement, with respect to an asset believed by certain of the parties to the litigation to have been excluded from the assets JPMC acquired.

*See,* paragraphs 7 and 28 of this report. The Purchase and Assumption Agreement, however, was effective <u>as of September 25, 2008</u>, whereas the retroactive modification under which the Settlement Agreement, when and if it becomes effective, would convey the Anchor Award to JPMC <u>as of September 26, 2008</u>, one day later. Making the Settlement Agreement effective one day earlier could open up the Settlement Agreement to challenge in the Delaware Bankruptcy Court as a prepetition voidable transfer of valuable property rights from WMI and WMII to the other parties to the Settlement Agreement.[48]

### VIII.    Tax Accounting Rules for Recognition of Income from Litigation Awards

44.    Under the accrual method of accounting, employed by WMU and JPMC for federal income tax purposes, income generally must be recognized when "all events" have occurred which fix the right to receive the income or the amount of the income can be determined with reasonable accuracy.  26 CFR §1.446-1(c)(1)(ii). This means that taxpayers may be required to recognize income in a tax year earlier than when they collect the accrued income in cash. This also means that uncertainty over ownership of an income item may defer the time for accrual of the income. These rules must be applied by an accountant preparing an income tax return.

45.    When a tax preparer is evaluating when to report taxable income from a litigation award, the tax preparer must consider *H. Liebes & Co. v. Comm'r.,* 90 F.2d 932 (9th Cir. 1932). This tax case addresses the time at which an accrual basis taxpayer must recognize income for federal income tax purposes of a litigation award against the United States that was subject to possible appeal. At the time the Ninth Circuit decided *Liebes,* the rule of present <u>26 CFR § 1.446-1</u>(c)(1)(ii) was provided by *Lichtenberger-Ferguson Co. v. Welch,* 54 F.2d 570, 572 (9th Cir. 1931), which stated as follows:

> "Under the accrual system of accounting, where an item is definitely ascertained as to its amount, and acknowledged to be due, it has 'accrued.' To quote from the decision of the United States board of Tax Appeals in the case of *Appeal of Clarence Schock,* 1 BTA 528, 'Under such system of accounting receipt of income – actual or constructive – is not essential to constitute income within the statutory definition of income. Under an accrual system of accounting one accrues income, he does not receive it. Under the receipts and disbursements method, one receives income and does not accrue it.'"[49]

46.     The *Liebes* case concerned damages assessed against the United States that a California District Court had awarded to owners of vessels used in sealing operations, when the owners were citizens of the United States. After the United States had purchased Alaska from the Russian empire in 1867, the two countries divided jurisdiction over the taking of seals in the Bering Sea, with each government taking the position that its jurisdiction extended beyond three miles from their respective coastlines. An arbitration panel decided later that the United States had no jurisdiction beyond the three-mile limit. The Act of June 7, 1924, 43 Stat. 595 (28 USCA §52) provided that a California District Court could hear and determine claims against the United States for damages incurred in 1886 to 1896 resulting from the seizure, detention, sale, or interference, outside the three-mile limit, with sealing vessels owned by United States citizens.

47.     Between the time the United States seized the taxpayer's vessel and the time the California Court awarded damages to the taxpayer, the States ratified the 16th Amendment to the United States Constitution, allowing passage of the Revenue Act of 1913 and subjecting to federal income tax income reportable after March 1, 1913.

48.     The *Liebes* case addresses whether the income from the damages awarded to Liebes was attributable to the tax year in which the taxpayer incurred the damages (i.e., prior to the effective date of the Revenue Act of 1913), or in the tax years when the trial court entered judgment in favor of the taxpayer, or in the tax year the appeal period lapsed and the United States paid the damage award.

49.     As to whether the income accrued prior to the effective date of the Revenue Act of 1913, the Court of Appeals cited *United States v. Safety Car Heating & Lighting Co.*, 297 US 88 (1936), which held that the recovery after March 1, 1913 for damages the taxpayer incurred for patent infringement were taxable with respect to infringement occurring both before and after March 1, 1913.

25

This means that income does not accrue for tax purposes when the damages were incurred, but rather when the taxpayer prevails on litigation to recover the damages.

      50.     As to whether the income from the damages awarded to Liebes was attributable to the tax year in which the judgment was entered, the Court of Appeals stated, "It is clear that where a claim exists, no income may accrue, in the absence of a settlement, so long as a judgment has not been entered."[50] The Court of Appeals stated as follows regarding when the income is accruable for federal income tax purposes during the period when an appeal may be taken:

> "Approaching the other end of the process of litigation, we have for consideration the case where the claim has been reduced to judgment but an appeal has been taken. *United States v. Safety Car Heating & Lighting Co.*, 297 US 88, 99 (1936), we believe establishes the rule, namely that no income accrues until the appeal is determined. [Citations in footnote.][51]"

> "As to the situation lying between the two mentioned, that is where judgment is entered, and no appeal has been taken, but the time within which an appeal might be taken has not expired, we find no cases directly in point. If appeal is taken, the right is not fixed until determination of the appeal; and if no appeal is taken, the right is fixed. We believe in the latter situation that the right becomes fixed on termination of the appeal time. This seems to coincide with the actual practice of the government, as shown by provisions regarding payment of judgments rendered against the United States. It is usually provided that payment will not be made until the time for appeal has expired. [Citations omitted.]"

> "With respect to the contention that the absence of an appropriation makes the right conditional, we believe that such fact does not affect the right, but the realization of the right. Even if the judgment remained unpaid, the right would not be impaired. But the absence of an appropriation, may be considered in connection with the condition in the general definition hereinabove mentioned, that there must be a reasonable expectancy that the right will be converted into money or its equivalent. ... It is inconceivable that Congress would go through the idle ceremony of enacting a statute authorizing the suits in question, an subsequently render it nugatory by the failure to make an appropriation. We believe that when the appeal time expired, there was a reasonable expectancy that the right would be converted into money."

      51.     In the case of the Anchor Award and awards in Winstar cases generally, my understanding is that the United States has set aside monies to satisfy final and nonappealable damage awards in the Winstar cases, and that no additional appropriation is required to pay such awards. Thus,

once the Anchor Award becomes final and nonappealable, there is not an uncertainty that the Anchor Award will be paid.

