## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ANCHOR SAVINGS BANK, FSB,

        Plaintiffs,

        v.

UNITED STATES OF AMERICA,

        Defendant.

STEPHEN ROSENBAUM, FRANK E. WILLIAMS, Jr., COMPASS POINT PARTNERS LLC and LEGAL ALPHA LLC, on behalf of themselves and on behalf of all other similarly situated holders of Litigation Tracking Warrants of Dime Bancorp,

        Plaintiffs-Interveners,

        v.

UNITED STATES OF AMERICA,

        Defendant.

Civil Action No. No. 95-039C

(Judge Block)

Oral Argument Requested

---

## CONSOLIDATED REPLY OF PLAINTIFF-INTERVENORS STEPHEN ROSENBAUM, FRANK E. WILLIAMS, JR., COMPASS POINT PARTNERS AND LEGAL ALPHA LLC TO PLAINTIFF'S AND DEFENDANT'S OPPOSITION TO MOTION TO INTERVENE

# TABLE OF CONTENTS

Page

BACKGROUND ........................................................................................................1

    1.  Dime LTWs are Third Party Beneficiaries to 85% of the Net Economic Value
       of the Judgment in the *Anchor Savings* Litigation........................................................1

    2.  The PAA Creates a Second, Independent Contract Right for Benefit of the
       Intervener / Dime LTW Holders................................................................................5

    3.  Inability to Intervene Before Now ..........................................................................7

ARGUMENT.............................................................................................................9

I.    This Court has Jurisdiction under the Tucker Act over the Interveners' Claim as Third
    Party Beneficiaries to 85% of the Value of the Anchor Savings Award ..............................9

    A.  The Tucker Act ...................................................................................................9

         1.  General Principles..........................................................................................9

         2.  Third Party Beneficiaries ..............................................................................11

         3.  Equitable Relief ..........................................................................................13

         4.  Jurisdiction over Claims Against the FDIC .......................................................14

    B.  Discussion .......................................................................................................16

II.   Intervention is Proper Under Rule 24 .......................................................................17

    A.  Intervention as of Right......................................................................................17

    B.  Permissive Intervention......................................................................................18

CONCLUSION...........................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Ambase v. United States,*
    61 Fed. Cl. 794, 800 (Ct. Cl. 2004) ..................................................................13, 14, 15

*Capelouto v. United States,*
    99 Fed. Cl. 682, 693 ...........................................................................................................13

*D&H Distributing Co. v. United States,*
    102 F.3d 542 (CAFC 1996) ......................................................................................11, 12, 13

*First Hartford v. United States,*
    194 F.3d 1279 (CAFC 1999) .....................................................................................13, 14, 15

*FlexFab v. United States,*
    62 Fed. Cl. 139 (Ct. Cl. 2004)...................................................................................10, 11

*Franklin Federal Savings v. United States,*
    53 Fed. Cl. 690, 720-721 (Ct. Cl. 2002),
    rev'd on other grounds, 431 F.3d 1360 (CAFC 2005)...............................................16

*Gaurdsman Elevator v. United States,*
    50 Fed. Cl. 577 (Ct. Cl. 2001).......................................................................................6

*Hage v. United States,*
    35 Fed. Cl. 737, 740 (1996) ..........................................................................................17

*James v. Caldera,*
    159 F.3d 573, 580 (CAFC 1998) ..................................................................................13

*JGB Enterprises v. United States,*
    497 F.3d 1259, 1261 (CAFC 2007) ...............................................................................11

*L'Enfant Plaza v. United States,*
    645 F.2d 886, 892 (CAFC 1981) ...................................................................................14

*Montana v. United States,*
    124 F.3d 1269 (CAFC 1997) ...........................................................................................6

366008

*Osage Tribe of Indians v. United States*,
    85 Fed. Cl. 162 (Ct. Cl. 2008)...................................................................18

*Pauley Petroleum*,
    591 F.2d 1308, 219 Ct. Cl. 24....................................................................14

*Rolls-Royce v. United States*,
    176 Ct. Cl. 694, 364 F.2d 415, 420 (Ct. Cl. 1966).....................................13

*Simons v. United States*,
    74 Fed. Cl. 709, 715 (Ct. Cl. 2006) ...........................................................14

*Slattery v. United States*,
    583 F.3d 800 (CAFC 2009) .........................................................................15

*Slattery v. United States*,
    635 F.3d 1298 (CAFC 2011) .......................................................................15

*Todd Const., L.P. v. U.S.*,
    656 F.3d 1306, 1311 (CAFC 2011) .............................................................10

*United States v. Milliken Imprinting Co.*,
    202 U.S. 168, 174, 50 L. Ed. 980, 26 S. Ct. 572, 41 Ct. Cl. 509 (1906) ....14

*Quinault Allottee Asso., etc. v. United States*,
    453 F.2d 1272, 197 Ct. Cl. 134 (1972) .......................................................14

## FEDERAL STATUTES

28 U.S.C. § 1491(a)(1)......................................................................................10

## FEDERAL RULES

RCFC 23 .............................................................................................................14

RCFC 24 ...............................................................................................................1

RCFC 24(a)(2) ...................................................................................................17

Stephen Rosenbaum, Frank E. Williams, Jr., Compass Point Partners LLC and Legal Alpha LLC (together, "Applicants") submit this consolidated Reply Memorandum in support of their Motion to Intervene in this action pursuant to Rule 24 of the Rules of the United States Court of Federal Claims ("Rule 24").

## BACKGROUND

At this juncture, the sole issue for this Court is whether the Interveners have pled sufficient facts to meet the threshold requirement for jurisdiction under the Tucker Act. The Interveners have jurisdictional standing to assert a claim here for one very simple reason: as owners of Dime Litigation Tracking Warrants (Dime LTWs), the Interveners are third party beneficiaries with a direct claim to 85% of the net economic value of the damages in this case. Alternatively, the Interveners can establish jurisdiction through the Purchase and Assumption Agreement ("PAA") which, contrary to arguments by the Responders plaintiff Anchor Savings Bank and defendant Department of Justice (collectively, the "Responders"), independently creates a separate contact right for benefit of the Dime LTW holders as members of an identifiable class of third party beneficiaries.

### 1. Dime LTWs are Third Party Beneficiaries to 85% of the Net Economic Value of the Judgment in the *Anchor Savings* Litigation

The Responders paint a highly misleading picture of the nature, purpose and intent of the Dime Litigation Tracking Warrants (Dime LTWs). First, *contrary* to a statement of fact in the Anchor brief, Washington Mutual Inc. ("WMI") did <u>not</u> issue or create the Dime LTWs. See Anchor Brief at 1 (*"Movants are holders of certain "litigation tracking warrants <u>issued by</u> Washington Mutual Inc"*). WMI did not issue the Dime LTWs. Dime Bancorp created and issued the Dime LTWs in 2000. Second, Dime created the LTWs for the specific purpose of transferring a significant share of Dime's economic interest in the *Anchor Savings* litigation to its

1

shareholders. To this point, on Dec 18, 2000, Dime issued a Press Release, attached to a Form 8K filed with the SEC, that made clear that the purpose in distributing the LTWs was to distribute a share of Dime's economic interest in the Anchor Savings litigation to its shareholders: **"Dime Bancorp today announced that its Board of Directors has declared a _distribution_ to common stockholders _of a substantial portion of Dime's economic interest_ _in its_ _pending "goodwill" lawsuit_ against the United States government through the issuance of Litigation Tracking Warrants."** See Exhibit 1 attached hereto. Clearly, Dime created the LTWs to spin-out the value of its economic interest in the Anchor Savings litigation to its shareholders through the instrument of a litigation tracking warrant.

The Dime tracking warrant is the basis for entry into this litigation. By specifically designating the LTW holders as recipients of a substantial portion of Dime economic value in its pending goodwill lawsuit against the government, the Dime LTW holders became third party beneficiaries to the judgment in this case. This conclusion is reinforced by the attached letters from former senior Dime executives who created the Dime LTWs. See Exhibit 2, attached hereto. These letters underscore the intent and purpose of Dime in creating the LTWs. And they make clear that Dime's purpose in creating the LTWs was to _separate the value_ of the _Anchor Savings_ litigation from the equity value of the bank itself, and transfer or assign that value permanently and exclusively to the Dime LTW holders. See Exhibit 2. Equally important, Dime never intended to revoke this assignment of value to the Dime LTW holders, and never intended that the value of the Dime LTWs would be eviscerated or transferred away from the Dime LTW holders to an unrelated third party. See Exhibit 2.

This brings up a second misperception created by the Opposition briefs, or more specifically the Anchor (or JPMorgan) brief, which claims that the Dime LTWs _do no more than_

2

*provide Dime LTW holders with more equity in the bank.* As the Dime Warrant Agreement attached to our Complaint makes clear, Dime issued the LTWs in the form of a non-taxable stock dividend, in which the LTWs could – initially -- be exercised for an amount of stock in Dime equal to 85% of the net economic value of the *Anchor* litigation, with the bank retaining 15% of the litigation value in exchange for prosecuting the litigation. As the statements from the former Dime executives attest, however, Dime did not issue the LTWs with the intent to do *no more than* provide LTW holders with more equity in the bank. To the contrary, Dime decided to issue the LTWs in the form of a non-taxable stock dividend so that, upon issuance and receipt of the LTWs, its shareholders would not be taxed on phantom income from the *Anchor* litigation that had not yet materialized.

**Further, and even more important, as the Warrant Agreement also made clear, and as the attached letters from former Dime executives attest, once issued** *the LTWs could eventually be exercised for valuable non-equity consideration, including* <u>*cash,*</u> <u>*securities*</u> *or* <u>*other property*</u>**, depending on the circumstances.** This is consistent with the fact that the purpose of Dime in creating and issuing the LTWs was to transfer, assign or spin-out the economic value of its stake in the Anchor Savings litigation to its shareholders through a litigation tracking warrant that retained that value separate and apart from the bank's common equity.[1] <u>See</u> Exhibits 1 and 2.

---

[1]  Anchor makes yet another misrepresentation stating or implying that the Warrant Agreement only provided for valuable non-equity consideration in the event of a merger or combination. The Warrant Agreement does not say that, and does not in any way limit the LTW holders' right to valuable non-equity consideration <u>only</u> to situations where bank equity disappears in a merger, though certainly that is an enumerated instance. Further, Article IV of the Warrant Agreement contains a standard "Savings Clause," which empowers the Board to take action on behalf of the LTW holders in the event of other unforeseen circumstances. <u>See</u> Exhibit 3, attached hereto, Dime Warrant Agreement Article IV, 4.4. As any corporate lawyer knows, a Savings Clause is always drafted for the benefit of the security holder, in this case the Dime LTW holders, here even more so because the Dime LTW holders never participated in negotiating the Warrant Agreement.

3

Finally, although at this juncture of the litigation any arguments pertaining to the mechanics of the Warrant Agreement, or events in the WMI bankruptcy are irrelevant to jurisdiction, since the facts as alleged in the Complaint are assumed true, a few other comments on the Warrant Agreement are in order to clarify the record and any confusion engendered by the Opposition briefs. To that end, it is important to note that the 85% / 15% split in the economics of the warrant reflects a very fundamental fact concerning the nature of the relationship between Dime LTW holders and Washington Mutual <u>Bank</u>. The Warrant Agreement makes clear that although the bank owns the litigation and gets to keep the cash proceeds for bookkeeping purposes, the LTW holders are receiving 85% of the net economic value with Washington Mutual Bank retaining 15% of the value in exchange for prosecuting the litigation. In other words, the operating company, or Thrift – i.e. Washington Mutual Bank as opposed to the Holding company, Washington Mutual Inc – actually owns the litigation but is prosecuting the litigation for the benefit of the Dime LTW holders who are clearly the beneficiaries of 85% of the net economic value. The Warrant Agreement, which was issued by Washington Mutual Inc as the holding company, codifies this fiduciary relationship between the Dime LTW holders and the bank operating company, *which owned the litigation* and *was prosecuting it for the benefit of the LTW holders*, as third party beneficiaries.

Thus, accepting the facts pled in the proposed Complaint as true, all that matters is whether the Interveners have met the bare-bones test for jurisdiction under the Tucker Act and intervention under Rule 24. Clearly, this Court has jurisdiction over the Intervener's Complaint because the Interveners own the Dime LTWs and therefore are the intended third party beneficiaries to 85% of the net economic value of the judgment in the *Anchor Savings* case.

But there is more.

4

## 2. The PAA Creates a Second, Independent Contract Right for Benefit of the Intervener / Dime LTW Holders

When the FDIC seized WMB and transferred the Anchor litigation to JPMorgan pursuant to the PAA, a whole new obligation was created on behalf of the Dime LTW holders. The PAA makes clear that the buyer of WMBs assets acquired those assets subject to any liabilities, claims or attachments on the assets. And, as JPMorgan has made clear to this Court many times, JPMorgan acquired the Anchor Savings litigation pursuant to the PAA on Sept 25, 2008. On that day, JPMorgan, as the new owner of the Anchor litigation was obligated to amend the Warrant Agreement for the benefit of the Dime LTW holders. Moreover, once JPMorgan amended the Warrant Agreement, JPMorgan would be obligated to honor the liability to the Dime LTW holders as third party beneficiaries to 85% of the value of the Anchor Savings litigation.

JPMorgan's obligation to amend the Warrant Agreement for benefit of the LTW holders is set forth in Section 4(d) of the Warrant Agreement, which provides:

> (d) The Company will provide that any Successor Company will enter into an agreement with the Warrant Agent confirming the Holders' rights pursuant to this Section 4.2 and providing for adjustments, which will be as nearly equivalent as may be practicable to the adjustments provided for in this Article IV.

See Exhibit 3, Dime Warrant Agreement, Section 4.2(d)

This section of the Warrant Agreement makes clear that the Dime LTW holders' claim to a share in the net economic value of the Anchor Savings litigation as third party beneficiaries is *derived from*, and *attaches to* the litigation itself, without which there would be no need for the LTWs. Seen in another light, the Dime LTW holders' claim to 85% of the net economic value in the Anchor Savings case is **like a mortgage on a house**, with the Warrant Agreement

5

functioning as the Note. When the house is sold with a mortgage on it, the house is purchased subject to the mortgage or the Note. The same is true here with the *Anchor* litigation. Once the litigation changes hands, the new owner must act for the benefit of the LTW holders.[2]

The PAA respects and honors the rights of the Dime LTW holders as third party beneficiaries here by requiring purchasers of WMBs assets to honor the claims, liens and obligations that attach to the asset.[3] In this case, the obligation that attached to the litigation was JPMorgan amending the Warrant Agreement in favor of the Dime LTW holders. Although not identified as such in the PAA, clearly the Dime LTW holders belong to a class of identifiable beneficiaries, and thus under the PAA have standing to assert claims here. See *Montana v. United States*, 124 F.3d 1269 (CAFC 1997) (agreement that protected superior lien holders included plaintiff, who held a superior lien); *Gaurdsman Elevator v. United States*, 50 Fed. Cl. 577 (Ct. Cl. 2001) (contract discussed payment of pre-receivership payables – plaintiff qualified as pre-receivership payable).