52.     However, the Asset Ownership Dispute raises uncertainty over whether "all events" have occurred which fix the right to receive the income. This uncertainty is addressed in the table in paragraph 75. In the *Liebes* case, there were three claims against the United States, one filed directly by the taxpayer (H. Liebes & Co.) and two others filed by the sole surviving director of a corporation dissolved in 1905 for nonpayment of state taxes. The sole surviving director, under California law, was the sole surviving trustee for the corporation and its stockholders. The latter two suits were, therefore, brought in the name of the sole surviving trustee.

53.     The taxpayer, H. Liebes & Co., was at all times the sole shareholder of the corporation. However, prior to the United States paying the judgment to the trustee for the corporation, certain persons filed intervening actions in state court, asserting that they had inherited stock in the corporation and had right to receive the proceeds. It was not until the following tax year that the state court resolved the stock ownership issue in favor of the taxpayer, H. Liebes & Co. The Board of Tax Appeals held as follows:

> "It was not until the litigation in the state courts was concluded that its right to any of the proceeds of the judgment was established. If the decision in the intervention suit had gone against the petitioner, it would be absurd to require accrual while that suit was pending and then allow a loss in the later year of termination of the suit."[52]

54.     However, regardless of possible deferral of the date for accrual of the income from the Anchor Award beyond August 2, 2010, there is no substantive difference in the conclusions of this report than if there were no Asset ownership dispute. In the event JPMC ultimately receives the dollar amount of the Anchor Award, WMB would still be required to report as income the fair market value of the Anchor Award at the time of transfer and JPMC would report as income the amount by which the Anchor Award exceeds that fair market value.

55.    Finally, a line of cases addressing the "anticipatory assignment of income" doctrine hold that the assignor of a contingent litigation claim is taxable on 100 percent of the amount realized by the assignee if the recovery on the transferred claim is certain at the time of transfer, but not where recovery on the claim is doubtful or contingent at the time of transfer.[53]  However, these cases deal with the assignment of income doctrine and not an amount realized as proceeds in a taxable purchase and sale of assets.  Each of these cases involves assignment of a litigation claim in a nontaxable transfer and not in a taxable sale or exchange.  On the other hand, *Jones v. Comm'r.*, 306 F.2d 292 (5th Cir. 1962), involved a taxpayer's *sale* of an unresolved and contingent litigation claim to a related corporation for a sum of money and the corporation's assumption of certain unpaid tax liabilities of the seller.  The Court of Appeals stated that the trial court's opinion in the litigation (even though appealed by the defendant) "settled those contingencies [i.e., Jones' right to the litigation proceeds], but until so settled they were real, vital and active." *Jones*, 306 F.2d at 303.  The Internal Revenue Service has stated that this *Jones* opinion can be read as "setting a standard that a judgment of a lower court results in the taxpayer having 'earned' income under the assignment of income doctrine."  However, the Internal Revenue Service believes that such a reading is not required,[54] and I make my analysis in this report without reading *Jones* as triggering assignment of income when a plaintiff assigns a claim after a trial court decision.  I base my analysis solely on sale or exchange treatment in a taxable transfer, consistent with the transaction documents and how Anchor's counsel described the transaction. *See*, section VI and footnote 46, *supra.*

IX.    Tax Accounting Rules for Backdating and Other Retroactive Transactions

56.    A central feature of the United States income tax system is the collection of tax annually, pursuant to which taxpayers must account for their taxable income each tax year, based on the transactions that have occurred during that year.  The United States Supreme Court stated in 1931

that "[a]ll revenue acts which have been enacted since the adoption of the Sixteenth Amendment have uniformly assessed the tax on the basis of the annual returns showing the net result of all the taxpayer's transactions during a fixed accounting period, either the calendar year, or, at the option of the taxpayer, the particular fiscal year which he may adopt." *Burnet v. Sanford & Brooks Co.,* 272 US 359 (1931).

57.     There is a body of administrative rulings and published court cases addressing a taxpayer's ability to retroactively amend or recast transactions previously entered into in computing the taxpayer's taxable income for an annual income tax accounting period.  These cases fall into three general categories:  (a) cases addressing rescission; (b) cases addressing retroactive amendments of contracts; and (c) cases addressing backdating of documents.  A certified public accountant who prepares an income tax return involving these issues is required by professional and Treasury Department standards to consider these cases.

58.     As to rescissions, the established rule is that a transaction in a particular tax year will be disregarded for federal income tax purposes provided that, during the same tax year, the parties to the transaction rescind the transaction and restore the parties to the respective economic positions before they undertook the transactions.  This is consistent with the annual accounting period, which requires that the tax consequences of a transaction be based upon the facts as they exist at the end of the taxable year in which the transaction occurred.[55]

59.     Retroactive modifications of contracts can be accomplished by agreement of the parties or by reformation, in the latter case by order of a court.  Similar to the tax treatment of rescissions, a retroactive modification or retroactive reformation will be given retroactive effect for federal income tax purposes only if accomplished in the same tax year as the original transaction.[56]

60.     Backdating is relevant to the Anchor Award because the body of the tax authorities in the backdating area is consistent with the tax authorities in the rescission and retroactive amendment areas.  Cases in the backdating area generally hold that backdating will be given retroactive

effect for federal income tax purposes only if the date of actual signing and the back-dated date fall in the same tax year.[57]

61.    Thus, if the Settlement Agreement ultimately becomes effective in 2011, it cannot become retroactive for federal income tax purposes to either 2008 or 2010. If the Settlement Agreement ultimately becomes effective in 2010, it cannot be become retroactive for federal income tax purposes to 2008, but it may become retroactive to 2010. The latter case would result in a sale by WMB of the Anchor Award to JPMC during 2010, with WMB reporting taxable income based on the fair market value at the date of sale, and subject to offset by tax losses available to offset income of WMB.

X.    Tax Accounting Rules for Sellers and Buyers of a Trade or Business

62.    The Internal Revenue Code defines an "applicable asset acquisition" as any acquisition of assets that constitutes a trade or business and for which the buyer's basis is determined wholly with respect to the consideration paid for the assets.[58] In an applicable asset acquisition, the buyer determines its cost basis in the individual assets acquired and the seller determines the proceeds realized from the sale of the individual assets sold by the residual allocation method.[59]

63.    Under the residual allocation method, the buyer allocates its aggregate acquisition cost and the seller allocates its aggregate amount realized to the following classes of assets in the following order, to the extent of the aggregate of the fair market values of the assets in each class:

Class I - Cash and general deposit accounts (including savings and checking accounts) other than certificates of deposits held in depository institutions.