The PAA forces JPMorgan, or whoever buys the *Anchor* litigation, to assume all liabilities, liens and obligations that attach to the acquired asset. Here, JPMorgan acquired the asset (the *Anchor* litigation) on Sept 25, 2008 without bothering to amend the Warrant Agreement even though JPMorgan acquired the *Anchor Savings* litigation the day before WMI, the holding company, filed for bankruptcy. On Sept 25, 2008, the day that the Anchor litigation was allegedly transferred to JPMorgan, the Dime LTW holders as third party beneficiaries had a

---

[2]   That, in fact, is exactly what happened when WMI merged with Dime Bancorp and WMB merged with Dime Savings Bank and became the new owner of the Anchor litigation. WMI amended the Warrant Agreement immediately, and in fact strengthened it in several respects. By contrast, JPMorgan never amended the Warrant Agreement even though JPMorgan technically and legally took control of the Anchor litigation on Sept 25, 2008, the day the FDIC, as receiver, seized WMB (and the day before WMI filed for bankruptcy).

[3]   Additionally, as the FDIC itself made clear in a Press Release issued on Sept 25, 2008, "in connection with the sale of assets of Washington Mutual Bank to JPMorgan Chase & Co., the FDIC transferred to JPMorgan Chase all Qualified Financial Contracts to which Washington Mutual Bank was a party. . . ." See Exhibit 4, attached hereto. Arguably, because the Dime LTWs are a registered security, WMBs obligations to Dime LTW holders would fall under JPMorgan's obligation to assume Qualified Financial Contracts, as well.

6

right to have that Warrant Agreement amended on their behalf.  Instead, what happened is that more than a year later JPMorgan and the FDIC walked into the bankruptcy court and, through the Global Settlement Agreement, told the bankruptcy court that WMI actually owned the Anchor litigation, and as of Sept 26, 2008 transferred the Anchor litigation to JPMorgan free and clear of the claims of the Dime LTW holders.

In the "wild west" they called that "speaking with a forked tongue."  In the aftermath of the banking crisis and mortgage fraud that led this Country to the brink of financial collapse, it's called something else.  Regardless, the Dime LTW holders have been severely damaged here by this clever "sleight-of-hand" because, as a result, they have been disenfranchised of the legal rights secured for them in the PAA which was designed to protect a class of persons with legitimate claims on the assets transferred to JPMorgan – in this case, the *Anchor Savings* litigation.

Clearly, dates do matter.  And, thankfully, the PAA exists to secure the rights of the little guy, in this case the Dime LTW holders.

### 3. Inability to Intervene Before Now

The Respondents belittle the Interveners, characterizing them as just a few stragglers who did not bother to accept the settlement with WMI and JPMorgan in the WMI adversary proceeding.[4]  Respondents further claim that as a result of intervening in the WMI bankruptcy, the Interveners are now somehow time-barred from intervening in the instant Anchor litigation, or are substantively barred from proceeding under principles of res judicata (issue preclusion and

---

[4]  Anchor argues that the vast majority of LTW holders, more than 90%, elected to opt-in to the proposed settlement with JPMorgan.  That is not necessarily so.  The debtor made clear that it wanted to count LTW holder who failed to submit a ballot electing either to opt-in or opt-out of the settlement with JPMorgan as "automatically" opting-in.  We don't know what that exact number is, but by no means does it imply, as the Anchor plaintiffs would lead this Court to believe, that more than 90% of LTW holders affirmatively relinquished their rights in the LTWs.  Moreover, it is irrelevant as far as this litigation is concerned, which, at this juncture, is only focused upon jurisdiction.

claim preclusion). Again, at this juncture of the litigation, matters pertaining to the WMI bankruptcy are not germane to the issue at hand which only concerns the threshold issue of whether this Court has jurisdiction over the asserted claims and the Interveners have proper standing under Rule 24. But for sake of clarification, the Court should be aware of the following facts.

First, the Dime LTW holders *had no choice* but to intervene in the WMI bankruptcy. When WMI filed for bankruptcy protection on Sept 26, 2008, this Court had already lost jurisdiction over the instant *Anchor* litigation by virtue of the appeal to the Court of Appeals for the Federal Circuit ("CAFC"). So we couldn't assert our claim as third party beneficiaries to the *Anchor* judgment. In fact, there still is not a final, non-appealable judgment in this matter because this court is tasked with (1) ruling on DOJs motion to dismiss JPMorgan from the case as the "real party in interest" – a decision that JPMorgan will most certainly appeal if it loses; and (2) on remand from the CAFC, this Court must still decide whether additional damages are owed – again, an issue that very likely will be appealed by either JPMorgan or DOJ, depending on "whose ox is gored" by the decision.[5] Because the Dime LTW holders only are asserting a claim to a share of the final damages award as third party beneficiaries, until there is a final non-appealable judgment, intervention is timely.

Second, Respondents argue that having intervened in the WMI bankruptcy the Dime LTW holders are now unable to assert a claim in this Court. Again – and importantly – at this juncture of the litigation res judicata is not an issue. The bankruptcy court lacked jurisdiction over claims relating to the Anchor litigation which had been transferred by the FDIC to

---

[5] JPMorgan / Anchor urges this Court to dispose of the Dime LTWs Motion to Intervene, arguing that the Anchor Opposition litigation is in its very late stages and all intervention will do is result in years of further litigation. See Anchor Brief at 20-21. Coming from JPMorgan, a late-intervener itself, and not even the original party to this case, the argument is a "disingenuous at best."

JPMorgan on Sept 25, 2008, the day before WMI, the holding company, filed for bankruptcy. Not only that, but once the FDIC seized WMB, WMI was literally out of the picture as far as the Anchor litigation goes, and could not intervene in this Court on behalf of the LTW holders. Hence matters inside the WMI bankruptcy are irrelevant. Indeed, as JPMorgan's counsel argued to this very Court in defending its purchase of the *Anchor Savings* litigation from the FDIC, *"the subsequent Chapter 11 filing and related bankruptcy proceedings of Washington Mutual Inc are therefore irrelevant for Washington Mutual Inc has no direct or indirect interest in the Anchor judgment."*

Finally, the fact that the mandate from the CAFC issued on May 3, followed by an initial post-appeal status conference in this Court, is of no moment. The bankruptcy process was well underway and there were deadlines for anyone with a potential claim against WMI to file that claim by a certain date – which for certain preceded the mandate issuing in this case. In short, the Dime LTW holders found themselves between a "rock and a hard place" and with nowhere to go, and unable to file anything in this Court, were compelled to file an adversary proceeding in the bankruptcy court.

## ARGUMENT

### I. This Court has Jurisdiction under the Tucker Act over the Interveners' Claim as Third Party Beneficiaries to 85% of the Value of the Anchor Savings Award

#### A. The Tucker Act

##### 1. General Principles

The Tucker Act waives sovereign immunity for, and grants the Court of Federal Claims exclusive jurisdiction over, actions for money damages of more than $ 10,000.

> The United States Court of Federal Claims shall have jurisdiction
> to render judgment upon any claim against the United States

founded either upon the Constitution, or any Act of Congress or
any regulation of an executive department, or upon any express or
implied contract with the United States, or for liquidated or
unliquidated damages in cases not sounding in tort.

See 28 U.S.C. § 1491(a)(1).

The Tucker Act provides jurisdiction in the Court of Claims for suits based on **unlawful**

**taking** of property and for **breach of contract**. For breach of contract claims, the plaintiff must

allege a claim for monetary damages based on either a money-mandating statute such as the

Contracts Disputes Act (CDA), or on the basis of an <u>express</u> or <u>implied-in-fact</u> contract with the

government. The complaint need only plead a valid contract, not actually prove a breach, to

overcome a challenge to jurisdiction. See *FlexFab v. United States,* 62 Fed. Cl. 139 (Ct. Cl.

2004) **(Judge Block),** *aff'd* 424 F.3d 1254 (CAFC 2005).

Under the Tucker Act, the term "claim" is defined <u>*expansively*</u>, meaning that the Court of

Claims will entertain jurisdiction over almost any demand relating to, or arising under the

contract. Emphasizing that *"courts should read the definition of "claim" [under the Tucker Act*

*and the CDA] broadly,"* the CAFC in *Todd* emphasized that:

> The Tucker Act provides jurisdiction to "render judgment upon
> *any claim* by or against . . . a contractor arising under section
> 10(a)(1) of the [CDA]. . . . We also explicitly recognized that . . .
> **"review of contract claims will be relatively easy to obtain, by**
> **defining the term 'claim' broadly, to include a demand or**
> **assertion seeking . . . relief <u>*arising under or relating to*</u> the**
> **contract."**

See *Todd Const., L.P. v. U.S.,* 656 F.3d 1306, 1311 (CAFC 2011) (citations omitted) (emphasis
added).

10

## 2.  Third Party Beneficiaries

"It is settled law that an intended third-party beneficiary of a government contract may bring an action under the Tucker Act".  See *FlexFab*, 62 Fed. Cl. at 139.  (emphasis added)

To establish status as a third-party beneficiary, the plaintiff must show that it is the *intended beneficiary* of the contract:

> In order to prove third-party beneficiary status, a party must demonstrate that the **contract not only reflects the express or implied intention to benefit the party,** but that it **reflects an intention to benefit the party directly.**  The intent of the parties to the contract is therefore the cornerstone of a claim for third-party beneficiary status.

See *FlexFab*, 424 F.3d at 1254 (citing cases) (emphasis added).

The issue of third party beneficiary rights usually comes up in the context of government contracts involving a prime contractor and a sub-contractor.  As the CAFC explained in *JGB Enterprises*:

> A subcontractor typically is unable to seek relief against the United States on a dispute over the contract since it is not a party to the contract and thus lacks privity with the United States. But JGB is not a typical subcontractor under the . . . contract because, as the United States concedes, **JGB is a third party beneficiary to the contract.  As such, JGB's claims are not derivative of CCP's rights under the contract; rather JGB is suing to enforce its own rights under the contract.**  Restatement (Second) of Contracts (*"beneficiary's right is direct, not merely derivative."*) The government argues that this distinction is immaterial in the setoff context. We do not agree.

See *JGB Enterprises v. United States,* 497 F.3d 1259, 1261 (CAFC 2007) (emphasis added).

A good example illustrating third party beneficiary rights in the Court of Claims is found in *D&H Distributing Co. v. United States,* 102 F.3d 542 (CAFC 1996).  The dispute arose when

11

the contractor failed to pay the subcontractor (D&H) for goods that the subcontractor supplied to the government. After the contractor became insolvent, the subcontractor sued the government in the Court of Claims arguing that (1) it had entered into an implied-in-fact contract with the government; and (2) it was *a third party beneficiary to the contract between the government and the contractor.* The Court of Claims ruled against the subcontractor and agreed with the government that the subcontractor could not maintain a third party beneficiary claim because "*D&H had failed to show that the <u>government intended to assume</u> a contractual obligation toward D&H.*" See *D&H Distributing,* 102 F.3d at 545 (emphasis added).

The CAFC reversed in favor of the third party beneficiary. The CAFC held that even though D&H was not a party to the original contract between the government and the contractor, *"D&H enjoyed the status as a third party beneficiary with respect to the payment clause of the modified contract and is therefore entitled to enforce that clause against the government."* See *D&H Distributing,* 102 F.3d at 54. In *D&H Distributing,* the modified contract conferred rights upon the subcontractor "to control disbursement of the contract proceeds . . . to ensure that its invoice . . . would be paid." See *D&H Distributing,* 102 F.3d at 544. The CAFC had no difficulty in holding that *"this case therefore presents a particularly clear instance in which the third party beneficiary's interests, specifically protected by the contract, would be impaired if the beneficiary were not accorded the right to obtain relief against the promisor in the event of a breach."* See *D&H Distributing,* 102 F.3d at 547 (emphasis added).

Alternatively, the CAFC held that D&H *could assert a claim <u>as an assignee of the proceeds</u>* of the original government contract:

> **A complete or partial assignment of the right to be paid the proceeds of the contract imposes an obligation on the promisor, once it has received notice of the assignment, to make payments under the contract in accordance with that**

> **assignment.** The promisor can be held liable on that obligation to the assignee if the promisor makes payments to the assignor, rather than to the assignee in accordance with the terms of the assignment. . . . **Thus, if the . . . modification is characterized as an assignment of rights under the contract, assented to by the government, it is appropriate to hold the government liable to D&H for its failure to make payment in accordance with the contract terms.**

See *D&H Distributing,* 102 F.3d at 547 (emphasis added) (citing cases).

### 3.  Equitable Relief

*As a general rule,* because the Tucker Act only provides relief for monetary damages, the

Court of Claims has **no original jurisdiction over equitable claims,** including claims based on

unjust enrichment, or equitable lien theories.   An exception to this rule exists when equitable

relief is awarded as part of a monetary judgment.   Thus, the Court of Claims may award

injunctive and declaratory relief "when such relief is an *"incident of and collateral to"* a money

judgment." See *Capelouto v. United States,* 99 Fed. Cl. 682, 693 quoting *James v. Caldera,* 159

F.3d 573, 580 (CAFC 1998).   See *First Hartford v. United States,* 194 F.3d 1279 (CAFC 1999)

(reversing Court of Claims prohibition against shareholder derivative actions in Court of Claims

and noting that certain circumstances Court of Claims can grant declaratory and injunctive

relief).[6]

To this point, in *Ambase* the Court of Claims explained:

> Labeling an argument "equitable" does not, however, automatically deprive this Court of jurisdiction. The assumption that this Court has no equity jurisdiction is an "ancient but inaccurate shibboleth."   The Court does not have the jurisdiction to grant specific equitable remedies, but "this principle does not preclude the courts from exercising equitable powers as an incident of our general jurisdiction."

---

[6]   The existence of declaratory relief can be quite useful in a case like this.  As one court noted: The Declaratory Judgment Act is designed to provide a remedy in a case or controversy, w*hile there is still opportunity for peaceable judicial settlement. . . .*" See *Rolls-Royce v. United States,* 176 Ct. Cl. 694, 364 F.2d 415, 420 (Ct. Cl. 1966) (emphasis added)

See *Ambase v. United States*, 61 Fed. Cl. 794, 800 (Ct. Cl. 2004) (emphasis added) (citations omitted).

In *Ambase,* the Court of Claims cited to various examples where it exercised jurisdiction over equitable claims:

> **The Court of Federal Claims and its predecessor courts have always possessed the power to assert jurisdiction over claims which sound in equity but which are claims for money damages against the government rather than a claim for non-monetary relief.** Thus the Court has relied on **reformation of contract** as the basis for a money judgment, *United States v. Milliken Imprinting Co., 202 U.S. 168, 174-74, 50 L. Ed. 980, 26 S. Ct. 572, 41 Ct. Cl. 509 (1906),* used **equitable accounting procedures to render a money judgment,** *Klamath & Modoc Tribes, 174 Ct. Cl. at 490,* has **permitted a class action suit prior to the existence of RCFC 23,** *Quinault Allottee Asso., etc. v. United States, 453 F.2d 1272, 197 Ct. Cl. 134 (1972),* heard suits for **rescission of contract due to mutual mistake or frustration,** *see, e.g., Pauley Petroleum, 591 F.2d 1308, 219 Ct. Cl. 24,* and heard **shareholder derivative suits despite their being historically based in equity,** *First Hartford, 194 F.3d 1279.*

See *Ambase v. United States*, 61 Fed. Cl. at 794, 800 (emphasis added).