Class II – Actively traded personal property, certificates of deposit and foreign currency.

Class III – Assets that the taxpayer marks to market at least annually for federal income tax purposes and

most debt instruments (including accounts receivable).

Class IV – Stock in trade or other property includible in the inventory of the taxpayer or other property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business.

Class V – All assets other than those in classes I, II, III, IV, VI and VII.

Class VI – All intangible assets except goodwill and going concern value.

Class VII – goodwill and going concern value.

64.     The buyer must report its allocations of the basis of property acquired on IRS Form 8594 filed with the buyer's federal income tax return for the year of the acquisition. The seller must report its allocations of the sales proceeds of property sold on IRS Form 8594 filed with the seller's federal income tax return for the year of the acquisition.[60] Neither the Code nor the regulations require that the buyer's and the seller's respective Forms 8594 agree.

65.     IRS Technical Advice Memorandum 9650002 (December 13, 1996) requires that a buyer allocate basis to all assets acquired including assets that are contingent, based on the fair market value of those assets including any that are contingent. The contingent asset acquired in the Technical Advice Memorandum was a right to receive excess pension funds in the pension plan maintained by the acquired corporation. The IRS examining agent argued that the excess pension funds was not an asset of the acquired corporation at the time of the acquisition, and, accordingly, that the buyer should not have allocated tax basis to that right.[61] The Technical Advice memorandum held that "[t]he potential right to receive the excess pension funds was properly treated as an asset at the time of the acquisition. It had real economic value to the acquiring corporation at that time. The possibility that the government might have refused permission did not affect its status as an asset. The possibility of termination made the potential right a contingent asset." *See also,* IRS Field Service Advice 1998 WL 1984330 (February 19, 1998), reaching a similar conclusion.

66.    Thus, contingent assets are assets that are sold by the seller and purchased by the buyer in an applicable asset acquisition. The Purchase and Assumption Agreement created an applicable asset acquisition on September 25, 2008. If the Anchor Award was sold pursuant to the Purchase and Assumption Agreement, it was a contingent asset that had a fair market value and was sold and purchased in the transaction at fair market value.

### XI.    Tax Accounting Treatment for Receivers of Corporate Taxpayers

67.    As the receiver of WMB, the FDIC is obligated to file tax returns on behalf of WMB, on the same tax forms and in the same manner as WMB would have filed such forms in the absence of the commencement of the receivership. 26 USC §6012(b)(3) provides as follows:

> "In a case where a receiver, trustee in a case under title 11 of the United States Code, or assignee, by order of a court of competent jurisdiction, by operation of law or otherwise, has possession of or holds title to all or substantially all the property or business of a corporation, whether or not such property or business is being operated, such receiver, trustee, or assignee shall make the return of income for such corporation in the same manner and form as corporations are required to make such returns.[62]

68.    Although the commencement of a proceeding under title 11 creates a separate legal entity under 11 USC §541, 26 USC §1399 provides that no taxable entity separate and apart from the debtor's prepetition tax entity is created by the commencement of the bankruptcy case of any debtor that is not a natural person. This rule applies to corporate debtors, partnership debtors, and debtors that are limited liability companies. Thus, the debtor or trustee of the corporate debtor continues to be obligated to file federal tax returns as if the bankruptcy case had not commenced. The commencement of a title 11 case for a corporate debtor (a) does not cause a short tax year or affect the corporation's taxable year,[63] (b) does not impact the ability of the corporate tax entity to be included in a consolidated federal income tax return,[64] or (c) its status as an S corporation pass-through tax entity.[65]

69.     The Internal Revenue Code authorizes affiliated groups to file consolidated federal income tax returns. 26 USC §1501 provides that "an affiliated group of corporation shall ... have the privilege of making a consolidated return with respect to the income tax imposed by [the Internal Revenue Code] for the taxable year in lieu of separate returns." The Secretary of the Treasury has promulgated regulations that allow a parent holding company to file a consolidated tax return as agent for its subsidiaries.[66]

70.     The commencement of a receivership of a subsidiary does not cause a disaffiliation of the parent corporation from the ownership of the subsidiaries for consolidated return purposes.[67] Similarly, the solicitation or receipt of acceptances to a plan of reorganization in a title 11 or similar case does not create a deemed equity option that would cause a disaffiliation of a subsidiary from an affiliated group filing a consolidated return for tax purposes.[68]

71.     Therefore, the FDIC, as receiver of WMB, will continue to be included, as the continuation of the corporate tax existence of WMB, in the consolidated federal income tax return filed by WMI until such time as a disaffiliation event occurs. There is no evidence that such event has occurred, through August 2, 2010, or through the August 26, 2010 date of this report. Accordingly, the taxable income from the Anchor Award, be it from sale in 2008, sale in 2010, or recognition as accrued income on August 2, 2010, that must be reported for federal income tax purposes by WMB will be subject to offset by tax losses I have estimated in Exhibit 6 to this report.

## XII.    Analysis

72.     The easiest way to explain the tax consequences is by way of analogy. Simply speaking, the boat left the tax dock on August 2, 2010, when the period for seeking the *writ of certiorari* for the Anchor Award lapsed. The issues are whether JPMC was on the boat on August 2, 2010, and, if it was, how it got on the boat. If JPMC was on the boat, it got there by purchase and not by a nontaxable

33

reorganization. There is no question about this. The purchase triggers a gain on sale to WMB at fair market value for the Anchor Award, measured at the date of purchase. If JPMC was not on the boat as of August 2, 2010, then 100 percent of the accrued income from the Anchor Award must be recognized by WMB as of August 2, 2010, and none of it by JPMC.