Finally, the Court of Claims can exercise jurisdiction over pendent **fraud claims** *if the fraud claims are closely intertwined with the claim for monetary damages.* See *Simons v. United States*, 74 Fed. Cl. 709, 715 (Ct. Cl. 2006) citing *L'Enfant Plaza v. United States,* 645 F.2d 886, 892 (CAFC 1981) (emphasis added).   Under these circumstances, **the Court of Claims will allow a pendent claim for *tortious breach of contract*.** See *L'Enfant Plaza,* 645 F.2d at 892: **"The distinction is there must be a "*tortious breach of contract* rather than a tort independent of the contract."**

### 4. Jurisdiction over Claims Against the FDIC

Respondents assert that claims against the FDIC are not justiciable in the Court of Claims under these circumstances.  That is a gross misstatement of the law.

This issue has come up before, and the CAFC's treatment of it bears mention here. For example, in *Slattery v. United States,* 583 F.3d 800 (CAFC 2009), the court observed, not unlike here, that:

> **The remark now quoted by the trial court, that the "FDIC is not generally considered to be the government for jurisdictional purposes in *Winstar* litigation," does not reflect the court's actual holding, for the Court of Federal Claims ruled in *Ambase* that it did have jurisdiction to review this action of the FDIC as receiver.** Discussing *§ 1821(d)(13)(D)*, the court looked to the entirety of the FDIC Act to understand the meaning of this provision, and concluded that it could not mean that the plaintiffs could challenge this aspect of the FDIC's acts only in district court, for that would create an absurd situation in which the plaintiffs could only seek money damages of the disputed action in the Court of Federal Claims, but could only determine the amount of damages for that action in the district court, which cannot provide relief. We agree with the logic of this analysis, and conclude that the Court of Federal Claims erred in dismissing the Interveners' claims in reliance on *Ambase*. The dismissal of the Interveners' claims on jurisdictional grounds is reversed.

*Slattery v. United States,* 583 F.3d at 829 (emphasis added) (citations omitted), aff'd on rehearing *en banc, Slattery v. United States,* 635 F.3d 1298 (CAFC 2011).

The CAFC in its *en banc* opinion reaffirmed the principle set forth in the *Slattery* panel opinion that "the FDIC does not automatically lose its government status when it acts as a receiver for a bank that it has seized in its governmental role. *Slattery v. United States,* 583 F.3d at 827. See also *First Hartford,* 194 F.3d at 1279. In fact, in its *en banc* decision, the CAFC held that the Tucker Act permitted jurisdiction over the FDIC, as a governmental entity, notwithstanding the availability of relief in another federal court. See *Slattery v. United States,* 635 F.3d 1298 (CAFC 2011) (*en banc*).

**B.    Discussion**

In this case, the fact that Dime created the LTWs for the specific purpose of assigning or transferring 85% of its economic interest in the Anchor Savings litigation to the Dime LTW holders is undisputed.  That fact alone makes the Dime LTW holders the intended third party beneficiaries for purposes of intervening in this lawsuit and asserting jurisdiction under the Tucker Act.

Respondents claim that because the Intervener / Dime LTW holders are not parties to a the underlying goodwill contract, then jurisdiction cannot lie in this Court.  But that of course is incorrect.  The government made a similar argument in *Franklin Federal Savings v. United States*, which the Court of Claims rejected.  There, the court held that an escrow agreement for the benefit of the individual plaintiff-shareholders was not an invalid assignment and did not preclude the shareholders from intervening in a *Winstar* case.  See *Franklin Federal Savings v. United States*, 53 Fed. Cl. 690, 720-721 (Ct. Cl. 2002), *rev'd on other grounds,* 431 F.3d 1360 (CAFC 2005).  The Interveners here are not unlike the shareholders in *Franklin Federal.*  In fact, we have an even stronger case for standing and jurisdiction because Dime clearly designated the Dime LTW holders as the intended third party beneficiaries to 85% of the economic value of the instant *Anchor Savings* litigation.

Lastly, contrary to Respondents' arguments, the Interveners clearly are seeking monetary damages based on a breach of their contract rights as third party beneficiaries.  Any declaratory relief is incidental to this monetary relief.  Indeed, the proposed Complaint makes clear that Interveners claim a *tortious breach* of their contract rights and are not, contrary to Respondents' arguments, asserting a separate tort.

16

## II.   Intervention is Proper Under Rule 24

### A.     Intervention as of Right

Intervention as of right is governed by Rule 24(a) of the Rules of the United States Court

of Federal Claims which provides in relevant part that:

> On timely motion, the court must permit anyone to intervene who . . . claims
> an *interest relating to the property or transaction that is the subject of the
> action,* and is so situated that the *disposition of the action may* as a practical
> matter *impair or impede the movant's ability to protect its interest,* unless
> existing parties adequately represent that interest.

*RCFC 24(a)(2)* (emphasis added).

As the Court is aware, once prerequisites for intervention as of right have been met, an

applicant "shall be permitted to intervene in an action." *Hage v. United States,* 35 Fed. Cl. 737,

740 (1996). These prerequisites are that the applicant:  (1) claims an interest relating to the

property or transaction which is the subject of the underlying action; (2) is so situated that the

disposition of the action may as a practical matter impair or impede his ability to protect that

interest; (3) demonstrates that the present parties do not adequately represent its interest; and (4)

has made a timely application to intervene. *Id.* Very clearly we meet these prerequisites.

As owners of Dime LTWs, the Interveners are third party beneficiaries to 85% of the net

economic damages in this case.  Our claim is thus integrally bound-up with the underlying

litigation.

Second, despite Respondents' argument that the Interveners can always assert their claim

to recovery as third party beneficiaries in another federal court, they do not dispute the fact that if

applicants are not allowed to intervene here, the damages in this case will go either to JPMorgan

or to the government when plainly Dime intended that 85% of the net economic value go to the

17

Dime LTWs. Thus, it is beyond peradventure that our interests as Dime LTW holders will be impaired.

Third, without question, neither the government nor JPMorgan will adequately represent our interests; indeed, they are fighting our Motion to Intervene, tooth and nail.

Fourth, for the reasons discussed above our Motion to Intervene is timely. There has yet to be a final damages award calculated in this case, and due to the intervening appeals coupled with the assault on the Dime LTW rights by the debtor in the WMI bankruptcy, we could not, until recently, have intervened in this Court to enforce our rights.

Finally, the Respondents cite to the Court of Claims decision in *The Osage Tribe of Indians v. United States* for the proposition that on almost identical facts intervention was denied and should be denied here as well. See *The Osage Tribe of Indians v. United States,* 85 Fed. Cl. 162 (Ct. Cl. 2008). Respondents' reliance on this Osage decision is misplaced.

In *Osage*, members of a tribe sought to intervene in a case where the proceeds would have flowed directly to the tribe itself. Because the Tribe was a party, the court deemed the rights of the interveners / individual tribe members to be adequately represented by tribal counsel. Simply put, the *Osage* case has nothing to do with the facts of our case.

## B. <u>Permissive Intervention</u>

Alternatively, this Court should grant intervention here under Rule 24(b) which permits this Court, exercising discretion, to allow intervention where there are common questions of law or fact and where intervention will not unduly delay the proceedings or prejudice the adjudication of the rights of the original parties. See Rule 24(b). The Court may also consider principles of judicial economy and fairness when deciding whether to grant intervention under this section.

As discussed, the applicant-Interveners here have a strong case for intervening. Our claim to a share of the economic value of the Anchor Savings damages is inextricably intertwined with the original cause of action, indeed our claim derives from it. The issue to be decided is actually quite discrete: whether as a matter of law the Dime LTW holders are third party beneficiaries to the Anchor damages award under the original Dime agreement and under the PAA. What better forum than this one to decide this issue, which contrary to JPMorgan's assertion will not result in lengthy litigation delays. Addressing this issue in this Court, in this proceeding, which is the very litigation that gave rise to the Dime LTWs, conserves judicial economy and is greatly preferable to the patch-work approach of piecemeal litigation advocated by Respondents.

## CONCLUSION

For the foregoing reasons, Applicants' Motion For Leave To Intervene in this action should be granted.

Dated this ___ day of June, 2012

Counsel of Record for Plaintiffs:

Walter J. Lack, Esq.
Paul A. Traina, Esq.
Adam D. Miller, Esq.
ENGSTROM, LIPSCOMB & LACK
10100 Santa Monica Blvd., 12th Floor
Los Angeles, CA 90067
Telephone No. (310) 552-3800
Facsimile No. (310) 552-9434

Attorney for Plaintiff-Intervenors

Of Counsel:

Robert T. Scott, Esq.
2650 Cedar Springs Road, Suite 7717
Dallas, TX 75201
Telephone No. (866) 898-7584
Facsimile No. (866) 898-7584

366008

# EXHIBIT 1

8-K 1 0001.htm FORM 8-K CURRENT REPORT

## SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM 8-K

## CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): December 18, 2000

Dime Bancorp, Inc.

(Exact Name of Registrant as Specified in its Charter)

| Delaware | 001-13094 | 11-3197414 |
|---|---|---|
| (State or Other Jurisdiction) | (Commission File Number) | (IRS Employer Identification No.) |

589 Fifth Avenue
New York, New York                                   10017

(Address of Principal Executive Offices)                   (Zip Code)

Registrant's telephone number, including area code: (212) 326-6170

Not applicable

(Former Name or Former Address, if Changed Since Last Report)

## Item 5.  Other Events.

Dime Bancorp, Inc. ("Dime") files this current report on Form 8-K (1) to disclose information regarding the issuance of litigation tracking warrants as a dividend on its outstanding common stock and (2) to update information previously disclosed regarding certain litigation arising out of the hostile takeover attempt against Dime (the "Hostile Tender Offer") by North Fork Bancorporation, Inc. ("North Fork").

## (1)  LITIGATION TRACKING WARRANTS

On December 18, 2000, Dime Bancorp, Inc. issued the following press release regarding its litigation tracking warrants:

> Contact: Dime
> William S. Burns
> (212) 326-6170

December 18, 2000
00/37

FOR IMMEDIATE RELEASE

### DIME ANNOUNCES DISTRIBUTION OF LITIGATION TRACKING WARRANTS

New York, NY-- December 18, 2000-- Dime Bancorp, Inc. (NYSE: DME) today announced that its Board of Directors has declared a distribution to common stockholders of a substantial portion of Dime's economic interest in its pending "goodwill" lawsuit against the United States government through the issuance of Litigation Tracking Warrants™(LTW™s).

Dime has set the close of business on December 22, 2000 as the record date for the determination of those stockholders eligible to receive LTWs. Each eligible stockholder will receive one LTW for each share of Dime's common stock held on the record date. Dime will distribute the LTWs to eligible stockholders beginning on December 29, 2000. The LTWs will be listed on the Nasdaq National Market under the trading symbol DIMEZ (CUSIP number 25429Q 11 0) and will begin trading following the record date. Dime understands that its common stock will continue to trade on the New York Stock Exchange with "due bills" (reflecting a seller's obligations to deliver LTWs when received) from December 20, 2000 until the "ex-distribution date," which will be January 2, 2001 - the first business day after the December 29th distribution date.

At September 30, 2000, Dime had assets of $25.2 billion and deposits of $13.9 billion. Its principal subsidiary, The Dime Savings Bank of New York, FSB (www.dime.com), is a regional bank serving consumers and businesses through 127 branches located throughout the greater New York City

metropolitan area. Directly and through its mortgage banking subsidiary, North American Mortgage Company (www.namc.com), Dime also provides consumer loans, insurance products and mortgage banking services throughout the United States.

---

Certain statements in this press release may be forward-looking. A variety of factors could cause Dime's actual results and experience to differ materially from the anticipated results or other expectations expressed in such forward-looking statements. The risks and uncertainties that may affect such forward-looking statements include the vagaries of litigation, the timing and occurrence (or non-occurrence) of events that may be subject to circumstances beyond Dime's control, market fluctuations, and changes in applicable laws and regulations or interpretations thereof.

# # #

## (2)  SALOMON SMITH BARNEY CASE

On March 29, 2000, Dime had filed suit in the Supreme Court of the State of New York, County of New York, against Salomon Smith Barney, Inc. ("Salomon"), which had been acting as a financial advisor to North Fork in connection with the Hostile Tender Offer. The complaint alleged violations of a provision of a confidentiality agreement, dated May 12, 1997, between Dime and Salomon, which the complaint stated prohibited Salomon, for a three-year period, from providing financial advisory services to any entity interested in acquiring or otherwise entering into a business combination transaction with Dime without Dime's prior written consent to either the transaction or the provision of such advice (the "Confidentiality Agreement"). On May 17, 2000, Dime had amended its complaint to include a claim for monetary damages from Salomon and a claim against North Fork. On June 30, 2000, North Fork moved to dismiss the amended complaint as against North Fork, which was denied on September 13, 2000. On December 7, 2000, the court granted Dime's motion for partial summary judgment against Salomon on the issue of liability, finding that Salomon breached the Confidentiality Agreement by advising North Fork without Dime's consent in connection with the Hostile Tender Offer, and denied Salomon's cross-motion for summary judgment against Dime on the issue of damages. In addition, on that date, Dime voluntarily dismissed its claims against North Fork.

---

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

DIME BANCORP, INC.

By:  /s/ James E. Kelly
 _____

Name:  James E. Kelly
Title:    General Counsel

Date: December 18, 2000

# EXHIBIT 2A

**JAMES LARGE**

May 31, 2012

Hon. Lawrence J. Block
Judge, U.S. Court of Federal Claims
717 Madison Place, NW
Washington, DC 20005

Re:   _Anchor Savings v. United States, 95-039c_

Dear Judge Block:

I write in support of certain owners of Dime Litigation Tracking Warrants who recently filed a motion to intervene in the above-captioned matter.

I previously served as Chairman and Chief Executive Officer of Anchor Bancorp ("Anchor"), and then, following the merger of Anchor into Dime Bancorp ("Dime"), became CEO of Dime, as well as a Member of Dime's Board of Directors.   I was active in seeking reimbursement from the government in the _Anchor Savings_ litigation filed in this Court in 1995, _Anchor Savings Bank FSB v. United States,_ 95-39 (the _"Anchor Savings"_ litigation).

In or about December 2000, Dime created and issued the "Dime Litigation Tracking Warrants" (the "Dime LTWs").   I was a member of the Dime Board when the Dime LTWs were created and issued to Dime shareholders.

Apart from a general sense of the purpose in creating the Dime LTWs, I have no independent recollection concerning any specific details about the LTWs, nor do I have any independent recollection of the details in the Warrant Agreement that accompanied the creation of the Dime LTWs, other than to say that at the time we thought that the term "warrant" was a misnomer. I am unable to comment on the final documentation including, specifically, the concept of making the ultimate payment, if any, to the LTW shareholders in DME stock.

However, as regards the purpose and intent of Dime in creating the Dime LTWs, it is my clear memory that the Dime LTWs were created for the purpose of separating the economic value of _Anchor Savings_ litigation from the rest of the bank and giving that value directly to holders of the Dime LTWs.   In other words, Dime created the Dime LTWs to give the LTW holders a direct beneficial interest in, or claim to about 85% of the net economic damages in the _Anchor Savings_ litigation.