73.    Based on my analysis in Sections V and XI and Exhibit 6 of this report, I believe that the tax losses available to offset all or any portion of the Anchor Award as may be recognized by WMB in 2008 or 2010 far exceed the amount of the Anchor Award, by such a wide margin that further investigation and analysis is not required.   I am not aware of any limitations on these losses that would restrict the ability to offset additional income at least equal to the Anchor Award.  As stated by the Court of Federal Claims (see, paragraph 5 and Exhibit 2 to this report), the availability of tax losses reduces the rate of tax for purposes of computing the Tax Gross-Up.

74.    The magnitude of losses available to WMI, WMII, and WMB is such that it is inconceivable that the recognition of taxable income from the Anchor Award would cause WMI, WMII, WMB, or any member of their affiliated tax group or groups to incur incremental tax liability in the future.

75.    There are eight potential tax scenarios for the treatment of the taxable income from the Anchor Award, as follows, none of which result in the Tax Gross-up Award sought by Anchor:

| Did JPMC acquire Anchor Award under Purchase and Assumption Agmt.? | Did JPMC acquire Anchor Award under Settlement Agreement? | Did the Asset Ownership Dispute defer date for accruing the Anchor Award beyond Aug. 2, 2010? | Portion of Anchor Award taxed to WMB and offset by tax losses available to WMB | Portion of Anchor Award taxed to JPMC |
|---|---|---|---|---|
| No | Yes, but not until 2011 | No | 100% | 0% |
| No | Yes, but not until 2011 | Yes | 100% | 0% |
| No | Yes, in 2010 | No | Based on fair market value at 2010 date | Based on 100 percent minus fair market value at 2010 date |
| No | Yes, in 2010 | Yes | 100%, since Settlement Agmt. effective after August 2, 2010 | 0% |
| Yes | Not applicable | No | Based on fair market value at 2008 date | Based on 100 percent minus fair market value at 2008 date |
| Yes | Not applicable | Yes | Based on fair market value at 2008 date | Based on 100 percent minus fair market value at 2008 date |
| No | No (assumes Settlement Agmt. never becomes effective and WMB continues to own the Anchor Award) | No | 100% | 0% |
| No | No (assumes Settlement Agmt. never becomes effective and WMB continues to own the Anchor Award) | Yes | 100% | 0% |

76.     If JPMC would not have perfected its ownership for tax purposes as of

September 25 in the Anchor Award, then the granting of ownership to JPMC of the Anchor Award,

retroactive to September 26, 2008 pursuant to the Settlement Agreement, will be treated for federal

income tax purposes as occurring no earlier than the Settlement Agreement becoming effective for

federal income tax purposes.  This is based on my analysis in Section IX of this report.

77.     Although counsel for Anchor has asserted that JPMC did perfect its ownership

for tax purposes as of September 25 in the Anchor Award, such assertion is inconsistent with the need

35

to institute litigation over the ownership of the Anchor Award and the need to grant ownership of the

Anchor Award to JPMC as of <u>September 26</u> pursuant to the Settlement Agreement.[69]

78.    Anchor seeks additional damages of $63,191,000, pursuant its Motion on

Remand for Correction of Award of Mitigation Damages (June 11, 2010). This relates to earnings of RFC

during 1996 and 1997, which the Court of Federal Claims did not award as lost profits due to an issue of

proof and a change in RFC's business plan.[70] As a general rule, a recovery of capital would include a

reimbursement to a taxpayer for a nondeductible expenditure, including an acquisition of a capital asset

such as stock, but, under the March 14, 2008, opinion of the Court of Federal Claims, does not include

retained earnings attributable to periods before the purchase of the capital asset.   I provide the analysis

in Exhibit 4 to assist the Court of Federal Claims in determining whether, if it awards any part of the

$63,191,000 as additional damages, such additional damages should be treated as a recovery of lost

capital for which Anchor should be entitled to a tax gross-up.

79.    Should the Court of Federal Claims determine that the $63,191,000 should be

treated as a recovery of lost capital for which Anchor should be entitled to a tax gross-up, the

$63,191,000 would be reportable for tax purposes by WMB and none would be reportable by JPMC if an

award of the $63,191,000 becomes final and nonappealable prior to the tax year in which the

Settlement Agreement becomes effective or if the Settlement Agreement ultimately does not become

effective. On the other hand, if the Settlement Agreement becomes effective on or before the end of

the tax year in which the award of the $63,191,000 becomes final and nonappealable, then WMB would

have income from selling the $63,191,000 at fair market value on the date of sale for federal income tax

purposes, and the taxable income reportable by JPMC would be the remainder of the award.

36

### XIII. Conclusion

80.     The Court's standard for awarding the Tax Gross-Up is that it must be able to determine to a reasonable certainty the rate at which the Anchor Award would be taxed and/or the tax year for which plaintiff would pay income tax on the Anchor Award. If the Court is unable to determine these facts to a reasonable certainty, the Court has stated that it would allow the Plaintiff to petition for the Tax Gross-Up Award when the reasonable certainty criterion is met.

81.     In my opinion, it is clear that reasonable certainty is lacking as to the timing and amount of any tax that either the FDIC, as receiver for WMB, or JPMC should pay on account of the Anchor Award. The amounts that will be paid, if any, are dependent upon whether the Settlement Agreement ultimately becomes effective, when it becomes effective, and whether it is amended prior to becoming effective. If the Settlement Agreement does not become effective until 2011, then, in my opinion, no income tax on account of the Anchor Award will be paid by the taxpayer (WMB) that is required to report the entire Anchor Award as taxable income. If the Settlement Agreement becomes effective in 2010, the amount of income tax paid attributable to the Anchor Award will be materially less than the amount computed by Anchor in its Rule 60(b) Motion for Award of a Tax Gross-Up.

82.     Even if the Settlement Agreement were unnecessary to perfect JPMC's claim that it purchased the Settlement Agreement, Anchor's request for a gross-up is incorrect because it ignores the fact that such purchase would be a taxable transaction, in which WMB would have recognized gain on selling the Anchor Award for its fair market value on September 25, 2008, and the amount of income JPMC would recognize on August 2, 2010, would be the amount of the Anchor Award minus the fair market value of the Anchor Award on September 25, 2008. The gain recognized in that case by WMB would be equal to the fair market value of the Anchor Award on September 25, 2008, and would be sheltered by the tax losses available to WMB. Incorrectly, Anchor's claim for a gross-up characterizes 100 percent of the taxable income from the Anchor Award as reportable by JPMC.