Very truly yours,

James Large

# EXHIBIT 2B

**William S. Burns**

2012 FEB 17  AM 9: 37

CLERK
US BANKRUPTCY
DISTRICT OF DE

February 16, 2012

Honorable Mary F. Walrath
United States Bankruptcy Court
District of Delaware
824 North Market Street, 5th Floor
Wilmington, DE 19801

Re:   **Nantahala et al. v. Washington Mutual Inc.** ("**Dime Litigation Tracking Warrants**")

       **Ch. 11 Case No. 08-12229 (MFW)**
       **(Jointly Administered)**

       **Adv. Proc. No. 10-50911 (MFW)**

       **Re: D.I. Nos. 314, 323, 424, 325, 9389, 9472, 9486, 9487, 9494, 9504, 9515**

Dear Judge Walrath:

I am a former Senior Vice President of Dime Savings Bank, a subsidiary of Dime Bancorp. I was head of Corporate Development and Investor Relations, which included among other responsibilities, strategic planning, mergers & acquisitions, as well as maintaining and optimizing the firm's capital structure. My employment at Dime began in 1997 and ended approximately one month after the merger with Washington Mutual in early 2002.

I write in regard to the Dime Litigation Tracking Warrants' litigation, as both a current holder of the Dime Litigation Tracking Warrants (LTWs) and as a former senior Dime executive with direct knowledge of the intent of Dime Bank in creating these LTWs and the bank's purpose in issuing the LTWs to our shareholders.

More specifically, Your Honor, I write to "correct the record" here as regards to the intent of Dime Bank in issuing these warrants, which I feel was not accurately presented to Your Honor.

The purpose of the LTWs, was to separate the value of the Anchor Litigation from the equity value of the rest of the Bank, and to give our shareholders a share in the value of the Anchor litigation.   Contrary to the impression created in the trial record presented to Your Honor, we did not create the LTWs to give LTW holders increased equity ownership in Dime Bank.   And we certainly did not intend for the value of the Anchor litigation, once given to LTW holders, to be taken from LTW holders, or transferred to an unrelated party.   When we created and distributed the LTWs to our shareholders, the primary intent and purpose of Dime Bank was to

Honorable Mary F. Walrath
February 16, 2012

convey 85% of the value of the Anchor litigation to LTW holders, irrespective of the form of consideration that would later be used to monetize the value of the LTWs if we won the Anchor litigation. By issuing the LTWs, we did not intend to take that value back from LTW holders, or to eliminate this value though issuance of worthless equity in the bank. And that's because the primary intent and purpose of Dime Bank in creating and issuing the LTWs to shareholders was to convey 85% of the value of successful Anchor litigation to LTW holders. The idea that Dime Bank issued the LTWs simply to provide LTW holders with increased equity value in Dime Bank is simply not true.

If I may, I would like to give you a little more color on creating the LTWs.

First, we created the LTWs because upon issuance, the LTWs would immediately be "value accretive;" in other words, the value of our common stock plus the value of the LTWs (just after issuance of the LTWs) would exceed the value of our common stock just prior to issuance. Second, if Dime was to ever issue equity in the future, either to raise capital or in connection with the acquisition of another bank or financial services company, LTW holders would not have their respective value in the Anchor litigation diluted. Further, we felt strongly that Dime's stock price did not reflect the significant value of the lawsuit and we wanted to split that value out as a separate financial instrument in order to allow our shareholders to evaluate and invest in the underlying asset (the lawsuit) independent of their interest in investing in Dime stock.

Our Board approved the issuance of LTWs just prior to our issuance of a significant amount of equity to Warburg Pincus, a private equity investment firm. At the time, we believed the lawsuit could have a value in excess of $1 Billion. The intent of the LTW issuance was very clear to me, as well as to all of the undersigned: to separate the value of the Anchor Litigation from that of the rest of the bank so that the existing Dime shareholders would not be diluted in their right to receive the value of any payout resulting from the litigation.

There was one necessary evil inherent in the value separation mechanism: In order to avoid any tax upon so-called "phantom" income that might occur upon the initial issuance of the LTWs, and which might have resulted in a current tax liability to our shareholders, we decided to call the instrument a "warrant." However, the name given to the instrument was in our view a misnomer because at issuance the LTW was not considered by the bank to be equity. To this point, warrants are like options; they have a strike price. Here, by contrast, there was no exercise price. In other words, the name given to this instrument was simply a tax strategy that we agreed upon *after* we decided to separate and convey the value of the Anchor litigation to our shareholders through a Litigation Tracking Warrant. Indeed, elsewhere in the warrant agreement, the bank made clear that if equity were unavailable, then the LTW holders would be entitled to monetize their claim to 85% of the value of the Anchor litigation through other, valuable non-equity consideration, including cash, securities or other property. That's why,

Honorable Mary F. Walrath
February 16, 2012

Your Honor, upon issuance, the LTWs were neither equity nor debt. Rather, the LTWs were an obligation of the bank, a promise by the bank to LTW holders to provide them with 85% of the economic value of the Anchor litigation, regardless of the form of consideration used to monetize that value.

You Honor, our intention was always clear: Dime issued these LTWs to give 85% of the value of the Anchor litigation to LTW holders, not to give LTW holders a claim to more equity in the bank equal to 85% of the Anchor litigation. Given potential tax considerations upon issuance, the mechanics of issuing the LTWs were problematic, but to be clear, and to reiterate, it would be erroneous for anyone to suggest that Dime Senior Management and its Board issued the LTWs in order to increase the amount of equity contained in our capital structure

I, as well as many original Dime shareholders, continue to hold LTW shares. We held them for all these years on the basis that we were the legal beneficiaries of any payout related to the litigation regardless of the financial fate of Dime Bancorp. We never even considered the possibility of bankruptcy as a risk to LTW holders claiming 85% of the value of the Anchor litigation. But even though no one at Dime considered bankruptcy, I can say for sure that the notion that bankruptcy would eviscerate the value of the LTWs (through issuance of worthless equity) was simply unthinkable. For these reasons, it would be unjust for anyone other than LTW holders to benefit from the pending payout expected from the FDIC

Your Honor, I know you worked very hard here in this case, and I think it is regrettable that no one associated with the litigation brought these facts to your attention earlier. On behalf of my former colleagues at Dime I want to thank you for considering what I have had to say in this letter.

Very truly yours,

William S. Burns
Former Senior Vice President, Dime Bancorp

D. James Daras
Former Executive Vice President and Treasurer, Dime Bancorp

# EXHIBIT 2C

D. James Daras

February 16, 2012

Honorable Mary F. Walrath
United States Bankruptcy Court
District of Delaware
824 North Market Street, 5th Floor
Wilmington, DE 19801

Re:   **Nantahala et al. v. Washington Mutual Inc.** **("Dime Litigation Tracking Warrants")**

       **Ch. 11 Case No. 08-12229 (MFW)**
       **(Jointly Administered)**

       **Adv. Proc. No. 10-50911 (MFW)**

       **Re: D.I. Nos. 314, 323, 424, 325, 9389, 9472, 9486, 9487, 9494, 9504, 9515**

Dear Judge Walrath:

I am a former Executive Vice President and Treasurer of Dime Savings Bank and its parent
Dime Bancorp, Inc. and chairman of the bank's asset-liability management. My responsibilities
included balance sheet and capital management. My employment at Dime began in 1991 and
ended approximately one month after the merger with Washington Mutual in early 2002.

I write in regard to the Dime Litigation Tracking Warrants' litigation, as both a current holder of
the Dime Litigation Tracking Warrants (LTWs) and as a former senior Dime executive with
direct knowledge of the intent of Dime Bank in creating these LTWs and the bank's purpose in
issuing the LTWs to our shareholders.

More specifically, Your Honor, I write to "correct the record" here as regards to the intent of
Dime Bank in issuing these warrants, which I feel was not accurately presented to Your Honor.

The purpose of the LTWs, was to separate the value of the Anchor Litigation from the equity
value of the rest of the Bank, and to give our shareholders a share in the value of the Anchor
litigation.   Contrary to the impression created in the trial record presented to Your Honor, we
did not create the LTWs to give LTW holders increased equity ownership in Dime Bank. And
we certainly did not intend for the value of the Anchor litigation, once given to LTW holders, to
be taken from LTW holders, or transferred to an unrelated party. When we created and
distributed the LTWs to our shareholders, the primary intent and purpose of Dime Bank was to

Honorable Mary F. Walrath
February 16, 2012

convey 85% of the value of the Anchor litigation to LTW holders, irrespective of the form of consideration that would later be used to monetize the value of the LTWs if we won the Anchor litigation. By issuing the LTWs, we did not intend to take that value back from LTW holders, or to eliminate this value though issuance of worthless equity in the bank. And that's because the primary intent and purpose of Dime Bank in creating and issuing the LTWs to shareholders was to convey 85% of the value of successful Anchor litigation to LTW holders. The idea that Dime Bank issued the LTWs simply to provide LTW holders with increased equity value in Dime Bank is simply not true.

If I may, I would like to give you a little more color on creating the LTWs.

First, we created the LTWs because upon issuance, the LTWs would immediately be "value accretive;" in other words, the value of our common stock plus the value of the LTWs (just after issuance of the LTWs) would exceed the value of our common stock just prior to issuance. Second, if Dime was to ever issue equity in the future, either to raise capital or in connection with the acquisition of another bank or financial services company, LTW holders would not have their respective value in the Anchor litigation diluted. Further, we felt strongly that Dime's stock price did not reflect the significant value of the lawsuit and we wanted to split that value out as a separate financial instrument in order to allow our shareholders to evaluate and invest in the underlying asset (the lawsuit) independent of their interest in investing in Dime stock.

Our Board approved the issuance of LTWs just prior to our issuance of a significant amount of equity to Warburg Pincus, a private equity investment firm. At the time, we believed the lawsuit could have a value in excess of $1 Billion. The intent of the LTW issuance was very clear to me, as well as to all of the undersigned: to separate the value of the Anchor Litigation from that of the rest of the bank so that the existing Dime shareholders would not be diluted in their right to receive the value of any payout resulting from the litigation.

There was one necessary evil inherent in the value separation mechanism: In order to avoid any tax upon so-called "phantom" income that might occur upon the initial issuance of the LTWs, and which might have resulted in a current tax liability to our shareholders, we decided to call the instrument a "warrant." However, the name given to the instrument was in our view a misnomer because at issuance the LTW was not considered by the bank to be equity. To this point, warrants are like options; they have a strike price. Here, by contrast, there was no exercise price. In other words, the name given to this instrument was simply a tax strategy that we agreed upon *after* we decided to separate and convey the value of the Anchor litigation to our shareholders through a Litigation Tracking Warrant. Indeed, elsewhere in the warrant agreement, the bank made clear that if equity were unavailable, then the LTW holders would be entitled to monetize their claim to 85% of the value of the Anchor litigation through other, valuable non-equity consideration, including cash, securities or other property. That's why,

Honorable Mary F. Walrath

February 16, 2012

Your Honor, upon issuance, the LTWs were neither equity nor debt. Rather, the LTWs were an obligation of the bank, a promise by the bank to LTW holders to provide them with 85% of the economic value of the Anchor litigation, regardless of the form of consideration used to monetize that value.

You Honor, our intention was always clear: Dime issued these LTWs to give 85% of the value of the Anchor litigation to LTW holders, not to give LTW holders a claim to more equity in the bank equal to 85% of the Anchor litigation. Given potential tax considerations upon issuance, the mechanics of issuing the LTWs were problematic, but to be clear, and to reiterate, it would be erroneous for anyone to suggest that Dime Senior Management and its Board issued the LTWs in order to increase the amount of equity contained in our capital structure

I, as well as many original Dime shareholders, continue to hold LTW shares. We held them for all these years on the basis that we were the legal beneficiaries of any payout related to the litigation regardless of the financial fate of Dime Bancorp. The documentation for the LTW's did not consider the possibility of bankruptcy as a risk to LTW holders claiming 85% of the value of the Anchor litigation. At that time the notion that bankruptcy would eviscerate the value of the LTWs (through issuance of worthless equity) was simply unthinkable. For these reasons, it would be unjust for anyone other than LTW holders to benefit from the pending payout expected from the FDIC

Your Honor, I know you worked very hard here in this case, and I think it is regrettable that no one associated with the litigation brought these facts to your attention earlier. On behalf of my former colleagues at Dime I want to thank you for considering what I have had to say in this letter.

Very truly yours,

D. James Daras
Former Executive Vice President and Treasurer, Dime Bancorp

# EXHIBIT 2D

02/27/2012  17:43      9734025311                                    PAGE   01



# Franklin Madison, LLC

**1055 Parsippany Blvd. Suite 303
Parsippany, New Jersey 07054
Fax: (973) 402-5311**

# Fax transmittal

**to:** BEN BUSH

**fax:** 1-310-496-3229

**from:**
☒ ANTHONY BURRIESCI                          973-402-6459

☐ MICHAEL GALLAGHER                        973-402-6458

**date:** 2/27/2012

**re:** DIME WARRANTS

YOU SHOULD RECEIVE ___2___ PAGE(S), INCLUDING THIS COVER SHEET.

**NOTES:** 1

I sent the attached letter to Judge Walrath on February 17, 2012.

Anthony R. Burriesci

February 16, 2012

Honorable Mary F. Walrath
United States Bankruptcy Court
District of Delaware
824 North Market Street, 5th Floor
Wilmington, DE 19801

**Re:**    **Nantahala et al. v. Washington Mutual Inc. ("Dime Litigation Tracking Warrants")**

      **Ch. 11 Case No. 08-12229 (MFW)**
      **(Jointly Administered)**

      **Adv. Proc. No. 10-50911 (MFW)**

      **Re: D.I. Nos. 314, 323, 424, 325, 9389, 9472, 9486, 9487, 9494, 9504, 9515**

Dear Judge Walrath:

I am writing in support of the letters you received from Messrs. Daras and Burns, my former colleagues at Dime Bancorp, regarding Dime's Litigation Tracking Warrants (LTW's). I am a former Executive Vice President and Chief Financial Officer of Dime Savings Bank and its parent Dime Bancorp, Inc. Messrs. Daras and Burns both reported to me. My employment at Dime began in 1997 and ended approximately one month after the merger with Washington Mutual in early 2002.

The comments as to intent and purpose made by Messrs. Daras and Burns accurately reflect the facts as they existed at the time we issued the LTW's. I just wanted to reflect my complete concurrence and support for the statements made.

I too think it is regrettable that no one associated with the litigation brought these facts to your attention earlier. Thank you for considering what we have had to say in this matter.

Very truly yours,

Anthony R. Burriesci
Former Executive Vice President and Chief Financial Officer, Dime Bancorp

# EXHIBIT 3



# DIME BANCORP INC

## FORM 8-A12G
### (Securities Registration (section 12(g)))

## Filed 12/15/00

| | |
|---|---|
| Address | 589 5TH AVE |
| | NEW YORK, NY 10017 |
| Telephone | 2123266170 |
| CIK | 0000919568 |
| SIC Code | 6035 - Savings Institutions, Federally Chartered |
| Industry | S&Ls/Savings Banks |
| Sector | Financial |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2011, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8-A

**FOR REGISTRATION OF CERTAIN CLASSES OF SECURITIES
PURSUANT TO SECTION 12(b) OR 12(g) OF THE
SECURITIES EXCHANGE ACT OF 1934**

# Dime Bancorp, Inc.
(Exact Name of Registrant as Specified in its Charter)

| DELAWARE | 11-3197414 |
|---|---|
| (State of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| 589 Fifth Avenue, New York, New York | 10017 |
| (Address of Principal Executive Offices) | (Zip Code) |

If this form relates to the registration of a class of securities pursuant to Section 12(b) of the Exchange Act and is effective pursuant to General Instruction A.(c), check the following box. [_]

If this form relates to the registration of a class of securities pursuant to Section 12(g) of the Exchange Act and is effective pursuant to General Instruction A.(d), check the following box. [X]

Securities Act registration statement file number to which this form relates: (if applicable).