83.     Anchor's counsel has stated that JPMC did not allocate any of its purchase price to the Anchor Award. If JPMC acquired the Anchor Award on September 25, 2008, it should have assigned some of the purchase price to it at the time it prepared and filed its 2008 federal income tax return. The fact that it did not in an indicia that JPMC did not believe that it owned the Anchor Award on September 25, 2008.

84.     As to the $63,191,000 additional damages Anchor is seeking pursuant to its motion of June 11, 2010, these additional damages, if awarded by the Court of Federal Claims, should entitle Anchor to a tax gross-up only if the $63,191,000 represents a recovery of lost capital and not a recovery of lost profits. *See,* Exhibit 4.

85.     As to the $63,191,000 additional damages Anchor is seeking pursuant to its motion of June 11, 2010, it is clear that reasonable certainty is lacking as to the timing and amount of any tax that either the FDIC, as receiver for WMB, or JPMC should pay on account of Anchor's requested $63,191,000. The amounts that will be paid, if any, are dependent upon whether the Settlement Agreement ultimately becomes effective, when it becomes effective, whether it is amended prior to becoming effective, what the fair market value of the contingent $63,191,000 might be at the date when the claim would be treated as having been purchased and sold for federal income tax purposes, and when any award of the $63,191,000 might become final and nonappealable.

86.     Anchor's calculations of the tax gross-up relating to the $63,191,000 also are incorrect, in that they ignore the fact that, if JPMC is entitled to the $63,191,000 claim, it acquired the claim in a taxable purchase, in which WMB would have sold the claim to JPMC at fair market value on the date acquired. Anchor's computations incorrectly assume that 100 percent of the taxable income from the $63,191,000 would be taxable to JPMC, when in fact part of the income would be attributable to WMB based on the fair market value at the purchase and sale date.

## XIV.    List of Exhibits

87.     I incorporate the following Exhibits into this report:

Exhibit 1    -  Timeline of Key Events Regarding Tax Reporting of the Anchor Award

Exhibit 2    -  June 27, 2008, Order of the Court of Federal Claims

Exhibit 3    -  Summary of Litigation Among Certain Stakeholders and Settlement Agreement

Exhibit 4    -  Whether $63,191,000 Sought by Anchor as Alleged Additional Damages, Pursuant to its

Motion on Remand for Correction of Award of Mitigation Damages (June 11, 2010), Would

Be a Recovery of Lost Capital or a Recovery of Lost Profits

Exhibit 5    -  Plaintiff's Responses to Discovery Requests and to Defendant's Motion for Enlargement of

Time to File Response to Plaintiff's Rule 60(b) Motion for Award of a Tax Gross-Up

Exhibit 6a   -  Estimate of Possible Tax Losses of WMI, WMB, and WMII Available to Shelter the Anchor

Award

Exhibit 6b   -  Estimated Plan Assets to WMI and WMB per Settlement Agreement

Exhibit 7    –  Curriculum Vitae and Statement of Prior Testimony of Kenneth J. Malek; Hourly Rate of

Compensation

Exhibit 8    -  Documents Relied Upon

Respectfully submitted,

_Kenneth J. Malek_

---

[1] Statement on Standards for Tax Services No. 1, Paragraph 4, American Institute of Certified Public Accountants
(November 2009).
[2] 26 USC §6694(a).

[3] 26 USC §6662(d)(2)(B)(ii).

[4] Order Correcting Clerical Mistake Pursuant to RCFC 60(a), July 16, 2008.

[5] Case 1:95-cv-00039LB, document 309, dated March 10, 2010 and issued as a mandate May 3, 2010. The Court of Appeals affirmed in part and remanded in part. The only part remanded was to determine whether any correction was required in the trial court's opinion relating to a possible "double counting" of certain mitigation costs. The Court of Federal Claims was affirmed in all other respects.

[6] Rules of the Supreme Court of the United States, Part III. Jurisdiction of *Writ of Certiorari*, Rule 13, Review of *Certiorari*: Time for Petitioning. Unless otherwise provided by law, a petition for a writ of certiorari to review a judgment in any case, civil or criminal, is timely when it is filed with the Clerk of the U.S. Supreme Court within 90 days after entry of the judgment by the lower court. Depending upon the facts relating to the United States evaluating the possibility of seeking a *writ of certiorari*, it is possible that the time for accruing the income from the Anchor Award would be earlier than August 2, 2010, but in no case earlier March 10, 2010. *See, Fifth Avenue Coach Lines, Inc., v. Comm'r.*, 31 TC 1080, 1003 (1959)("[t]he petitioner's liability in the instant case established by this Court's decision was substantially fixed and unconditional in the year 1948 because it was extremely unlikely that the decision would be appealed").

[7] FDIC Order Number 2008-36, http://files.ots.treas.gov/680024.pdf.

[8] In the IRS Tax Form 8594, Asset Acquisition Statement, of JPMC furnished through discovery, JPMC answers "No" to question 5, "Did the purchaser and seller provide for an allocation of the sales price in the sales contract or in another written document signed by both parties?" See, Forms 8594, attached as part of Exhibit 5.

[9] Purchase and Assumption Agreement, page 6.

[10] *Ibid.*, page 1.

[11] 11 USC §547; Professor Grant W. Newton, *Bankruptcy and Insolvency Accounting,* Volume One, Practice and Procedure, 6th ed. 2000, page 190, *et seq.* The provisions of 11 USC §547 are intended to prevent disruption of the an insolvent debtor's prepetition operations by creditors rushing to have repayment of their receivables from the debtor preferred as to payment over other creditors, by leveling the playing field among creditors who do versus do not receive preferential payments within the recovery period for preferences. The recovery period is 90 days from unaffiliated creditors and one year from creditors who are insiders of the debtor. The mechanism for leveling the playing field is to allow the trustee or debtor in possession to recover payments from creditors who received more during the recovery period than they would have received in liquidation, then place the recovered amounts in the general pot to be distributed pro rata among creditors by order of priority by class of claims.