Securities to be registered pursuant to Section 12(b) of the Act:

NONE

Securities to be registered pursuant to Section 12(g) of the Act:

Litigation Tracking Warrants, for the purchase of shares of common stock, par value $0.01 per share, of Dime Bancorp, Inc.

(Title of class)

**Item 1. Description of Registrant's Securities to be Registered.**

A complete description of the litigation tracking warrants (the "LTWs") to be registered hereunder is contained under the caption "Description of the LTWs" in the Prospectus forming a part of the Form S-3 Registration Statement (File No. 333-48368) of Dime Bancorp, Inc. ("Dime"), originally filed on October 20, 2000, as amended, with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). Such description is hereby incorporated by reference and any such description included in a form of prospectus subsequently filed by Dime pursuant to Rule 424(b) under the Securities Act shall also be deemed to be incorporated herein by reference.

**Item 2. Exhibits.**

| Exhibit Number | Description |
| --- | --- |
| 1. | Amended and Restated Certificate of Incorporation of Dime (incorporated by reference to Exhibit 3.1 to Dime's Quarterly Report on Form 10-Q for the quarter ended March 31, 1998, filed with the SEC on May 15, 1998 (SEC file no. 001-13094). |
| 2. | By-laws of Dime (incorporated by reference to Exhibit 3 to Dime's Quarterly Report on Form 10-Q for the quarter ended June 30, 1997 filed with the SEC on August 14, 1997 (SEC file no. 001-13094). |
| 3. | Form of Warrant Agreement, among Dime, EquiServe Trust Company, N.A. and Equiserve Limited Partnership, pertaining to the Litigation Tracking Warrants. |
| 4. | Form of Warrant Certificate (included in Exhibit 3). |

1

## SIGNATURE

Pursuant to the requirements of Section 12 of the Securities Exchange Act of 1934, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized.

**DIME BANCORP, INC.**

```
By:      /s/ James E. Kelly
    ----------------------------------
         James E. Kelly
         General Counsel
```

Date: December 15, 2000

2

## EXHIBIT INDEX

| Exhibit Number | Description |
| --- | --- |
| 1. | Amended and Restated Certificate of Incorporation of Dime (incorporated by reference to Exhibit 3.1 to Dime's Quarterly Report on Form 10-Q for the quarter ended March 31, 1998, filed with the SEC on May 15, 1998, (SEC file no. 001-13094). |
| 2. | By-laws of Dime (incorporated by reference to Exhibit 3 to Dime's Quarterly Report on Form 10-Q for the quarter ended June 30, 1997 filed with the SEC on August 14, 1997 (SEC file no. 001-13094). |
| 3. | Form of Warrant Agreement, between Dime and EquiServe Trust Company N.A., pertaining to the Litigation Tracking Warrants. |
| 4. | Form of Warrant Certificate (included in Exhibit 3). |

3

Exhibit 3

Form of

**Warrant Agreement**

**Dated as of**

December [ ], 2000

among

**Dime Bancorp, Inc.**

**EquiServe Trust Company, N.A.**

and

**EquiServe Limited Partnership**

**as the Warrant Agent**

# TABLE OF CONTENTS

## Article I

## Defined Terms

| | Page |
|---|---|
| 1.1 Definitions.............................................. | 1 |
| 1.2 Other Definitions...................................... | 3 |

## Article II

### Warrant Certificates

| | |
|---|---|
| 2.1 Issuance of Warrant Certificates.................................. | 4 |
| 2.2 Form and Dating.................................................. | 4 |
| 2.3 Execution and Countersignature.................................. | 4 |
| 2.4 Certificate Register............................................ | 5 |
| 2.5 Transfer and Exchange........................................... | 5 |
| 2.6 Replacement Certificates........................................ | 6 |
| 2.7 Temporary Certificates.......................................... | 7 |
| 2.8 Cancellation.................................................... | 7 |
| 2.9 Purchase of Warrants by the Company............................. | 7 |

## Article III

### Exercise Terms

| | |
|---|---|
| 3.1 Number of Warrant Shares; Exercise Price........................ | 7 |
| 3.2 Exercise Period................................................. | 7 |
| 3.3 Expiration...................................................... | 8 |
| 3.4 Manner of Exercise.............................................. | 8 |
| 3.5 Issuance of Warrant Shares...................................... | 8 |
| 3.6 Fractional Warrant Shares....................................... | 9 |
| 3.7 Reservation of Warrant Shares................................... | 9 |
| 3.8 Compliance with Law............................................. | 9 |
| 3.9 Holders Not Entitled to Interest................................ | 9 |

## Article IV

### Adjustments

| | |
|---|---|
| Reclassifications, Redesignations or Reorganizations of Common | |
| 4.1 Stock.......................................................... | 10 |
| 4.2 Combination.................................................... | 10 |
| 4.3 Exercise Price Adjustment...................................... | 10 |
| 4.4 Other Events................................................... | 11 |
| 4.5 Notice of Certain Transactions................................. | 11 |
| 4.6 Adjustment to Warrant Certificate.............................. | 11 |

## Article V

### Warrant Agent

| | |
|---|---|
| 5.1 Nature of Duties and Responsibilities Assumed.................... | 11 |
| 5.2 Right to Consult Counsel........................................ | 12 |
| 5.3 Compensation and Reimbursement.................................. | 13 |
| 5.4 Indemnification................................................. | 13 |
| 5.5 Warrant Agent May Hold Company Securities....................... | 13 |
| 5.6 Change of Warrant Agent......................................... | 13 |

i

Article VI

**Rights of Holders**

|  |  | Page |
|---|---|---|
| 6.1 | Holders not Stockholders | 13 |
| 6.2 | Claims by Holders | 14 |
| 6.3 | Control of Litigation | 14 |
| 6.4 | Determination of Values | 14 |

Article VII

Miscellaneous

|  |  |  |
|---|---|---|
| 7.1 | Information | 14 |
| 7.2 | Amendment | 14 |
| 7.3 | Notices | 15 |
| 7.4 | GOVERNING LAW | 15 |
| 7.5 | WAIVER OF JURY TRIAL | 15 |
| 7.6 | Entire Agreement, Etc | 16 |
| 7.7 | Counterparts and Facsimile | 16 |
| 7.8 | Captions | 16 |
| 7.9 | Severability | 16 |
| 7.10 | No Third Party Beneficiaries | 16 |
| 7.11 | Successors | 16 |

EXHIBIT A--Form of Warrant Certificate
EXHIBIT B--Form of Election to Purchase Warrant Shares EXHIBIT C--Certificate for Exchange of Global Warrant Certificate

ii

Warrant Agreement, dated as of December [ ], 2000 (this "Agreement"), among Dime Bancorp, Inc., a Delaware corporation (the "Company") and EquiServe Trust Company, N.A. and EquiServe Limited Partnership collectively as Warrant Agent (in such capacity, the "Warrant Agent").

### Recitals

A. The Board of Directors of the Company has authorized a distribution (the "Distribution") of one Litigation Tracking Warrant(TM) (a "Warrant") for each share of the Company's common stock, par value $0.01 per share ("Common Stock"), outstanding as of the Close of Business (as defined below) on the Record Date (as defined below). Each Warrant represents the right to purchase shares or a portion of a share of Common Stock (subject to adjustment as provided herein), upon the terms and subject to the conditions herein set forth.

B. In order to issue Warrants in the Distribution and to issue Warrants to holders of outstanding Convertible Securities (as defined herein) who exercise or convert such Convertible Securities at any time and from time to time before the occurrence of the Trigger (as defined herein), the Company has determined to enter into this Agreement with the Warrant Agent.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties agree as follows:

### Article I

### Defined Terms

1.1 Definitions. As used in this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

"Adjusted Litigation Recovery" means an amount equal to 85% of the amount obtained from the following equation: (a) the Amount Recovered minus (b) the sum of the following: (i) the total of all expenses incurred by or on behalf of the Bank and the Company in pursuing the Litigation and obtaining the Amount Recovered (whether incurred before or after the date hereof), including, without limitation, fees and expenses of counsel, witnesses, experts and consultants, (ii) the total of all expenses incurred by the Company in connection with the creation, issuance and trading of the Warrants, including, without limitation, legal, financial advisory and accounting fees, the fees and expenses of the Warrant Agent and printing and registration costs (whether incurred before or after the date hereof) and (iii) an amount equal to the Amount Recovered, less the expenses described in the preceding clauses (i) and
(ii), multiplied by the combined highest federal, New York State and New York City income tax rates applicable to financial institutions in the year (or years) in which the amount of the damages (in whole or in part) is fixed or determinable (after taking into account the effect of the deductibility of such taxes for federal and state income tax purposes).

"Adjusted Stock Price" means the average of the daily Closing Prices of a share of Common Stock for the thirty consecutive Trading Days ending on and including the Determination Date minus $0.01; provided, that if the context in which this defined term is used is with respect to securities other than shares of Common Stock, then "Adjusted Stock Price" means the average of the daily Closing Prices of a unit of such securities for the thirty consecutive Trading Days ending on and including the Determination Date minus the exercise price determined for such securities in the manner described in Section 4.3; and provided, further that if the context in which this defined term is used is with respect to property other than publicly traded securities, then "Adjusted Stock Price" means the Fair Market Value of the amount of such property distributable in respect of one share of Common Stock.

"Amount Recovered" means the aggregate amount of any cash payment and the Fair Market Value of any property or assets actually received by the Bank pursuant to a final, nonappealable judgment in or final settlement of the Litigation (including any post-judgment interest actually received by the Bank on any Amount Recovered).

"Assistant Secretary" means any assistant secretary or person of similar title of the Company.

"Bank" means The Dime Savings Bank of New York, FSB, a federally chartered savings bank or any successor thereto.

"Board" means the Board of Directors of the Company or any committee thereof duly authorized to act on behalf of such Board of Directors.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"Close of Business" on any given date means 5:00 P.M., New York City time, on such date; provided, however, that if such date is not a Business Day it will mean 5:00 P.M., New York City time, on the next succeeding Business Day.

"Closing Price" on any day means the closing sale price regular way (with any relevant due bills attached) of a share of Common Stock on such day, or in case no such sale takes place on such day, the average of the reported closing bid and asked prices regular way (with any relevant due bills attached) of a share of Common Stock, in each case on the NYSE Composite Tape (or any successor composite tape reporting transactions on national securities exchanges), or, if the Common Stock is not listed or admitted to trading on the NYSE, on the principal national securities exchange on which the Common Stock is listed or admitted to trading (which will be the national securities exchange on which the greatest number of shares of Common Stock has been traded during the five consecutive Trading Days ending on and including the Determination Date), or, if not listed or admitted to trading on any national securities exchange, the average of the closing bid and asked prices regular way (with any relevant due bills attached) of a share of Common Stock on the over-the-counter market on the day in question as reported by NASDAQ, or a similar generally accepted reporting service, or if not so available as determined in good faith by the Board, on the basis of such relevant factors as it in good faith considers appropriate.

"Combination" means an event in which the Company consolidates with, merges with or into, or sells all or substantially all its property and assets to another Person.

"Determination Date" means the 30th calendar day before the date on which the Bank receives the total amount of the Amount Recovered unless such date is not a Trading Day, in which case the Determination Date will be the next succeeding Trading Day. If the Amount Recovered is payable by the United States Government in installments, the Determination Date will be the 30th calendar day before the date on which the Bank receives the last installment of the Amount Recovered unless such date is not a Trading Day, in which case the Determination Date will be the next succeeding Trading Day.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Fair Market Value" means the fair market value of the relevant property on the Determination Date as determined in good faith by the Board, on the basis of such factors as it in good faith considers appropriate.

"Holder" means the duly registered holder of a Warrant under the terms of this Agreement.

"Litigation" means the Bank's case against the United States Government in the United States Court of Federal Claims entitled Anchor Savings Bank, FSB v. United States, No. 95-39C, filed on January 13, 1995.

"NASDAQ" means the stock market and automated quotation system operated by the National Association of Securities Dealers, Inc.

"NYSE" means the stock exchange operated by New York Stock Exchange, Inc.

"Officer" means the Chief Executive Officer, the President or any Executive Vice President of the Company.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Record Date" means the date fixed by the Board for the Distribution.

"SEC" means the Securities and Exchange Commission.

"Secretary" means the secretary of the Company.

"Securities Act" means the Securities Act of 1933, as amended.

"Trading Day" means a date on which the NYSE or NASDAQ (or any successor thereto) is open for the transaction of business.

"Trigger" means the occurrence of all of the following events: (a) receipt by the Bank of the Amount Recovered in full, (b) determination by the Bank of the amount of the Adjusted Litigation Recovery and (c) receipt of all regulatory approvals necessary to issue the shares of Common Stock to be issued upon the exercise of the Warrants, including without limitation, the effectiveness of a registration statement relating to the issuance of the Warrant Shares under the Securities Act.

"Warrant Shares" means the shares of Common Stock of the Company issued and received upon exercise of the Warrants.

1.2 Other Definitions

| Term | Defined in Section |
| --- | --- |
| "Agent Members" | 2.2(c) |
| "Certificate Register" | 2.4 |
| "Certificated Warrants" | 2.2(a) |
| "Common Stock" | Recitals |
| "Company" | Recitals |
| "Convertible Securities" | 2.1(b) |
| "Distribution" | Recitals |
| "DTC" | 2.2(b) |
| "Exercise Notice" | 3.2 |
| "Global Warrant" | 2.2(b) |
| "Maximum Number of Warrants" | 2.1(c) |
| "Number of Shortfall Shares" | 3.7(b) |
| "Registrar" | 3.7(a) |
| "SARs" | 2.1(b) |
| "Stock Options" | 2.1(b) |
| "Successor Company" | 4.2(b) |
| "Termination Date" | 3.3 |
| "Termination Notice" | 3.3 |
| "Transfer Agent" | 3.5 |
| "Warrant" | Recitals |
| "Warrant Agent" | Recitals |
| "Warrant Certificate" | 2.1(a) |
| "Warrant Exercise Period" | 3.2(b) |

3

## Article II

### Warrant Certificates

2.1 Issuance of Warrant Certificates. (a) As soon as practicable after the Record Date, the Warrant Agent will prepare and execute, the Company will countersign, and the Warrant Agent will send by first-class, postage-prepaid mail or other means as required by the Warrant Agent's insurance, to each record holder of Common Stock as of the Close of Business on the Record Date, at the address of such holder shown on the records of the Company, one or more Warrant Certificates, in substantially the form of Exhibit A hereto (a "Warrant Certificate"), evidencing one Warrant for each share of Common Stock held.

(b) At any time and from time to time before the Trigger occurs, the Company may cause the Warrant Agent to issue, in accordance with the provisions of this Article 2, Warrants to holders of stock options of the Company (the "Stock Options") that were outstanding on the Record Date, who exercise or convert such Convertible Securities into shares of Common Stock and Warrants in accordance with the terms and conditions of such Convertible Securities.

(c) The maximum number of Warrants (the "Maximum Number of Warrants") that may be issued hereunder is equal to (i) the number of shares of Common Stock outstanding on the Record Date plus (ii) the number of Warrants that holders of Convertible Securities would be entitled to receive had such Convertible Securities been exercised immediately before the Record Date.