[12] Voluntary Petition of Washington Mutual, Inc., NY2:1920667\03\155ZV03IDOC\79831.0003; Motion of Debtors for Order Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure, NY2:\1919737\08\155@108I.DOC\79831.0003, RLF1-3327427-1; Order Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure, NY2:\1919737\08\155@108I.DOC\79831.0003, RLF1-3327427-1;

[13] Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, Exhibit H. Dated July 1, 2010. X:\NRPORTBL\US_ACTIVE\DIBLASIK\43435105_4.DOC.

[14] May 21, 2010 Settlement Agreement, Section 2.12(b).

[15] May 21, 2010 Settlement Agreement, Sections 7.2 and 7.3.

[16] Agreed Order Directing the Appointment of an Examiner. US_ACTIVE:\43452719\06\79831.003

[17] Plaintiff's Rule 60(b) Motion for Award of a Tax Gross-Up, Case 1:95-cv-00039-LB, document 321, Filed June 11, 2010, pages 7 and 8.

[18] *Ibid.*, page 4.

[19] United States Court of Federal Claims, Plaintiff's Motion on Remand for Correction of Award of Mitigation Damages, June 11, 2010, pages 4-5.

[20] Plaintiff's Opposition to Defendant's Motion for Enlargement of Time to File Response to Plaintiff's Rule 60(b) Motion for Award of a Tax Gross-up, page 3.

[21] Plaintiff's Objections and Responses to Defendant's Revised Request for Supplementation of Defendant's First Phase II Case-Specific Requests for production of Documents, page 7, responses to request nos. 11, 12 and 13.

[22] *See,* discussion in footnote 32, *infra,* and accompanying text.

[23] Based on the facts described in paragraph 10 of this report and typical scope of due diligence by parties attempting to settle litigation, it is reasonable to assume that JPMC has possession of substantial information relating to tax losses, loss carrybacks, and remaining loss carryforwards of WMB, WMI, and/or WMII. In its complaint filed March 24, 2009, captioned JPMC v. WMI and WMII, Adversary Pro. No. 09-5-551(MFW), in the Delaware Bankruptcy Court, JPMC states as follows: "81. U.S. federal and state income tax refunds, substantially all of which are expected to be attributable to WMB and its subsidiaries, are expected for the 2008 tax year and for tax years prior to 2008 relating to overpayments of taxes by the WaMu Group to the various state taxing authorities. 82. For the 2008 tax year, the WaMu Group is expected to have a variety of tax attributes such as net operating losses, net capital losses and excess tax credits, and a substantial portion of such tax attributable are expected to be attributable to the operations of WMB and its subsidiaries. The WaMu Group expected to be able to carry back these favorable tax attributes to prior tax years, where such carrybacks will result in additional U.S. federal and state income tax refunds for such prior tax years. 83. All facts and circumstances necessary to determine the amount of U.S. federal and state tax refunds for WMB and for any of WMB's subsidiaries are fixed and determinable." It is possible that JPMC obtained documentation regarding these matters through discovery and that the information obtained is subject to confidentiality.

[24] Anchor Savings Bank, FSB, v. United States, 2008-5175, -5182 (Fed. Cir., March 10, 2010)

[25] United States Court of Federal Claims. Anchor Savings Bank, FSB, v. The United States of America (No. 95-39C) Opinion and Order. Dated March 14, 2008. Pg. 92.

[26] *Ibid.*

[27] *Ibid.*

[28] Order Correcting Clerical Mistake Pursuant to RCFC 60(a), July 16, 2008.

[29] *Anchor Savings Bank, FSB, v. United States*, 81 Fed. Cl. 1, 153 (2008).

[30] Case 1:95-cv-00039LB, document 309, dated March 10, 2010 and issued as a mandate May 3, 2010. The Court of Appeals affirmed in part and remanded in part. The only part remanded was to determine whether any correction was required in the trial court's opinion relating to a possible "double counting" of certain mitigation costs. The Court of Federal Claims was affirmed in all other respects.

[31] Rules of the Supreme Court of the United States, Part III. Jurisdiction of *Writ of Certiorari*, Rule 13, Review of *Certiorari*: Time for Petitioning. Unless otherwise provided by law, a petition for a writ of certiorari to review a judgment in any case, civil or criminal, is timely when it is filed with the Clerk of the U.S. Supreme Court within 90 days after entry of the judgment by the lower court.

[32] The debtors in the *In re ASARCO* chapter 11 case had won an $8.4 billion trial court fraudulent conveyance award against their Mexican parent corporation, after which the debtors conducted an auction of the judgment. The auction process attracted seven offers from unrelated third parties. ASARCO retained Professor Kenneth Klee to provide a report and testimony regarding his determination of the value to creditors of the $8.4 billion litigation award. After weighing the merits of arguments the parties could make on appeal, Professor Klee opined that the $8.4 billion award had a value ranging from $400 million to $2.9 billion, with a weighted midpoint of $800.0 million. The third-party bids, which reflected actual indications of market value of the judgment, ranged from $850 million (roughly the mid-point of Professor Klee's values) on the high end to a low of $400 million (the low end of Professor Klee's values). Final Proffer of Professor Kenneth N. Klee in Support of Confirmation of the Sixth Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the United States Bankruptcy Code, as Modified, filed August 15, 2009, Case 05-21207, Document 12041, Filed in TXSB on July 21, 2009. During the pendency of the appeal period, the creditors realized approximately $1.5 billion from the trial court's litigation award, through the Mexican parent's agreeing to fund a plan of reorganization in which the creditors (including unsecured prepetition creditors) would be paid 100 cents on the dollar. https://ecf.txsb.uscourts.gov/doc1/178020427555. For a recent article addressing purchases and sales of litigation claims, *see*, http://money.cnn.com/2009/05/04/magazines/fortune/demos_litigation.fortune/index.htm.

[33] *See,* June 27, 2008 Order, attached as Exhibit 2.

[34] $12.6 lost capital damages prior to gross-up divided by one minus the combined tax rate = $12.6 million ÷ (1−.37) = $20.0 million lost capital damages after the tax gross-up.

[35] All corporate taxable income is taxed at 35% when 2010 taxable income exceeds $335,000.

[36] "Tax Refunds" are defined at page 2 of the Disclosure Statement for the Fifth Amended Plan as: "approximately $5.5 to $5.8 billion in tax refunds, including interest through a projected future date of receipt and net of tax payments estimated to be owed to certain taxing authorities ... that the Debtors believe are owed to WMI, as the common parent of a consolidated or combined tax group, which the case may be, for federal and state income tax purposes, comprised of WMI and WMB, among other subsidiaries ... ."
C:\NRPORTBL\US_ACTIVE\SAPEIKAT\43338029_44.doc, page 2.