2.2 Form and Dating. The Warrant Certificates will be substantially in the form of Exhibit A, hereto. The Warrants may have such notations, legends or endorsements as the Company may deem appropriate and as are not inconsistent with the provisions hereof or as may be required by law, stock exchange or stock market rule, agreements to which the Company is subject, if any, or usage (provided that any such notation, legend or endorsement is in a form acceptable to the Company). Each Warrant will be dated the date of its countersignature.

(a) Certificated Warrants. The Warrants may be issued in definitive form represented by a physical Warrant Certificate (such certificate and all other certificates representing physical delivery of Warrants in definitive form being called "Certificated Warrants").

(b) Global Warrant. The Warrants may be issued in the form of one or more fully registered global certificates with the global securities legend set forth in Exhibit A hereto (the "Global Warrant"), which will be registered in the name of the Warrant Agent on behalf of beneficial owners of Warrants and deposited in an account with the Depository Trust Company (or with such other custodian as it may direct) ("DTC") , and registered in the name of DTC or a nominee of DTC, duly executed by the Company and countersigned by the Warrant Agent as hereinafter provided. The number of Warrants represented by Global Warrants may from time to time be increased or decreased by adjustments made on the records of the Warrant Agent and DTC or its nominee as hereinafter provided. Except as provided in Section 2.5, owners of beneficial interests in a Global Warrant will not be entitled to receive physical delivery of Certificated Warrants.

(c) Book-Entry Provisions. Members of, or participants in, DTC ("Agent Members") will have no rights under this Agreement with respect to any Global Warrant held on their behalf with DTC or by the Warrant Agent or under such Global Warrant, and DTC may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all purposes whatsoever. Notwithstanding the foregoing, nothing herein will prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or impair, as between DTC and its Agent Members, the operation of customary practices of DTC governing the exercise of the rights of a holder of a beneficial interest in any Global Warrant.

2.3 Execution and Countersignature. (a) With respect to any Global Warrant to be issued hereunder, one Officer will sign, and the Secretary or any Assistant Secretary will attest, such Global Warrant. The Warrant

4

Agent, upon the written order of the Company signed by an Officer, will countersign any Global Warrant certificate by manual or facsimile signature, and such Global Warrant will be deposited in accordance with Section 2.2(b) hereof.

(b) With respect to all other Warrants, an Officer will sign, and the Company's Secretary or any of its Assistant Secretaries will attest, the Warrant Certificates for the Company by manual or facsimile signature. The Warrant Agent will countersign and deliver the Warrant Certificates for original issue, in each case upon a written order of the Company signed by an Officer of the Company. Such order will specify (in addition to the number of Warrants) the date on which the original issue of Warrants is to be countersigned.

(c) If an Officer whose signature is on a Warrant Certificate no longer holds that office at the time the Warrant Agent countersigns the Warrant Certificate, the Warrant will be valid nevertheless. A Warrant will not be valid until an authorized signatory of the Warrant Agent manually countersigns the Warrant Certificate. The signature will be conclusive evidence that the Warrant Certificate has been countersigned under this Agreement.

(d) The Warrant Agent may appoint an agent reasonably acceptable to the Company to countersign the Warrant Certificates. Unless limited by the terms of such appointment, such agent may countersign Warrant Certificates whenever the Warrant Agent may do so. Each reference in this Agreement to countersignature by the Warrant Agent includes by such agent. Such agent will have the same rights as the Warrant Agent for service of notices and demands.

2.4 Certificate Register. The Warrant Agent will keep a register (the "Certificate Register") of the Warrant Certificates and of their transfer and exchange which the Company may examine upon reasonable notice. The Certificate Register will show the names and addresses of the respective Holders and the date and number of Warrants evidenced on the face of each of the Warrant Certificates. The Company and the Warrant Agent may deem and treat the Person in whose name a Warrant Certificate is registered as the absolute owner of such Warrant Certificate and neither the Company nor the Warrant Agent will be affected by notice to the contrary.

2.5 Transfer and Exchange.

(a) Transfer and Exchange of Certificated Warrants. When Certificated Warrants are presented to the Warrant Agent with a request to register the transfer or exchange of such Certificated Warrants, the Warrant Agent will register the transfer or make the exchange as requested if its reasonable requirements for such transaction are met; provided, however, that the Certificated Warrants surrendered for transfer or exchange will be duly endorsed or accompanied by a written instrument of transfer in form reasonably satisfactory to the Company and the Warrant Agent, duly executed by the Holder thereof or its attorney duly authorized in writing.

(b ) Restrictions on Transfer of Certificated Warrants for a Beneficial Interest in a Global Warrant. Certificated Warrants may not be exchanged for a beneficial interest in a Global Warrant except upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of Certificated Warrants, duly endorsed or accompanied by appropriate instruments of transfer, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct DTC to make, an adjustment on its books and records with respect to such Global Warrants to reflect an increase in the number of Warrants represented by the Global Warrant, then the Warrant Agent will cancel such Certificated Warrants and cause, or direct DTC to cause, in accordance with the standing instructions and procedures existing between DTC and the Warrant Agent, the number of Warrants represented by the Global Warrant to be increased accordingly.

(c) Transfer and Exchange of Global Warrants. The transfer and exchange of beneficial interests in a Global Warrant will be effected through DTC, in accordance with this Agreement and the procedures of DTC.

5

(d) Restrictions on Transfer and Exchange of the Global Warrant. Notwithstanding any other provisions of this Agreement, Global Warrants may not be transferred as a whole except by DTC to a nominee of DTC or by a nominee of DTC to DTC or another nominee of DTC or by DTC or any such nominee to a successor depositary or a nominee of such successor depositary.

(e) Authentication and Distribution of Certificated Warrants. If at any time:

(i) DTC notifies the Company that DTC is unwilling or unable to continue as depositary for Global Warrants and a successor depositary for Global Warrants is not appointed by the Company within 90 calendar days after delivery of such notice;

(ii) DTC ceases to be a clearing agency registered under the Exchange Act; or

(iii) the Company, in its sole discretion, notifies the Warrant Agent in writing that it elects to cause the issuance of Certificated Warrants under this Agreement;

then, the Company will execute, and the Warrant Agent, upon receipt of a written order of the Company signed by an Officer requesting the delivery of Certificated Warrants to the holders of beneficial interests in the Global Warrant, will countersign and deliver Certificated Warrants equal to the number of Warrants represented by Global Warrants, in exchange for such Global Warrants. Certificated Warrants issued in exchange for a beneficial interest in a Global Warrant will be registered in such names and in such authorized denominations as DTC, pursuant to instructions from its direct or indirect participants or otherwise, will instruct the Warrant Agent. The Warrant Agent will deliver such Certificated Warrants to the Persons in whose names such Warrants are so registered in accordance with the instructions of DTC.

(f) Cancellation or Adjustment of Global Warrants. At such time as all beneficial interests in Global Warrants have either been exchanged for Certificated Warrants, redeemed, repurchased or canceled, such Global Warrant will be returned to DTC for cancellation or retained and canceled by the Warrant Agent. At any time before such cancellation, if any beneficial interest in a Global Warrant is exchanged for Certificated Warrants, redeemed, repurchased or canceled, the number of Warrants represented by such Global Warrant will be reduced and an adjustment will be made on the books and records of the Warrant Agent with respect to such Global Warrant, by the Warrant Agent or DTC, to reflect such reduction.

(g) Obligations with Respect to Transfers and Exchanges of Warrants.

(i) To permit registrations of transfers and exchanges, the Company will execute and the Warrant Agent will countersign Certificated Warrants and Global Warrants as required pursuant to the provisions of this Section 2.5.

(ii) All Certificated Warrants and Global Warrants issued upon any registration of transfer or exchange of Certificated Warrants will be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Certificated Warrants or Global Warrants surrendered upon such registration of transfer or exchange.

(iii) Before due presentment for registration of transfer of any Warrant, the Warrant Agent and the Company may deem and treat the Person in whose name any Warrant is registered as the absolute owner of such Warrant and neither the Warrant Agent nor the Company will be affected by notice to the contrary.

(iv) No service charge will be made to a Holder for any registration of transfer or exchange upon surrender of any Warrant Certificate at the office of the Warrant Agent maintained for that purpose. The Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrant Certificates.

2.6 Replacement Certificates. If a mutilated Warrant Certificate is surrendered to the Warrant Agent or if the Holder of a Warrant Certificate claims that the Warrant Certificate has been lost, destroyed or wrongfully taken, the Company will issue and the Warrant Agent will countersign a replacement Warrant Certificate if the

6

reasonable requirements of the Warrant Agent and of Section 8-405 of the Uniform Commercial Code as in effect in the State of New York are met. If required by the Warrant Agent or the Company, such Holder will furnish an indemnity bond or other instrument sufficient in the judgment of the Company and the Warrant Agent to protect the Company and the Warrant Agent from any loss which either of them may suffer if a Warrant Certificate is replaced. The Company and the Warrant Agent may charge the Holder for their expenses in replacing a Warrant Certificate.

2.7 Temporary Certificates. Until definitive Warrant Certificates are ready for delivery, the Company may prepare and the Warrant Agent will countersign temporary Warrant Certificates. Temporary Warrant Certificates will be substantially in the form of definitive Warrant Certificates but may have variations that the Company considers appropriate for temporary Warrant Certificates. Without unreasonable delay, the Company will prepare and the Warrant Agent will countersign definitive Warrant Certificates and deliver them in exchange for temporary Warrant Certificates.

2.8 Cancellation. (a) In the event the Company will purchase or otherwise acquire Certificated Warrants, the same will thereupon be delivered to the Warrant Agent for cancellation.

(b) The Warrant Agent and no one else will cancel and destroy all Warrant Certificates surrendered for transfer, exchange, replacement, exercise or cancellation and deliver a certificate of such destruction to the Company unless the Company directs the Warrant Agent to deliver canceled Warrant Certificates to the Company. The Company may not issue new Warrant Certificates to replace Warrant Certificates to the extent they evidence Warrants that have been exercised or Warrants that the Company has purchased or otherwise acquired.

2.9 Purchase of Warrants by the Company. The Company will have the right, except as limited by law or other agreement, to purchase or otherwise acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate.

**Article III**

**Exercise Terms**

3.1 Number of Warrant Shares; Exercise Price. Each Warrant will, upon exercise thereof as provided herein, initially entitle the Holder thereof to purchase the number of shares of Common Stock having an Adjusted Stock Price equal to the Adjusted Litigation Recovery divided by the Maximum Number of Warrants at an exercise price per Warrant equal to the number of shares of Common Stock for which the Warrant is exercisable multiplied by $0.01 (the "Exercise Price"). All calculations made pursuant to this Section 3.1 will be rounded to the nearest ten-thousandth. When exercising Warrants, a Holder shall pay a total Exercise Price of $0.01 per each whole share of Common Stock the Holder will receive upon such exercise.

3.2 Exercise Period. (a) The Company will provide notice, as described below (the "Exercise Notice") to each Holder and the Warrant Agent, of the occurrence of the Trigger not more than 15 calendar days after the occurrence thereof. If the Amount Recovered is payable by the United States government in installments, the Trigger will not be deemed to have occurred until the Bank receives the last installment of the Amount Recovered. The Exercise Notice will be dated the date it is first sent to Holders and will be provided by means of a press release to one or more national news services and by mailing such notice first class, postage prepaid, to each Holder at such Holder's address as it appears on the Certificate Register; provided, however, that neither the failure to give such notice by mail to any particular Holder nor any defect therein will affect the validity of the Exercise Notice or the expiration of all Warrants on the Close of Business on the last day of the Warrant Exercise Period with respect to the other Holders. The Exercise Notice will contain the following information:

(i) that the Trigger has occurred,

(ii) the total number of shares for which the Warrants are exercisable,

7

(iii) the number of shares of Common Stock for which one Warrant is exercisable,

(iv) the Exercise Price per Warrant,

(v) the manner in which the Warrants are exercisable, and

(vi) the date on which the Warrants will no longer be exercisable.

(b) Subject to the terms and conditions set forth herein, each Warrant will be exercisable at any time or from time to time during the 60-day period commencing on the date on which the Exercise Notice is first sent to Holders pursuant to Section 3.2(a) (the "Warrant Exercise Period").

(c) No Warrant will be exercisable after the Close of Business on the last day of the Warrant Exercise Period.

3.3 Expiration. A Warrant will terminate and become void as of the earlier of the Close of Business on the last day of the Warrant Exercise Period, the Close of Business on the date the Litigation has been disposed of in a manner such that no shares of Common Stock or other securities or property will be issuable under the terms of the Warrants (the "Termination Date") or the time and date such Warrant is exercised. The Company will provide notice, as described below (the "Termination Notice"), of the occurrence of the Termination Date or the expiration of the Warrant Exercise Period not more than 60 calendar days after the occurrence thereof. The Termination Notice will be dated the date it is first sent to Holders and will be provided by means of a press release to one or more national news services and by mailing such notice first class, postage prepaid, to each Holder at such Holder's address as it appears on the Certificate Register. The Termination Notice will state the following:

(i) that the Termination Date has occurred or the Warrant Exercise Period has expired, as the case may be, and

(ii) that all outstanding Warrants have terminated and become void.

The Warrants will terminate and become void as provided herein notwithstanding the Company's failure to give the Termination Notice.

3.4 Manner of Exercise. Warrants may be exercised upon (i) surrender to the Warrant Agent of the Warrant Certificates, together with the form of election to purchase Common Stock on the reverse thereof properly completed and validly executed by the Holder thereof and (ii) payment to the Warrant Agent, for the account of the Company, of the total Exercise Price for the number of Warrants being exercised. Such payment will be made by certified or official bank check or personal check payable to the order of the Company. Subject to Sections 3.2 and 3.3, the Warrants will be exercisable at the election of the Holders thereof either in full at any time or from time to time in part. In the event that a Warrant Certificate is surrendered for exercise in respect of less than all the Warrant Shares purchasable on such exercise at any time before the expiration of the Warrant Exercise Period a new Warrant Certificate exercisable for the remaining Warrant Shares will be issued and its exercise will also be subject to Sections 3.2 and 3.3. The Warrant Agent will countersign and deliver the required new Warrant Certificates, and the Company, at the Warrant Agent's request, will supply the Warrant Agent with Warrant Certificates duly signed on behalf of the Company for such purpose. The Warrant Agent will account promptly to the Company with respect to all Warrants exercised and concurrently pay to the Company all moneys received by the Warrant Agent for the purchase of shares of Common Stock through the exercise of such Warrants.

3.5 Issuance of Warrant Shares. Subject to Section 3.6, upon the surrender of Warrant Certificates and payment of the Exercise Price in accordance with
Section 3.4, the Company will issue and cause the Warrant Agent or, if appointed, a transfer agent for the Common Stock ("Transfer Agent") to countersign and deliver to or upon the written order of the Holder and in such name or names as the Holder may designate, a certificate or certificates for the number of full Warrant Shares so purchased upon the exercise of such Warrants or such other securities or property to which it is entitled, to the Person or Persons entitled to receive the same, together

8

with cash as provided in Section 3.6 in respect of any fractional Warrant Shares. Such certificate or certificates will be deemed to have been issued and any Person so designated to be named therein will be deemed to have become a holder of record of such Warrant Shares as of the date of the surrender of such Warrant Certificates and payment of the Exercise Price.