[37] C:\NRPORTBL\US_ACTIVE\SAPEIKAT\43338029_44.doc, page 10.

[38] WMI Monthly Operating report for June 2010, July 28, 2010, Note 6: Taxes.

[39] C:\NRPORTBL\US_ACTIVE\SAPEIKAT\43338029_44.doc, pages 142 to 147.

[40] Disclosure Statement for Fifth Amended Plan, page 136.

[41] Plaintiff's Opposition to Defendant's Motion for Enlargement of Time to File Response to Plaintiff's Rule 60(b) Motion for Award of a Tax Gross-up, page 3.

[42] Plaintiff's Objections and Responses to Defendant's Revised Request for Supplementation of Defendant's First Phase II Case-Specific Requests for Production of Documents, page 7, response to document request nos. 11, 12 and 13.

[43] Ibid., page 8, response to document request no. 15.

[44] And the rate of tax.

[45] And the rate of tax.

[46] See, June 27, 2008 Order, attached as Exhibit 2.

[47] Disclosure Statement to Fifth Amended Plan, Page 2.

[48] See, discussion in footnote 11, supra.

[49] The court in Liebes also cited Lucas v. North Texas Lumber Co., 281 US 11, 13 (1930) (income does not accrue until there is "unconditional liability" on behalf of a party to pay the income to the taxpayer); Continental Tie & L. Co. v. United States, 286 US 290, 295 (1932) (income accrues when there is a "right to payment"); Spring City Foundry Co. v. Comm'r., 292 US 182, 194 (1934) ("[k]eeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive becomes fixed, the right accrues").

[50] The Court of Appeals cited Lucas v. American Code Co., 280 US 445 (1930); North American Oil Consol. V. Burnet, 286 US 417, 423 (1932); United States v. Safety Car Heating & Lighting Co., 297 US 88, 99 (1936); and other lower court decisions.

[51] Compare, Comm'r v. Brown, 54 F.2d 563 (1st Cir. 1931); Comm'r. v. John Thatcher & Son, 76 F.2d 900, 902 (2d Cir. 1935); Comm'r. v. Southeastern Express Co., 56 F.2d 600 (1932); J.N. Pharr & Sons v. Comm'r, 56 F.2d 832 (1932); Central Trust Co. v. Burnet, 45 F.2d 922, 923 (App. D.C. 1930).

[52] H. Liebes & Co. v. Comm'r., 34 BTA 677 (1936).

[53] See, Doyle v. Comm'r., 147 F.2d 769 (4th Cir. 1945) (assignor taxable on full proceeds realized by his spouse and children where the Court of Claims had denied application of r a new trial and the U.S. Supreme Court had denied certiorari prior to the transfer); Cold Metal Process Co. v. Comm'r., 247 F.2d 864 (6th Cir. 1957), rev'g 25 TC 1333 (1956) (corporate assignor who transferred litigation claims to a charitable trust in complete liquidation held not taxable on the full proceeds realized by the charity since the transfer occurred at a time when the defendant was still exercising its appeal rights); Schulze v. Comm'r., TC Memo 1983-263 (attorney who sued his former law partnership and assigned a portion of the claim in the arbitration proceeding to his former spouse held taxable on only his portion of the eventual arbitration proceeds, since at the time of the assignment the arbitration remained in process).

[54] Private Letter Ruling 200107019 (November 16, 2000).

[55] Penn v. Robertson, 115 F.2d 167 (4th Cir. 1940) (a 1931 rescission of an employee stock benefit fund for 1931 and retroactive to 1930 was treated for tax purposes as retroactively void for 1931; however, for 1930, the annual accounting period principle required the determination of income based on facts in existence at the close of the 1930 taxable year, without regard to subsequent rescission event); Hutcheson v. Comm'r., 71 TCM 2425 (1996) (rescission doctrine not applicable even to attempted rescission in same tax year, because buyer and seller were not put back in the same economic position they would have occupied); Ripley Realty v. Comm'r., 23 BTA1247 (1931), aff'd per curiam 61 F.2d 1038 (2d Cir. 1932) (suit was for damages and not for a rescission, so