3.6 Fractional Warrant Shares. The Company will not issue fractional Warrant Shares. If any fraction of a Warrant Share would, except for this Section 3.6, be issuable, the Company will pay an amount in cash equal to (a) the sum of (i) the Adjusted Stock Price and (ii) $0.01 (the Exercise Price per whole Warrant Share that would have been received), multiplied by (b) such fraction. Such cash amount will be rounded to the nearest whole cent.

3.7 Reservation of Warrant Shares. (a) The Company will use its best efforts to at all times keep reserved and available out of its authorized and unissued shares of Common Stock or shares of Common Stock held in its treasury a number of shares of Common Stock sufficient to provide for the exercise in full of all Warrants then outstanding or reserved for issuance pursuant to Section 2.1. The registrar for the Common Stock (the "Registrar") will at all times until the Termination Date, or the time at which all Warrants have been exercised or canceled, reserve such number of authorized shares as will be required for such purpose. The Company will keep a copy of this Agreement on file with the Registrar. The Company will supply such Registrar with duly executed stock certificates for such purpose and will itself provide or otherwise make available any cash which may be payable as provided in Section 3.6. The Company will furnish to such Registrar a copy of all notices of adjustments and certificates related thereto transmitted to each Holder.

(b) If, upon the Trigger, the number of shares of Common Stock authorized but not issued plus the number of shares of Common Stock held in the Company's treasury is less than the number of shares of Common Stock necessary to permit the exercise in full of the Warrants then outstanding or reserved for issuance pursuant to Section 2.1 (the number of shares of Common Stock comprising such deficiency being the "Number of Shortfall Shares"), then the Company will either (i) to the extent permitted by applicable law and any material agreements then in effect to which the Company is a party, commence a tender offer or buyback for the aggregate number of shares of Common Stock at least equal to the Number of Shortfall Shares or (ii) call a special meeting of the holders of Common Stock for the purpose of increasing the number of authorized shares of Common Stock in an amount at least equal to the Number of Shortfall Shares. In such an event, the Warrant Exercise Period will be automatically extended to 60 calendar days after (A) the date on which the tender offer or buyback referred to in clause (i) above is successfully completed or (B) the effective date of the increase in the number of authorized shares of Common Stock referred to in clause (ii) above.

(c) The Company covenants that all shares of Common Stock that may be issued upon exercise of Warrants will, upon issue, be fully paid, nonassessable, free of preemptive rights, free from all taxes, liens, charges and security interests, created by or through the Company, with respect to the issue thereof.

3.8 Compliance with Law. (a) Notwithstanding anything in this Agreement to the contrary, in no event will a Holder be entitled to exercise a Warrant unless (i) a registration statement filed under the Securities Act in respect of the issuance of the Warrant Shares is then effective or (ii) an exemption from such registration requirements is available to all Holders under the Securities Act at the time of such exercise.

(b) If any shares of Common Stock required to be reserved for purposes of exercise of Warrants require, under any other Federal or state law or applicable governing rule or regulation of any national securities exchange or stock market, registration with or approval of any governmental authority, or listing on any such national securities exchange or stock market before such shares may be issued upon exercise, the Company will cause such shares to be duly registered or approved by such governmental authority or listed on the relevant national securities exchange or stock market.

3.9 Holders Not Entitled to Interest. Notwithstanding anything to the contrary, Holders will not be entitled to receive any interest or additional shares of our common stock for any period, including, without limitation, the period of time between the date on which the Bank receives the Amount Recovered (in full or in part) and the date on which the Warrants become exercisable.

9

## Article IV

## Adjustments

4.1 Reclassifications, Redesignations or Reorganizations of Common Stock. (a) In the event that at any time or from time to time after the date hereof the Company will issue by reclassification, redesignation or reorganization of the shares of Common Stock any shares of capital stock of the Company then, in any such event, the Holders will have the right to receive upon exercise of each Warrant the number of shares of such capital stock of the Company equal to the Adjusted Litigation Recovery divided by the Maximum Number of Warrants divided by the aggregate Adjusted Stock Price of the capital stock of the Company that one share of Common Stock was exchanged for or converted into as a result of such reclassification, redesignation or reorganization.

(b) The proportion and type of capital stock of the Company that the Holders will have the right to receive in the circumstance set forth in Section 4.1(a) will be in the same proportion and type as one share of Common Stock was exchanged for or converted into as a result of such reclassification, redesignation or reorganization. Such adjustment will become effective immediately after the effective date of such reclassification, redesignation or reorganization. In the event of the occurrence of more than one of the foregoing, such adjustments will be made successively.

4.2 Combination. (a) Except as provided in Section 4.2(c), in the event of a Combination, the Holders will have the right to receive upon exercise of each Warrant the number of shares of capital stock or other securities or an amount of property equal to the Adjusted Litigation Recovery divided by the Maximum Number of Warrants divided by the aggregate Adjusted Stock Price of the capital stock, other securities or property that one share of Common Stock was exchanged for or converted into as a result of such Combination.

(b) The proportion and type of capital stock, other securities or property that the Holders will have the right to receive in the circumstance set forth in Section 4.2(a) will be in the same proportion and type as one share of Common Stock was exchanged for or converted into as a result of such Combination. The provisions of this Section 4.2 will similarly apply to successive Combinations involving the surviving or acquiring Person (the "Successor Company") in any Combination.

(c) In the event of a Combination where consideration is payable to holders of Common Stock in exchange for their shares solely in cash, the Holders will have the right to receive upon exercise of each Warrant cash in an amount equal to the Adjusted Litigation Recovery divided by the Maximum Number of Warrants, less the Exercise Price. In case of any Combination described in this Section 4.2(c), the surviving or acquiring Person will promptly after the occurrence of the Trigger deposit with the Warrant Agent the funds necessary to pay to the Holders of the Warrants the amounts to which they are entitled as described above. After such funds and the surrendered Warrant Certificates are received, the Warrant Agent will make payment to the Holders by delivering a check in such amount as is appropriate to such Person or Persons as it may be directed in writing by the Holders surrendering such Warrants. No interest will accrue to the Holders or the surviving or acquiring Person on such funds.

(d) The Company will provide that any Successor Company will enter into an agreement with the Warrant Agent confirming the Holders' rights pursuant to this Section 4.2 and providing for adjustments, which will be as nearly equivalent as may be practicable to the adjustments provided for in this Article IV.

4.3 Exercise Price Adjustment. In case of any reclassification, redesignation or reorganization described in Section 4.1 or any Combination described in Section 4.2, the Exercise Price of one Warrant after such reclassification, redesignation, reorganization or Combination will equal (i) if the Warrants are exercisable into stock only or stock and any cash or property other than cash which is received instead of any fractional share of stock, the per share par value of such stock multiplied by the number of shares of such stock into which one Warrant is exercisable and (ii) if the Warrants are exercisable for cash or property only, $0.01. The Exercise Price may be adjusted, to the extent permitted by law, in such manner, if any, and at such time, as the Board may determine in good faith to be equitable in the circumstances.

10

4.4 Other Events. If any event occurs as to which the foregoing provisions of this Article IV are not strictly applicable or, if strictly applicable, would not, in the good faith judgment of the Board, fairly and adequately protect the purchase rights of the Holders of the Warrants in accordance with the essential intent and principles of such provisions, then the Board may make, without the consent of the Holders, such adjustments to the terms of this Article IV, in accordance with such essential intent and principles, as will be reasonably necessary, in the good faith opinion of such Board, to protect such purchase rights as aforesaid.

4.5 Notice of Certain Transactions. In the event that the Company will publicly announce a plan (a) to effect any reclassification, redesignation or reorganization of its shares of Common Stock, (b) to effect any capital reorganization, consolidation or merger or (c) to effect the voluntary or involuntary dissolution, liquidation or winding-up of the Company, the Company will within 5 calendar days after such public announcement send to the Warrant Agent and the Warrant Agent will within 5 calendar days after receipt thereof send the Holders a notice (in such form as will be furnished to the Warrant Agent by the Company) of such proposed action, such notice to be mailed by the Warrant Agent to the Holders at their addresses as they appear in the Certificate Register, which notice will specify the expected date that such issuance or event is to take place and the expected date of participation therein by the holders of Common Stock and will briefly indicate the effect of such action on the Common Stock and on the number and kind of any other shares of stock and on other securities or property, if any, and the number of shares of Common Stock and other securities or property, if any, purchasable upon exercise of each Warrant and the Exercise Price after giving effect to any adjustment which will be required as a result of such action.

4.6 Adjustment to Warrant Certificate. The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article IV, and Warrant Certificates issued after such adjustment may have the same terms and conditions as are stated in any Warrant Certificates issued prior to the adjustment. The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate, and any Warrant Certificate thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

**Article V**

**Warrant Agent**

5.1 Nature of Duties and Responsibilities Assumed.

(a) Appointment. The Company hereby appoints the Warrant Agent to act as agent of the Company as set forth in this Agreement. The Warrant Agent hereby accepts the appointment as agent of the Company and agrees to perform that agency upon the terms and conditions herein set forth, by all of which the Company and the Warrant Holders, by their acceptance thereof, will be bound.

(b) Authorization. Whenever in the performance of its duties under this Agreement, the Warrant Agent will deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a certificate signed by an Officer and delivered to the Warrant Agent; and such certificate will be full authorization to the Warrant Agent for any action taken or suffered in good faith by it under the provisions of this Agreement in reliance upon such certificate.

(c) Liability of Warrant Agent. The Warrant Agent will be liable hereunder only for its own negligence, bad faith or willful misconduct. The Warrant Agent will not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or in the Warrant Certificates (except its countersignature on the Warrant Certificates and such statements or recitals describing the Warrant Agent or action taken or to be taken by it) or be required to verify the same, but all such statements and recitals are and will be deemed to have

11

been made by the Company only. The Warrant Agent will not have any liability or responsibility in respect of the legality, validity or enforceability of this Agreement or the execution and delivery hereof (except the due execution hereof by the Warrant Agent) or in respect of the validity or execution of any Warrant Certificate (except its countersignature thereof); nor will it be responsible or liable for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant Certificate; nor will it be responsible or liable for the making of any change in the number of shares of Common Stock required under the provisions of Article IV or responsible for the manner, method or amount of any such change or the ascertaining of the existence of any facts that would require any such adjustment or change; nor will it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Agreement or any Warrant Certificate or as to whether any shares of Common Stock will, when issued, be validly issued, fully paid and nonassessable. The Warrant Agent will not be responsible or liable for any failure of the Company to comply with any of the covenants contained in this Agreement or in the Warrant Certificates to be complied with by the Company. The Warrant Agent will not incur any liability or responsibility to the Company or to any Warrant Holder for any action taken, or any failure to take action, in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument reasonably believed by the Warrant Agent to be genuine and to have been signed, sent or presented by the proper party or parties.

(d) Litigation. The Warrant Agent will be under no obligation to institute any action, suit or legal proceeding or take any other action likely to involve expense unless the Company or one or more Holders of Warrants will furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred. All rights of action under this Agreement or under any of the Warrants may be enforced by the Warrant Agent without the possession of any of the Warrants or the production thereof at any trial or other proceeding relative thereto, and any such action, suit or proceeding instituted by the Warrant Agent will be brought in its name as Warrant Agent and any recovery of judgment will be for the ratable benefit of the Holders of the Warrants, as their respective rights or interests may appear. The Warrant Agent will promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against it arising out of or in connection with this Agreement.

(e) Instructions from the Company. The Warrant Agent is hereby authorized and directed to accept written instructions with respect to the performance of its duties hereunder from an Officer, and to apply to any such Officer for advice or instructions in connection with the Warrant Agent's duties, and it will not be liable for any action taken or suffered to be taken or omitted by it in good faith in accordance with the instructions of any such Officer.

(f) Agents. The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, provided, however, reasonable care has been exercised in the selection and in the continued employment of any such attorney, agent or employee.

(g) Other Acts. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable it to carry out or perform its duties under this Agreement.

(h) Agreement as Source of Duties. The Warrant Agent will act hereunder solely as agent of the Company in a ministerial capacity, and its duties will be determined solely by the provisions hereof.

5.2 Right to Consult Counsel. The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company) and the opinion of such counsel will be full and complete authorization and protection to the Warrant Agent as to any action taken, suffered or omitted by it in good faith in accordance with such opinion; provided, however, that the Warrant Agent will have exercised reasonable care in the selection of such counsel.

5.3 Compensation and Reimbursement. The Company agrees to pay to the Warrant Agent from time to time compensation for all services rendered by it hereunder as set forth in the attached Exhibit D, and to reimburse the Warrant Agent for reasonable expenses and disbursements incurred in connection with the execution and administration of this Agreement (including the reasonable compensation and expenses of its counsel) except for expenses incurred as a result of the Warrant Agent's negligence, bad faith or willful misconduct.

5.4 Indemnification. The Company agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability or expenses incurred without negligence, bad faith or willful misconduct on its part, arising out of or in connection with the acceptance and administration of this Agreement, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder. In no case will either party be liable to the other party for special, indirect, incidental or consequential loss or damages of any kind whatsoever (including, but not limited to, lost profits), even if such party has been advised of the possibility of such damages.

5.5 Warrant Agent May Hold Company Securities. The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or its affiliates or have a pecuniary interest in any transaction in which the Company or its affiliates may be interested, or contract with or lend money to the Company or its affiliates or otherwise act as fully and freely as though it were not the Warrant Agent under this Agreement. Nothing herein will preclude the Company and its affiliates from engaging the Warrant Agent in any other capacity.

5.6 Change of Warrant Agent. The Warrant Agent may resign and be discharged from its duties under this Agreement upon 90 calendar days' prior notice in writing mailed, by registered or certified mail, to the Company. The Company may remove the Warrant Agent or any successor warrant agent upon 60 calendar days' prior notice in writing, mailed to the Warrant Agent or successor warrant agent, as the case may be, by registered or certified mail. Notwithstanding the foregoing, if the Warrant Agent becomes incapable of acting or is adjudged a bankrupt or insolvent or a receiver of the Warrant Agent or its property is appointed or any public officer takes control of the Warrant Agent or its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Company may remove the Warrant Agent immediately. If the Warrant Agent resigns or is removed or otherwise becomes incapable of acting, the Company will appoint a successor to the Warrant Agent and will, within 30 calendar days following such appointment, give notice thereof in writing to each registered holder of the Warrant Certificates. If the Company fails to make such appointment within a period of 30 calendar days after giving notice of such removal or after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated Warrant Agent, then the Company agrees to perform the duties of the Warrant Agent hereunder until a successor warrant agent is appointed. After appointment, the successor warrant agent will be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Warrant Agent without further act or deed; but the former Warrant Agent will deliver and transfer to the successor Warrant Agent any property at the time held by it hereunder, and execute and deliver any further assurance, conveyance, act or deed necessary for this purpose. Failure to give any notice provided for in this Section, however, or any defect therein will not affect the legality or validity of the resignation or removal of the Warrant Agent or the appointment of the successor warrant agent, as the case may be.