retroactive treatment denied); Rev. Rul. 80-58, 1980-1 CB 181 (no gain recognized on the sale of property when, in the year of sale, seller both accepts reconveyance of property and returns all of buyer's payments to buyer; the annual accounting aspect of the federal tax system requires that the tax consequences of a transaction be based upon the facts as they exist at the end of the taxable year; if a reconveyance occurs in a later taxable year, the seller must report the sale in the taxable year of sale and acquires a new basis in the property reacquired, equal to the amount paid by the seller); Rev. Rul. 74-501, 1974-2 CB 98 (no adjustment to stock basis required following a corporation's distribution of stock subscription rights with significant initial value, when corporation cancelled the subscriptions in the same tax year); Rev. Rul. 78-119, 1978-1 CB 278 (rescission of a corporate acquisition not given retroactive effective for tax purposes where dividends retained by the buyer during the period prior to the rescission). See also, *Mortimer L. Schultz v. Comm'r.*, 59 TC 559, 563 (1973)(seller who received unrestricted sales proceeds from transaction in year one, but had to return proceeds to the buyer in year 2, required to treat unrestricted sales proceeds as income in year 1); Technical Advice Memorandum 8323006 (February 28, 1983)(revision of prior year agreement, where all rights and obligations of the parties were retroactively restored to the time preceding the initial agreement, held to have prospective effect only for federal income tax purposes).
[56] For example, in *Sinopulo v. Jones*, 154 F.2d 648 (10th Cir. 1946), the taxpayer created trusts, which the state court found he intended to be irrevocable. Two years later his state of domicile passed a statute providing that every trust created under state law is revocable unless expressly made irrevocable by the trust agreement. A trust beneficiary instituted suit in state court to construe the trust as irrevocable. The state court reformed the agreements by substituting clarifying language and made the reformation retroactive and effective as of date when the taxpayer originally executed the trusts. The IRS claimed that the taxpayer was taxable on the trust income between the trust creation date and the date of the reformation, since revocable trusts are treated as grantor trusts the income from which is taxable to the grantor. The appellate court ruled that "While the judgment of the state court made the reformation of the trust retroactive and effective as of the date of execution, this could not affect the rights of the government under its tax laws. It is a general rule that as between parties to an instrument a reformation relates back to the date of the instrument, but as to third parties who have acquired rights under the instrument, the reformation is effective only from the date thereof." *Sinopulo v. Jones*, at 650. In *Estate of Hill v. Comm'r*, 64 TC 867 (1975), *acq* 1976-2CB 2, *aff'd in unpublished opinion* (5th Cir. 1978), the Tax Court followed the *Sinopulo v. Jones* case and included the trust corpus in the estate of Mr. Hill, even though the decedent arguably intended irrevocability and the estate argued that the possibility of reformation under state law should be given retroactive effect. In *George L. Barker v. Comm'r.*, 47 TCM 131 (1983), in 1979 a physician entered into an agreement with his partners to retroactively withdraw from his medical partnership, effective as of end of 1975. The Tax Court denied the treatment asserted by the IRS that would have taxed the doctor retroactively to 1975 on his relief from partnership indebtedness pursuant to the settlement, indicating that "consideration cannot be given to what may or may not happen in a subsequent year." 47 TCM at 135. In *Van Den Wymelenberg v. Comm'r.*, 272 F.Supp. 571 (E.D. Wis. 1967), *aff'd* 397 F.2d 443 (7th Cir. 1968), *cert den* 393 US 953, the principal issue raised was whether an amended trust agreement executed in a later year retroactively determined the tax consequences of an earlier year transaction. The Court of Appeals stated that "Federal tax liabilities would remain unsettled for years after their assessment if state courts and private persons were empowered to retroactively affect the tax consequences of completed transactions and completed tax years." A case that is clearly in the minority is *Flitcroft v. Comm'r.*, 328 F.2d 449 (9th Cir. 1964), which granted retroactive treatment across tax years, on the basis that the decree of state court adjudicated property rights, which then should be the basis for the federal tax consequences.
[57] See, e.g., *John N. Baird v. Comm'r.*, 68 TC 115, 128 (1977) and *Elizabeth L. Deyoe v. Comm'r.*, 66 TC 904, 908 (1976), holding that backdating will be allowed for tax purposes when backdating covered not more than four months and both the retroactive "as of" date and the date on which the transaction documents were executed fell into the same taxable year; *Dezendorf v. Comm'r.*, 312 F.2d 95 (5th Cir. 10965), *aff'g* 20 TCM 1480 (1961), holding that although the agreement recited that it was "effective as of January 1, 1953, and all transactions herein referred to shall, for all legal purposes, be treated as though they occurred January 1, 1953," a sale was not deemed to occur for tax purposes until the parties reached agreement in January 1954. However, in *Herbert E. Wiese v. Comm'r.*, 35 TCM 1641 (1976), an agreement for the sale of stock executed on October 18, 1971, reciting that it was "made and entered into as of July 1, 1971" was not given retroactive effective for purposes of

determining the buyer's long-term vs. short-term holding period for the stock. Another exception is *Edward C. James,* 16 TC 930 (1951), *aff'd per curiam* 197 F.2d 813 (5th Cir.), *cert den* 100 S. Ct. 450, in which backdating was evidence of the intent of the parties to never form a partnership, where the partnership interest were sold for a deferred payment note, on which the buyer never made payments, and the parties cancelled the notes two years later.

[58] 26 USC §1060(a).

[59] 26 USC §§1060 and 338(b)(5).

[60] 26 USC §1060(b); 26 CFR §1.1060-1(e).

[61] The premise of the examining agent's argument was that the acquired corporation did not have the right to receive the excess pension funds until it obtained permission from the government to terminate the pension plan. The taxpayer's request for technical advice described the contingent right as follows: "Federal law permits the sponsor of a qualified defined benefit pension plan to terminate the plan, buy annuities for each plan participant to insure payment of the amounts then deemed vested, and to recover any overfunded amounts remaining in the plan. If the plan is reestablished, as was done here, the reversion can be accomplished only with permission of the IRS and the Labor Department, and can be done only once in each 15 year period."

[62] *See also,* 26 CFR §1.6012-3(b)(4).

[63] Rev. Rul. 69-600, 1969-2 CB 241; 26 CFR §1.6012-2(a)(2); *Mrs. Grant Smith v. Comm'r,* 26 BTA 1178 *1932), *nonacq.*

[64] Rev. Rul. 63-104, 1963-1 CB 241. This applies irrespective of a bankruptcy trustee's refusal to execute or sign any otherwise-required forms or consents. *See,* 26 CFR §1.1502-75(h)(3). Although GCM 12207, CB XII-2, 83 (1933), mentioned in Rev. Rul. 63-104, was declared obsolete by CC-2003-005 (January 16, 2003), Rev. Rul. 63-104 continues to be cited as authority in private letter rulings. *See,* Private Letter Ruling 200843012 (October 24, 2008).

[65] *See, e.g., Mourad v. Comm'r,* 121 TC 1 (2003), aff'd 387 F.2d 27 (1st Cir. 2004).

[66] 26 CFR §1.1502-77.

[67] 26 USC §6012(b)(3) and Rev. Rul. Rev. Rul. 63-104, 1963-1 CB 241.

[68] 26 CFR §1.1504-4(d)(2)(vii).

[69] *See,* footnote 11 and accompanying discussion in the text, for the possible bankruptcy impact of making the Settlement Agreement truly retroactive to September 25, 2008, which effectively could unwind the entire Settlement Agreement by allowing WMI and WMII to challenge the validity of the Settlement Agreement in the Delaware Bankruptcy Court. The fact that the retroactive amendment to the Purchase and Assumption Agreement is not fully retroactive – i.e., it does not impact the parties rights on the date of the Purchase and Assumption Agreement – is an indicia that JPMC did not acquire for tax purposes the Anchor Award on the date of the Purchase and Assumption Agreement.

[70] United States Court of Appeals for the Federal Circuit. 2008-5175, -5182. Anchor Savings Bank, FSB, v. United States. Appeal Dated March 10, 2010. Pg. 26.