**Article VI**

**Rights of Holders**

6.1 Holders not Stockholders. No Holder, as such, will be entitled to vote or to receive dividends or otherwise will be deemed to be the holder of shares of Common Stock for any purpose, nor will anything contained herein or in any Warrant Certificate be construed to confer upon any Holder, as such, any of the rights of a stockholder of the Company or any right to vote upon or give or withhold consent to any action of the Company (whether upon any reorganization, issuance of securities, reclassification or conversion of

13

Common Stock, consolidation, merger, sale, lease, conveyance or otherwise), receive notice of meetings or other action affecting stockholders (except for notices expressly provided for in this Agreement) or receive dividends or subscription rights, unless and until such Warrant Certificate will have been surrendered for exercise as provided in this Agreement, payment in respect of such exercise will have been received by the Warrant Agent, and shares of Common Stock will have become issuable thereunder and such person will have been deemed to have become a holder of record of such shares. No Holder will, upon the exercise of Warrants, be entitled to any dividends if the record date with respect to payment of such dividends will be a date prior to the date such shares of Common Stock became issuable upon the exercise of such Warrants.

6.2 Claims by Holders. All rights of action in respect of the Warrants will be vested in the respective Holders; provided, however, that no Holder will have the right to enforce, institute or maintain any suit, action or proceeding against the Company to enforce, or otherwise act in respect of, the Warrants, unless (a) such Holder has previously given written notice to the Company of the substance of such dispute, and the Holders of at least 25% of the issued and outstanding Warrants have given written notice to the Company of their support for the institution of such proceeding to resolve such dispute, (b) such Holder has previously given written notice to the Warrant Agent of the substance of such dispute and of the support for the institution of such proceeding and (c) the Warrant Agent has not instituted appropriate proceedings with respect to such dispute within 30 days following the date of such written notice to the Warrant Agent, it being understood and intended that the Warrant Agent has no obligation to institute proceedings and that no one or more Holders will have the right in any manner whatsoever to affect, disturb or prejudice the rights of any other Holders, or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any rights of the Holders, except in the manner described in this Section 6.2 for the equal and ratable benefit of all Holders. Except as described above, no Holder will have the right to enforce, institute or maintain any suit, action or proceeding to enforce, or otherwise act in respect of, the Warrants.

6.3 Control of Litigation. The Bank will retain sole and exclusive control of the Litigation and will retain 100% of any recovery from the Litigation. The Holders will not have any right to control or manage the course or disposition of the Litigation or the proceeds of any recovery therefrom or any rights against the Company for any decision regarding the conduct of the Litigation or disposition of the Litigation for an amount less than the amount claimed in damages in the Litigation, regardless of the effect on the value of the Warrants.

6.4 Determination of Values. The determination of the Board of the Adjusted Litigation Recovery, the number of shares of Common Stock issuable upon exercise of a Warrant and the Exercise Price will be final, conclusive and binding upon the Holders.

### Article VII

### Miscellaneous

7.1 Information. So long as any Warrant remains outstanding, the Company will deliver to the Warrant Agent and the Holders its annual report to stockholders and any other documents that the Company, in its discretion, deems appropriate.

7.2 Amendment. This Agreement may be amended by the parties hereto without the consent of any Holder for the purpose of curing any ambiguity, or of curing, correcting or supplementing any defective provision contained herein or making any other provisions with respect to matters or questions arising under this Agreement as the Company and the Warrant Agent may deem necessary or desirable; provided, however, that such action will not affect adversely the rights of the Holders. Any amendment or supplement to this Agreement that has an adverse effect on the interests of the Holders will require the written consent of the Holders of a majority of the then outstanding Warrants. The consent of each Holder affected will be required for any amendment pursuant to which the Exercise Price would be increased or the number of Warrant Shares purchasable upon exercise of Warrants would be decreased (other than pursuant to adjustments provided for

14

herein). In determining whether the Holders of the required number of Warrants have concurred in any direction, waiver or consent, Warrants owned by the Company or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company will be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Warrant Agent will be protected in relying on any such direction, waiver or consent, only Warrants which the Warrant Agent knows are so owned will be so disregarded. Also, subject to the foregoing, only Warrants outstanding at the time will be considered in any such determination.

7.3 Notices. Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally, or by telecopy or telefacsimile, upon confirmation of receipt, (b) on the first business day following the date of dispatch if delivered by a recognized next- day courier service, or (c) on the third business day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder will be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

(a) If to the Company:

James E. Kelly, Esq.
General Counsel
Dime Bancorp, Inc.
589 Fifth Avenue
New York, New York 10017
Telecopy: (212) 326-6110

with a copy to:

Mitchell S. Eitel, Esq.
Sullivan & Cromwell
125 Broad Street
New York, New York 10004
Telecopy: (212) 558-3588

(b) If to Warrant Agent:

EquiServe Trust Company, N.A.
c/o EquiServe Limited Partnership 150 Royall Street
Canton, MA 02021
Attn: Client Administration

Any notice or communication mailed to a Holder will be mailed to the Holder at the Holder's address as it appears on the Certificate Register and will be sufficiently given if so mailed within the time prescribed. Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

7.4 GOVERNING LAW. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

7.5 WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15

7.6 Entire Agreement, Etc. (a) This Agreement constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, between the parties, with respect to the subject matter hereof, and (b) this Agreement will not be assignable by operation of law or otherwise (any attempted assignment in contravention hereof being null and void).

7.7 Counterparts and Facsimile. For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Agreement may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

7.8 Captions. The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and will not be deemed to limit or otherwise affect any of the provisions hereof.

7.9 Severability. If any provision of this Agreement or the application thereof to any person (including, without limitation, the officers and directors of the Warrant Agent and the Company) or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and will in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination, the parties will negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

7.10 No Third Party Beneficiaries. Nothing contained in this Agreement, expressed or implied, is intended to confer upon any person or entity other than the parties hereto, any benefit right or remedies.

7.11 Successors. All agreements of the Company in this Agreement and the Warrant Certificates will bind its successors. All agreements of the Warrant Agent in this Agreement will bind its successors.

16

In witness whereof, the parties have caused this Agreement to be duly executed as of the date first written above.

**Dime Bancorp, Inc.**

By: _____
　　　　　　Name:
　　　　　　Title:

EquiServe Trust Company, N.A.
as Warrant Agent,

By: _____
　　　　　　Name:
　　　　　　Title:

EquiServe Limited Partnership
as Warrant Agent,

By: _____
　　　　　　Name:
　　　　　　Title:

17

## EXHIBIT A

## [FORM OF WARRANT CERTIFICATE]

[Unless and until it is exchanged in whole or in part for Warrants in definitive form, this Warrant may not be transferred except as a whole by the depositary to a nominee of the depositary or by a nominee of the depositary to the depositary or another nominee of the depositary or by the depositary or any such nominee to a successor depositary or a nominee of such successor depositary. The Depository Trust Company ("DTC") (55 Water Street, New York, New York) will act as the depositary until a successor will be appointed by the Company and the Warrant Agent. Unless this certificate is presented by an authorized representative of DTC to the issuer or its agent for registration of transfer, exchange or Amount Recovered, and any certificate issued is registered in the name of Cede & Co. or such other name as requested by an authorized representative of DTC (and any Amount Recovered is made to Cede & Co. or such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]*

### Dime Bancorp, Inc.

### Litigation Tracking Warrant

No.

Certificate for Litigation Tracking Warrants to Purchase Shares of Common Stock of Dime Bancorp, Inc.

THIS CERTIFIES THAT, , or registered assigns, is the registered holder of the number of Litigation Tracking Warrants set forth above (the "Warrants"). Each Warrant entitles the holder thereof (the "Holder"), at its option and subject to the provisions contained herein and in the Warrant Agreement referred to below, to purchase from Dime Bancorp, Inc., a Delaware corporation (the "Company"), the number of shares of Common Stock ("Warrant Shares"), par value of $0.01 per share, of the Company (the "Common Stock") equal to the Adjusted Litigation Recovery divided by the product of (1) the Adjusted Stock Price multiplied by (2) the Maximum Number of Warrants, at an exercise price per Warrant equal to the number of shares of Common Stock for which one Warrant is exercisable multiplied by $0.01 (the "Exercise Price"). This Warrant Certificate will terminate and become void on the earliest of (i) the Close of Business on the last day of the Warrant Exercise Period, (ii) the Close of Business on the date the Litigation has been disposed of in a manner such that no shares of Common Stock or other securities or property will be issuable under the terms of the Warrants and (iii) the time and date such Warrant is exercised.

This Warrant Certificate and each Warrant represented hereby are issued pursuant to and are subject in all respects to the terms and conditions contained in a Warrant Agreement dated as of December [ ], 2000, as such agreement may be amended from time to time (the "Warrant Agreement"), among the Company and EquiServe Trust Company, N.A. and EquiServe Limited Partnership collectively as Warrant Agent (in such capacity, the "Warrant Agent", which term includes any successor Warrant Agent under the Warrant Agreement), to all of which terms and provisions the Holder of this Warrant Certificate consents by acceptance hereof. The Warrant Agreement is hereby incorporated herein by reference and made a part hereof. Reference is hereby made to the Warrant Agreement for a full statement of the respective rights, limitations of rights, duties and obligations of the Company, the Warrant Agent and the Holders of the Warrants. Capitalized terms used but not defined herein will have the meanings ascribed thereto in the Warrant Agreement. A copy of the Warrant Agreement may be obtained for inspection by the Holder hereof upon written request to the Warrant Agent.
* To be included only if the Warrant is in global form.

A-1

Subject to the terms of the Warrant Agreement, the Warrants may be exercised in whole or in part by surrender of this Warrant Certificate with the form of election to purchase Warrant Shares attached hereto duly executed and with the simultaneous payment of the Exercise Price in cash (subject to adjustment) to the Warrant Agent for the account of the Company at the office of the Warrant Agent. Payment of the Exercise Price will be made by certified or official bank check or personal check payable to the order of the Company or by wire transfer of funds to an account designated by the Company for such purpose. No fractional Warrant Shares will be issued upon the exercise of any Warrant, but the Company will pay cash in lieu of a fractional share as provided in the Warrant Agreement.

As provided in the Warrant Agreement and subject to the terms and conditions therein set forth, each Warrant will be exercisable at any time from and from time to time during the Warrant Exercise Period only and will not be exercisable after the expiration of the Warrant Exercise Period.

The Warrant Agreement provides that upon the occurrence of certain events the number of Warrant Shares may be, subject to certain conditions, adjusted.

The Company may require payment of a sum sufficient to pay all taxes, assessments and other governmental charges in connection with the transfer or exchange of the Warrant Certificates.

The holder in whose name the Warrant Certificate is registered may be deemed and treated by the Company and the Warrant Agent as the absolute owner of the Warrant Certificate for all purposes whatsoever and neither the Company nor the Warrant Agent will be affected by notice to the contrary.

The Warrants represent a contingent right to purchase shares of Common Stock with an aggregate value based on a portion of any proceeds that may be received by the Bank from the Litigation. There can be no assurance as to when the Litigation will be resolved or the amount of proceeds, if any, the Bank will receive therefrom. The Holders will not have any right to control or manage the course or disposition of the Litigation or the proceeds of any recovery therefrom.

The Warrants do not entitle any holder hereof to any of the rights of a holder of any Common Stock or Preferred Stock of the Company.

A-2

This Warrant Certificate will not be valid or obligatory for any purpose until it will have been countersigned by the Warrant Agent.

**DIME BANCORP, INC.**

By _____

[SEAL]

Attest: _____
Secretary

DATED:

Countersigned: [_____]
as Warrant Agent,

by _____
Authorized Signatory

A-3

## EXHIBIT B

## FORM OF ELECTION TO PURCHASE WARRANT SHARES
(to be executed only upon exercise of Warrants)

### DIME BANCORP, INC.

The undersigned hereby irrevocably elects to exercise [ ] Warrants at an exercise price per Warrant of $[ ] to acquire [ ] shares of Common Stock, par value $0.01 per share, of Dime Bancorp, Inc. (the "Company"), on the terms and conditions specified in the within Warrant Certificate and the Warrant Agreement therein referred to, surrenders this Warrant Certificate and all right, title and interest therein to the Company, and directs that the shares of Common Stock deliverable upon the exercise of such Warrants be registered and delivered in the name and at the address specified below and delivered thereto.

Date: _____ ,

-------------------------------------------------
(Signature of Owner)*
-------------------------------------------------
(Street Address)
-------------------------------------------------
(City) (State) (Zip Code)

**Signature Guaranteed by:**

Securities and/or check to be issued to:

Name: _____

Social security or Federal tax identification number: _____

Street Address: _____

City, State and Zip Code: _____

Any unexercised Warrants evidenced by the within Warrant Certificate to be issued to: _____

Name: _____

Social security or Federal tax identification number: _____

Street Address: _____

City, State and Zip Code: _____

* The signature must correspond with the name as written upon the face of the within Warrant Certificate in every particular, without alteration or enlargement or any change whatever, and must be guaranteed by a national bank or trust company or by a member firm of any national securities exchange.

B-1

## EXHIBIT C

The following exchanges of a part of this Global Warrant for definitive Warrants have been made:

### CERTIFICATE TO BE DELIVERED UPON EXCHANGE OR
### REGISTRATION OF TRANSFER OF WARRANTS

Re: Warrants to Purchase Common Stock (the "Warrants") of Dime Bancorp, Inc. (the "Company")

This Certificate relates to Warrants held in definitive form by (the "Transferor").

The Transferor has requested the Warrant Agent by written order to exchange or register the transfer of a Warrant or Warrants. The Warrant Agent and the Company are entitled to rely upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

**[INSERT NAME OF TRANSFEROR]**

by _____

Date:

C-1

---

**End of Filing**

Powered By EDGAR® Online

© 2005 | EDGAR Online, Inc.

# EXHIBIT 4

**FDIC** | Federal Deposit
Insurance Corporation
Each depositor insured to at least $250,000 per insured bank

Advanced Search

Search FDIC...

Home | Deposit Insurance | Consumer Protection | Industry Analysis | Regulations & Examinations | Asset Sales |

Press Releases   On the Press Room   Conferences & Events   Financial Institution Letters   Special Alerts   Letters to the Editor/Opinion Editorials   Speeches & Testimony

Home > News & Events > JPMorgan Acquires All Qualified Financial Contracts as Part of Washington Mutual Acquisition

## JPMorgan Acquires All Qualified Financial Contracts as Part of Washington Mutual Acquisition

**September 25, 2008**

In connection with the sale of assets of Washington Mutual Bank to JPMorgan Chase & Co., the FDIC transferred to JPMorgan Chase & Co., all Qualified Financial Contracts to which Washington Mutual Bank was a party. Qualified Financial Contracts include swaps, options, futures, forwards, repurchase agreements and any other Qualified Financial Contract as defined in 12 U.S.C. Section 1821(e)(8)(D).

See related FDIC press release, dated September 25, 2008, for further information regarding the Washington Mutual Acquisition.

Last Updated 9/25/2008                                              communications@fdic.gov

Home | Contact Us | Search | Help | SiteMap | Forms | En Español
Website Policies | Privacy Policy | Plain Writing Act of 2010 | USA.gov | FDIC Office of Inspector General
Freedom of Information Act (FOIA) Service Center | FDIC Open Government Webpage | No FEAR Act Data

## CERTIFICATE OF SERVICE

I hereby certify that on this 1ST day of June, 2012, a copy of this **CONSOLIDATED REPLY OF PLAINTIFF-INTERVENORS STEPHEN ROSENBAUM, FRANK E. WILLIAMS, JR., COMPASS POINT PARTNERS AND LEGAL ALPHA LLC TO PLAINTIFF'S AND DEFENDANT'S OPPOSITION TO MOTION TO INTERVENE** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing, through the Court's system.

/s/ Zanida Samuels
ZANIDA SAMUELS

366008