# United States Court of Federal Claims

No. 95-39 C
May 18, 2015

---

**ANCHOR SAVINGS BANK, FSB,**

*Plaintiff,*

**v.**

**THE UNITED STATES OF AMERICA,**

*Defendant.*

*Winstar*; Breach of Contract; RCFC 12(b)(1); Standing; Successor in Interest; Assignment of Claims Act; Mitigation Costs; Tax Gross-Up

---

*Edwin L. Fountain*, Jones Day, Washington, DC, attorney of record for plaintiff, with whom were George T. Manning, Adrian Wager-Zito and Debra S. Clayman.

*Jacob A. Schunk* and *Amanda L. Tantum*, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, for defendant, with whom were Scott D. Austin, Sameer Yerawadekar and Vincent D. Phillips.

## OPINION *and* ORDER

**Block,** *Judge.*

This *Winstar* case is before the court on remand to clarify the court's calculation of mitigation costs. This court previously awarded plaintiff Anchor Savings Bank, FSB ("Anchor")[1] $356,454,910.91 in damages, including net lost profits, damages from reduced stock proceeds, mitigation costs, damages from branch sales, and "wounded bank" damages. *Anchor Savings Bank, FSB v. United States*, 81 Fed. Cl. 1 (2008) ("*Anchor III*"). Defendant appealed that judgment and plaintiff filed a cross-appeal, arguing that it is entitled to mitigation costs of $249,091,000.00 rather than $185,900,000.00.

On May 10, 2010, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") denied defendant's appeal and affirmed, in part, this court's judgment. *Anchor Sav. Bank v. United States*, 597 F.3d 1356 (Fed. Cir. 2010) ("*Anchor IV*"). The Federal Circuit, unsure of

---

[1] As explained in greater detail below, Anchor has undergone several changes of ownership since this suit was filed in January 1995. To avoid confusion, this opinion will continue to refer to plaintiff as "Anchor."

the basis for this court's calculation of mitigation costs, remanded the case for clarification of this issue. *Id*. at 1373-74.

Consideration of this issue has been delayed by defendant's motion to dismiss, which is predicated on complications arising out of the closure of Washington Mutual Bank ("WMB"), the successor in interest to Anchor's claim, while this case was still on appeal before the Federal Circuit. During the height of the global financial crisis, WMB was seized by its regulator, the Office of Thrift Supervision ("OTS"), in what has been described as "the largest bank failure in U.S. history."[2] On September 25, 2008, the very day on which OTS seized WMB and placed it into a receivership with the Federal Deposit Insurance Corporation ("FDIC"), the FDIC sold substantially all of WMB's assets to JPMorgan Chase Bank, N.A. ("JPMC") for $1.8 billion, pursuant to a purchase and assumption agreement. Although both the FDIC and JPMC agree that the *Anchor* litigation had been conveyed to JPMC under the terms of this agreement, defendant claims, in its motion to dismiss, that the terms of the agreement did not encompass the *Anchor* litigation, and that the FDIC is still the real party in interest. Defendant, accordingly, asserts that JPMC was not injured by the government's conduct and hence lacks standing to litigate this matter. In the alternative, defendant argues that the Assignment of Claims Act, 31 U.S.C. §§ 3727(a)(1), (b), prohibits any attempted transfer of the *Anchor* claim, despite the fact that the assignment at issue was made by the government rather than a third party.

Several weeks after filing its motion to dismiss, defendant filed a motion for judicial notice, appending an avalanche of attachments from other cases that purportedly support its motion to dismiss. Apparently unsatisfied by these extraneous submissions, defendant requests the court to further delay proceedings by allowing additional discovery to determine who the real party in interest is. Also before the court are plaintiff's motion for correction of the award of mitigation costs, plaintiff's motion for award of a tax gross-up, and defendant's motion to dismiss plaintiff's bill of costs.

These motions are finally ripe for judgment. For the reasons set forth below, the court denies defendant's motion to dismiss and denies defendant's request for additional discovery. The court grants defendant's unopposed motion for judicial notice but finds these documents only tangentially relevant. The court grants plaintiff's motion for correction of mitigation costs, and holds that plaintiff is entitled to a tax gross-up of these additional damages. But the court stays plaintiff's motion to calculate the tax gross-up until plaintiff provides further accounting information. Finally, the court finds that plaintiff's bill of costs is premature and, accordingly, grants defendant's motion to dismiss plaintiff's bill of costs.

# I. RELEVANT FACTS

## A. Anchor Expanded During the 1980s by Contracting with the Government To Acquire Failing Thrifts, in Exchange for "Supervisory Goodwill"

The particular facts of this case have been set forth exhaustively in *Anchor*, 81 Fed. Cl. at 6-51 ("*Anchor III*"). The following is a brief account of those facts that are pertinent to the motions before the court.

---

[2] Robin Sidel et al., *WaMu Is Seized, Sold Off to J.P. Morgan, In Largest Failure in U.S. Banking History*, WALL STREET JOURNAL, Sept. 25, 2008, available at http://online.wsj.com/articles/SB122238415586576687.

This litigation, like other *Winstar* cases, arose out of the shifting responses of the United States to the savings and loan crisis of the late 1970s and early 1980s, which were chronicled at length by the Supreme Court in *United States v. Winstar Corp.*, 518 U.S. 839 (1996) and by this court in *Anchor III*. During that period, the profitability of thrifts was threatened by a rising "interest rate gap," in which the amount of interest the thrifts had to pay on short term deposits exceeded the revenue they could generate from long-term, fixed-rate mortgage assets, which had been acquired during times of lower inflation. Federal regulations limiting the amount of interest thrifts could offer for customer deposits also undermined thrifts. As inflation rose rapidly in the mid-1970s, customers began to shift their money from thrifts to alternative investment vehicles that were not restricted by federal regulations and could offer higher interest rates. These developments threatened to collapse the savings and loan industry and to place a heavy financial burden on the federal government, which insured most of the thrifts' depositors. *See Anchor III*, 81 Fed. Cl. at 8-12; William K. Black, *Ending Our Forebearers' Forbearances: FIRREA and Supervisory Goodwill*, 2 STAN. L. & POL'Y REV. 102, 103 (1990).

To help avert this crisis, the Federal Savings and Loan Insurance Corporation ("FSLIC"), with the cooperation of the Federal Home Loan Bank Board ("FHLBB"), the principal regulator of the thrifts, sought to "buy time" by rolling back capital reserve requirements[3] and by adopting "regulatory accounting principles," which were considerably more lenient than the generally accepted accounting principles ("GAAP"). *See Anchor III*, 81 Fed. Cl. at 13-14, 28-29.

FSLIC and FHLBB also sought to induce healthy financial institutions like Anchor to acquire failing thrifts by offering both cash and "supervisory goodwill," an intangible accounting credit that was equal to the negative net worth of the failing thrift and could be applied toward the acquiring institution's capital reserve requirement. *See Anchor III*, 81 Fed. Cl. at 13-14, 28-29; Black, *Ending Our Forebearers' Forbearances*, 2 STAN. L. & POL'Y REV. at 103-04. This amelioration policy became controversial, especially as the thrift crisis persisted.[4]

Between 1982 and 1985, Anchor absorbed eight such failing thrifts, consequently acquiring over $550 million in net liabilities. *Id.* at 27. The terms of these "supervisory mergers" were set forth in a series of "forbearance agreements," in which the FHLBB and FSLIC agreed, among

---

[3] The "capital" that was regulated by the FHLBB can be understood as total net worth or the difference between assets and liabilities. *See* Richard C. Breeden, *Thumbs on the Scale: The Role that Accounting Practices Played in the Savings and Loan Crisis*, 59 FORDHAM L.REV. S58 (1991). Federal regulators require thrifts to retain a certain level of capitalization in order to "reduce the incentive to take excessive risks[,] provide a cushion against loss," and "serve[] as a check against uncontrolled growth." *Id.* at S75. Thrift regulators hoped to help thrifts survive until market forces lowered interest rates, by rolling back capital reserve requirements from five to four percent of assets in November 1980, and then from four percent to three percent in January 1982. *Winstar*, 518 U.S. at 845-46 (citing 45 Fed. Reg. 7111 (Nov. 1980); 47 Fed. Reg. 3543 (Jan. 1982)).

[4] Critics argued that the use of regulatory capital encouraged acquiring banks to overpay for the failing thrifts, knowing that whatever liabilities they absorbed in so doing would be transformed into regulatory assets. *See, e.g.*, Black, *Ending Our Forebearers' Forbearances*, 2 STAN. L. & POL'Y REV. at 104.

other things, to allow Anchor to "count the target institution's excess liabilities as a capital asset for regulatory purposes until the supervisory goodwill had fully amortized." *Id*. This favorable accounting treatment was essential to the bargain, as Anchor would not otherwise have been able to acquire these thrifts. *Id*. at 28. Moreover, it is worth emphasizing that at the outset, many of these acquisitions were made at the specific request of the FSLIC. *See Winstar*, 518 U.S. at 847 n.3; *Anchor III*, 81 Fed. Cl. at 12-15.

In order to address the liabilities that it had assumed with these acquisitions, Anchor adopted a long term asset restructuring program, with an emphasis on reducing its exposure to interest rate risk by "expanding into diverse streams of revenue that were less interest-rate sensitive." *Anchor III*, 81 Fed. Cl. at 32. An essential part of this effort was the acquisition of Residential Funding Corporation ("RFC") in 1988, which was the largest issuer of private mortgage-backed securities ("MBS") at the time. *Id*. at 34. This acquisition allowed Anchor to greatly expand its mortgage-banking business. *Id*. Since much of the income from the issuance of MBS stemmed from origination and servicing fees, the acquisition of RFC provided Anchor with a means to greatly reduce its exposure to interest rate risk. *Id*. at 32.

By 1989, RFC was already exceeding profitability expectations, generating between $12 and $15 million in net annual profits, and was poised to continue realizing Anchor's risk diversification strategy. *Id*. at 61. But Anchor's long-term plan for RFC never had a chance to come to fruition due to the passage of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub. L. 101-73, 103 Stat. 183 (1989). *Id*.

## B. The Passage of FIRREA Breached the Terms of Anchor's Forbearance Agreements by Rescinding Favorable Accounting Treatment, Preventing Anchor from Meeting Its Capital Reserve Requirements

Despite the regulators' efforts to save the thrift industry by relaxing regulatory standards and encouraging supervisory mergers, the savings and loan crisis continued unabated. *Anchor III*, 81 Fed. Cl. at 20. The persistence of this crisis sparked a concern in Congress that looser capital requirements had encouraged excessive risk taking and that inadequate capitalization had exposed the deposit insurance fund to huge potential losses. H. Conf. Rep. No. 222, 101st Cong., 1st Sess. 310, 1989 432, 443; *see also Winstar*, 518 U.S. at 846 ("The use of various accounting gimmicks and reduced capital standards masked the worsening financial condition of the industry and the FSLIC, and enabled many weak institutions to continue operating with an increasingly inadequate cushion to absorb future losses.") (quoting H. REP. NO. 101–54(I) at 298, U.S. Code Cong. & Admin. News 1989, pp. 86, 93–94); Black, *Ending Our Forebearers' Forbearances*, 2 STAN. L. & POL'Y REV. at 106-07.

Congress reacted by initiating a retrenchment of thrift regulatory policy with the passage of FIRREA, which was signed into law on August 9, 1989. Among other things, this law established three new, more stringent measures of regulatory capital for thrifts, including core capital, tangible, and risk-based capital requirements. To meet the new core capital requirement, a thrift had to have capital equal to at least 3% of its adjusted total assets. Although core capital included "supervisory capital," FIRREA restricted the amount of supervisory capital that could satisfy the 3% requirement and phased out the use of supervisory capital entirely over a period of five years. *Anchor III*, 81 Fed. Cl. at 41-42. For a thrift that had been carrying a significant amount

of supervisory capital, such as Anchor, these limits effectively eliminated the use of supervisory capital. *Id.*

The passage of FIRREA greatly damaged Anchor's financial position. At the time FIRREA was passed, Anchor exceeded capital reserve requirements by $186 million. *Id.* at 41. But under the new FIRREA standards, Anchor fell out of capital compliance by $333 million due to its inability to count most of its regulatory capital against the Act's risk-based capital requirements. *Id.* at 42. The Office of Thrift Supervision ("OTS"), which in the aftermath of FIRREA had replaced the FHLBB as the regulator of federally-insured savings associations, ordered Anchor to comply with the new capital reserve requirements within five years or less. *Id.* at 20, 42-43. As a result of Anchor's noncompliance with the new capital requirements, OTS also imposed regulatory sanctions on Anchor that significantly restricted its operations, which in turn made it more difficult for Anchor to raise the capital it needed to meet the new requirements. *Id.* at 42-43.

In the aftermath of FIRREA, Anchor had no choice but to sell off many of its most valuable assets at fire sale prices in order to avoid regulatory closure. *Id.* at 44-47, 87. Within just two years of the breach, Anchor had shrunk by more than $1 billion in assets. *Id.* at 4. Most importantly in the context of this litigation, Anchor sold RFC in March of 1990 to General Motors Acceptance Corporation ("GMAC"). Under GMAC's ownership, RFC "continued to operate with largely the same management" and continued to be very profitable. *Id.* at 58. Furthermore, Anchor had no choice but to suspend its long term plan of geographical expansion and diversification. *Id.*

Thanks to continued cost cutting and resourceful leadership, Anchor was able to achieve "well-capitalized" status in 1993 (as defined under the Federal Deposit Insurance Corporation Improvement Act of 1991). *Id.* at 50. This status eventually permitted Anchor—at this point doing business as "Dime," following its merger with The Dime Savings Bank of New York in January 1995—to reenter the mortgage securities market in a significant way with the acquisition of North American Mortgage Company ("NAMCO") in October 1997, for $351 million. *Id.* at 50-51.

Anchor commenced this action on January 13, 1995, alleging that provisions of FIRREA and its implementing regulations had breached the terms of the supervisory merger contracts by disallowing the inclusion of supervisory goodwill as regulatory capital. In a series of opinions and orders, this court found that the United States was in fact liable for breach of contract. *See, e.g.*, *Anchor Sav. Bank v. United States*, 52 Fed. Cl. 406 (2002) ("*Anchor I*") (holding that a contract existed between the United States and Anchor as to two of Anchor's supervisory acquisitions); *Anchor Sav. Bank, FSB v. United States*, 59 Fed. Cl. 126 (2003) ("*Anchor II*") (granting defendant's motion for summary judgment as to plaintiff's claim of reliance damages based on assumption of net liabilities of ailing thrifts, but denying summary judgment as to plaintiff's claims for lost profits and "wounded bank" damages).

## C. Damages Awarded to Anchor in This Court's Previous Opinion

Following a five-week trial held in 2005, this court awarded Anchor $111,619,000.00 in net lost profits from the sale of RFC, $42,000,000.00 in damages from reduced stock proceeds, $185,900,000.00 in mitigation costs for the purchase of NAMCO, $8,146,125.00 in damages for the sale of branch offices, and $8,789,785.91 in "wounded bank" damages. *Anchor III*, 81 Fed. Cl. at 153. The court also found that plaintiff was entitled to a tax "gross up" for its damages from

reduced stock proceeds and mitigation costs for the NAMCO purchase, but deferred accounting those sums until a later time.  *Id.*  Total damages awarded to plaintiff, before the tax gross-up, amounted to $356,454,910.91.  *Id.*

The damages awarded to Anchor for the forced sale of many of its branches and for out-of-pocket expenses arising from the breach (so-called "wounded bank" expenses) are not at issue on remand.  But the matter before the court on remand implicates the lost profits awarded from the sale of RFC, the damages awarded from reduced stock proceeds, and the mitigation costs awarded for purchasing NAMCO.  The court will accordingly provide a brief account of these three awards.

### 1.  Net Lost Profits from the Sale of RFC

In its opinion on damages, this court found that plaintiff had "reliably and credibly demonstrated that, but for the breach, it would have continued to own and operate RFC throughout the 1990s."  *Anchor III*, 81 Fed. Cl. at 118.  Additionally, the court found that there was "overwhelming" evidence that Anchor had sustained significant damages as a result of the breach.

> The evidence of harm sustained by Anchor as a result of the breach and subsequent divestiture of RFC is overwhelming.  The thrift sacrificed both a substantial revenue stream and its primary source of mortgage originations for an opportunity to regain capital compliance.  It also gave up a preferred relationship with a business that could help Anchor restructure its mortgage and MBS portfolio as dictated by market forces.

*Id.* at 119.

At trial, plaintiff argued that it was entitled to damages for lost profits from the sale of RFC for the period between March 1990, when plaintiff sold RFC, and October 1997, when plaintiff mitigated its damages for the loss of RFC by acquiring NAMCO.  Plaintiff provided a straightforward empirical model for calculating lost profits between 1990 and 1995—plaintiff showed that the same management led RFC both before and after Anchor had sold it off in 1990 and that after the sale, RFC continued to pursue the strategies that Anchor had planned for it.  *Id.* at 119-21.  After 1995, however, RFC expanded its asset base by 40%—a strategy that Anchor could not have pursued without breaching its capital reserve requirements.  Thus, plaintiff's experts employed a theoretical model to calculate how much revenue Anchor could have earned in 1996 and 1997.  *Id.* at 121.

The court agreed with plaintiff that the profits RFC earned between 1990 and 1995 could serve as a reasonable proxy for the profits Anchor would have earned over the course of that period, but for the breach.  However, the court rejected plaintiff's estimate of the profits it could have earned between 1996 and 1997 as speculative.  *Id.* at 121.  Although the court found that "Anchor's breach-related harm extends to 1996 and beyond," it held that "only plaintiff's lost profits model relying on damage calculations from 1990 to 1995 withstands scrutiny."  *Id.*  The court deducted proceeds from the 1990 sale of RFC ($92,865,000.00) from the lost profits attributable to plaintiff between 1990 and 1995 ($204,484,000.00), and found that plaintiff was entitled to lost profits of $111,619,000.00.

## 2.  Damages from Reduced Stock Proceeds

Plaintiff also argued that it was entitled to damages for reduced stock proceeds.  In July 1993, Anchor issued 10,500,000 shares of public stock at $13.00 per share.  This sale yielded $136,500,000.00, raising Anchor's capital by $67 million.  Anchor showed that but for defendant's breach, it would have had a stronger earnings history and would have been able to sell those stocks at a price of $17.11 per share.  The court found plaintiff's model, based on RFC's price-earnings ratio in the twelve months preceding the stock sale, to be reasonably accurate, and accordingly awarded plaintiff $42 million in damages.[5]  *Anchor III*, 81 Fed. Cl. at 122-24.

## 3.  Mitigation Costs for Purchasing NAMCO

Plaintiff also alleged that it had purchased NAMCO in October 1997 to recover the operational benefits and profitability it had lost when it had been forced to sell RFC at a fire sale price in order to raise capital quickly.  Anchor argued that it was entitled to recover the $351 million purchase price of NAMCO as substitution-cost, or mitigation, damages.

To begin with, the court observed that "[t]he costs associated with mitigation are not consequential . . . . they are 'direct' costs and may be awarded '*together with* any incidental and consequential damages.'"  *Anchor III*, 81 Fed. Cl. at 126 (original emphasis) (quoting *Hughes Comms Galaxy, Inc. v. United States*, 271 F.3d 1060, 1068 (Fed. Cir. 2001)).  The court then compared RFC and NAMCO to evaluate whether the two businesses were "commercially usable as reasonable substitutes under the circumstances."  *Hughes*, 271 F.3d at 1066.  The court ultimately found that RFC and NAMCO were "functionally similar, operate[d] in the same market, require[d] similar skills to effectively operate, and provide[d] similar operational benefits."  *Anchor III*, 81 Fed. Cl. at 126.  Both companies were able to generate a large volume of new mortgages and fees associated with those mortgages, and both companies played the same role in diversifying Anchor's assets and expanding its geographical reach.  *Id.* at 126-30.  The court accordingly found that the two companies were adequate substitutes, notwithstanding the fact that they had "slightly different product focuses."  *Id.* at 132.

Nonetheless, the court found that "due to a double-counting concern raised by defendant's expert, Anchor is entitled to far less than the full $351 million acquisition cost" of NAMCO.  *Id.* at 126.  Specifically, defendant's expert pointed out that much of the acquisition value of NAMCO consisted of earnings that NAMCO had retained between 1990 and 1997.  In other words, should the court award Anchor damages based on RFC's lost profits between 1990 and 1997, granting Anchor the full NAMCO acquisition price as mitigation costs "would provide plaintiff with RFC's profits and NAMCO's profits over the same period."  *Id.* at 133.  The court found that such a duplicative award "would be a windfall for plaintiff."  *Id.*

To prevent such double counting, the court decided to deduct NAMCO's retained earnings from NAMCO's acquisition price.  Due to an absence of data regarding NAMCO's retained earnings between 1996 and 1997, the court estimated NAMCO's cumulative retained earnings between 1990 and 1997 by deducting the $185.9 million premium for goodwill paid by Anchor from the $351 million acquisition cost, and arrived at the figure of $165.1 million as the proper

---

[5] To reach this figure, the court multiplied the number of shares sold by Anchor (10,500,000) by the estimated loss in share price (rounded down to $4).

offset. The court, accordingly, deducted the $165.1 million from the $351 million purchase price, and held that plaintiff was entitled to $185.9 million in mitigation costs "to reimburse plaintiff for its costs in replacing the benefits it lost when the breach forced Anchor to sell RFC." *Id*. at 133-34.

**D. The Federal Circuit's Remand and Denial of Defendant's Motion for Stay**

On March 14, 2008, this court granted judgment in favor of plaintiff and awarded Anchor a total judgment of $356,454,910.91. *Anchor III*, 81 Fed. Cl. at 153. On March 10, 2010, the Court of Appeals for the Federal Circuit denied defendant's appeal and affirmed substantially in part this court's judgment. But the Federal Circuit did not rule on plaintiff's cross-appeal.

In its cross-appeal, plaintiff argued that this court had erred in calculating plaintiff's mitigation costs. Plaintiff argued that, since this court had awarded Anchor lost profits only for the years 1990-1995, it should have offset Anchor's mitigation costs by deducting NAMCO's cumulative retained earnings for 1990-1995 rather than 1990-1997. *See* Pl.'s Mot. for Correction, ECF No. 320. Although the Federal Circuit found that "the trial court may have reduced Anchor's mitigation costs to avoid a 'double counting' that did not actually occur," the court remanded the issue for clarification by this court for the following reasons:

> [W]e are not sufficiently confident that our assessment [of error] comports with the trial court's methodology and intent, or that Anchor's proposed correction would appropriately and reliably "correct" the error, if any. In fact, Anchor's calculation mixes a precise figure (derived from the NAMCO annual report) with an admittedly imprecise "estimate" by the trial court. Thus, while it appears possible that a correction is warranted, it also appears possible that no correction is required—either because the trial court's mitigation estimate was "close enough" or because the trial court's full 1990-97 offset was made deliberately and appropriately in the first instance. On the information before us, we cannot make the determination."

*Anchor IV*, 597 F.3d at 1373-74. The dispute over the court's calculation of mitigation costs will be discussed in further detail below.

While this case was still on appeal, defendant filed a motion for a 90-day stay, arguing that the identity of the real party in interest was uncertain, pending the determination of a parallel proceeding before the United States Bankruptcy Court for the District of Delaware. *See* Mot. for 90-Day Stay, *Anchor Sav. Bank, FSB v. United States*, No. 2008-5175, -5182 (Fed. Cir. Aug. 2, 2010). Anchor, in response, filed a motion declaring JPMC the real party in interest. *See* Opp'n to Mot. to Stay, *Anchor*, No. 2008-5175, -5182 (Fed. Cir. Nov. 3, 2008). The Federal Circuit denied defendant's motion to stay. Order, Anchor, No. 2008-5175, -5182 (Fed. Cir. Nov. 21, 2008). Defendant, in turn, renewed this argument on remand, in its motion to dismiss. *See* Def.'s Mot. Dismiss, ECF No. 329. Defendant argues, in brief, that this court "lacks jurisdiction over the claim asserted by JPMC . . . because JPMC is not Anchor's successor-in-interest and, therefore, lacks standing." *Id*. at 1.

**E. Defendant's Motion To Dismiss**

To understand defendant's motion to dismiss, a brief account of Anchor's ownership history is in order. On January 13, 1995—the very day on which Anchor filed the instant case—Anchor merged with Dime Savings Bank of New York ("Dime"), and assumed the latter's name. *Anchor III* at 128-29. In 2002, Dime merged with Washington Mutual Bank ("WMB") and its holding company, Washington Mutual, Inc., in a "merger of equals." *See* Def.'s Mot. Dismiss, ECF No. 329, at 2; Pl.'s Resp., ECF No. 335, at 2. WMB later went on to become the largest thrift in American history.[6] Following this merger, ownership of the Anchor litigation passed on to WMB. On July 16, 2008, the court awarded Anchor a judgment of approximately $356 million,[7] after a five-week trial on the damages issues. Defendant filed a notice of appeal on September 8, 2008, and plaintiff filed a cross-appeal on September 22, 2008.

This litigation continued to advance even as WMB's financial position became untenable. At about the same time that defendant filed its notice of appeal to the Federal Circuit,[8] a storm was brewing in the financial services industry as the subprime mortgage crisis turned into a global financial pandemic.[9] Lehman Brothers—one of the most storied brokerage houses in American history—failed under the weight of the impending global financial crisis.[10] WMB faced similar stress, as its portfolio of collateralized mortgage obligations, much of which was saddled with subprime debt, began to face a wave of defaults—by September 2008, frenzied depositors, fearing the worst following the collapse of Lehman Brothers, had withdrawn $16.7 billion in deposits (about 9% of the deposits held by WMB at that time) in about ten days.[11]

---

[6] *See* Chris Isidore, *JPMorgan sues FDIC over Washington Mutual Money*, CNN MONEY, Dec. 18, 2013, available at http://money.cnn.com/2013/12/18/news/companies/jpmorgan-fdic-lawuit/.

[7] Initially, on March 14, 2008, the court issued an order and opinion awarding Anchor approximately $382 million. But on July 16, 2008, the court issued an order recalculating the damages to approximately $356 million.

[8] Def.'s Mot. Dismiss at 2, ECF No. 329.

[9] *See* Dick K. Nanto, *The Global Financial Crisis: Analysis and Policy Implications* (Congressional Research Service, 2009), p. 2-10; Ben Steverman, *Stock Market Crash: Understanding the Panic*, BLOOMBERG BUSINESSWEEK (October 10, 2008), http://www.businessweek.com/investor/content/oct2008/pi2008109_360708.htm.

[10] Andrew Ross Sorkin, *Lehman Files for Bankruptcy; Merrill Is Sold*, NEW YORK TIMES, Sept. 14, 2008, http://www.nytimes.com/2008/09/15/business/15lehman.html?pagewanted=all.

[11] David Enrich et al., *WaMu Is Seized, Sold Off to J.P. Morgan, In Largest Failure in U.S. Banking History*, WALL STREET JOURNAL, Sept. 26, 2008, http://online.wsj.com/article/SB122238415586576687.html (discussing a bank run on Washington Mutual in which depositors removed a total of $16.7 billion in 10 days); *See* David Mildenberg, *WaMu Leads Steepest-Ever Decline in Stock Index (Update 2)*, BLOOMBERG (July 14, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aZV7yVwcd0T0.

On September 25, 2008, OTS responded to this crisis by seizing WMB and appointing the FDIC as receiver.  Def.'s Mot. Dismiss, ECF No. 329, at 2.  That same day, the FDIC sold substantially all of WMB's assets to JPMC under the terms of a whole bank purchase and assumption ("P&A") agreement.[12]  Id. at 3.  A whole bank P&A is the preferred form of bank resolution by the FDIC.[13]  Under this approach, the FDIC sells "all assets of the failed institution on an 'as is,' discounted basis (with no guarantees)."[14]  Nonetheless, even in a whole bank P&A Agreement, "[s]ome categories of assets *never* pass to the acquirer," including "claims against former directors and officers, claims under bankers blanket bonds and director and officer insurance policies, prepaid assessments, and tax receivables."[15]

On March 10, 2010, the Federal Circuit remanded *Anchor Savings Bank, FSB v. United States* to this court to resolve a discrepancy over mitigation costs.  *Anchor IV*, 597 F.3d at 1373-74.  Defendant then filed the instant motion to dismiss on the theory that there were discordant claims of ownership over the *Anchor* judgment sufficient to deprive JPMC of standing.  Def.'s Mot. Dismiss, at 5–9.  Defendant insists that the *Anchor* judgment never passed to JPMC under the 2008 P&A Agreement.  Id. at 5-7.  In its view, the "plain language" of the P&A Agreement retained the *Anchor* judgment for the FDIC's benefit.  Id. at 9.  In the alternative, defendant argues that the P&A agreement is ambiguous and requests discovery.  Def.'s Reply, ECF No. 337, at 5.  Defendant maintains this position despite the opposition of JPMC and the FDIC, the parties to the agreement itself.  Pl.'s Resp., ECF No. 335, at 7-9.

Plaintiff, also relying on the P&A Agreement's "plain language," reaches a different conclusion.  It argues that losses "incurred" by WMB could not possibly include losses that were experienced by Anchor a decade before WMB acquired Anchor's successor.  Pl.'s Resp. at 7.  Plaintiff buttresses its point by proffering the e-mail exchange between FDIC's lawyers and JPMC, which took place after the P&A agreement had been executed.  The e-mails, plaintiff argues, confirm that the *Anchor* judgment was intended to pass to JPMC under the 2008 P&A Agreement.  *Id.* at 7–9.

Defendant, however, argues that the FDIC's intent is irrelevant.  Defendant argues that regardless of the FDIC's intent, any purported transfer or assignment of the Anchor claim is barred by the Anti-Assignment Acts, and hence void *ab initio*.  Def.'s Mot. Dismiss, ECF No. 329, at 9.  Defendant also cites to the DOJ's litigation authority, 28 U.S.C. § 516, arguing that the FDIC could not, in any event, waive the Anti-Assignment Acts on behalf of the United States without the consent of the DOJ.  Def.'s Reply, ECF No. 337, at 12.

---

[12] David Enrich et al., *supra* note 11.

[13] *FDIC Resolutions Handbook*, chapter 3, at 27,
http://www.fdic.gov/bank/historical/reshandbook/ch3pas.pdf.
The FDIC prefers this method of resolution for three reasons: (1) loan customers could continue to be served locally by the acquiring institution; (2) it minimizes the FDIC's cash outlay, requiring the FDIC to render no further financial support to the failed bank; and (3) it reduces the amount of assets held by the FDIC for liquidation. *Id.* at 28.

[14] *Id.*

[15] *Id.* at 27-28 (original emphasis).

Plaintiff sees these arguments as smoke and mirrors.  Plaintiff argues that Anchor's transfer was a "transfer" of an asset as that term is used in 12 U.S.C. § 1821(d)(2)(G), which gives the FDIC explicit authority to transfer any asset or liability "without any approval, assignment, or consent [of any other entity] with respect to such transfer."  Pl.'s Resp. at 16.  It also analogizes a bank failure to a failed company in bankruptcy, or to a company that merged with another company and, consequently, transferred its assets by operation of law.  *Id.* at 16–17.  Transfers by operation of law, plaintiff explains, are exempt from the scope of the Anti-Assignment Acts.  Therefore, plaintiff argues, the Anti-Assignment Acts do not apply.

The court heard oral argument on September 14, 2011.  Tr. at 1, ECF No. 348.  The issues remanded to the court from the Court of Appeals have been stayed pending resolution of this motion.  Order Staying Mots., ECF No. 343.

**F. Other Motions Before the Court**

Also, before the court are three other motions.  First among them is defendant's unopposed motion to take judicial notice, filed on August 8, 2010 (ECF No. 331).  Defendant requests that the court take judicial notice of an FDIC filing and a judicial opinion in the bankruptcy litigation concerning WMI, which was previously the holding company of WMB.  Defendant suggests that these documents support its interpretation of Schedule 3.5 of the P&A Agreement.

Also before the court is defendant's motion to strike plaintiff's bill of costs, submitted on June 7, 2010.  *See Anchor*, ECF No. 316 (regarding plaintiff's bill of costs, ECF No. 312, which Anchor submitted on June 2, 2010).  Defendant argues that plaintiff's bill of costs is premature because this court's judgment is not yet final.

Finally, plaintiff's motion for award of tax gross-up is also before the court.  As stated above, this court awarded a tax gross-up for plaintiff's damages from reduced stock proceeds and for plaintiff's mitigation costs, but stayed consideration of the gross-up calculation in 2008 due to WMB's uncertain financial condition.  Defendant did not appeal the court's award of a tax gross-up, but argues that a tax gross-up is inappropriate at this time due to uncertainty over how JPMC would declare any income stemming from this judgment.  Defendant also argues that should the court correct the mitigation figure, as suggested by plaintiff, that any additional sum awarded should not be grossed-up.

# II.  APPLICABLE LEGAL STANDARDS

**A. Subject Matter Jurisdiction**

As an initial matter, defendant challenges plaintiff's standing to pursue the judgment awarded by this court in *Anchor III*.  Article III of the U.S. Constitution confers on the judiciary the power to hear actual "cases" and "controversies."  U.S. Const. art. III, § 1.  The doctrine of standing "is an aspect of the case-or-controversy requirement," *Samsung Electronics Co., Ltd. v. Rambus, Inc*., 523 F.3d 1374, 1378 (Fed. Cir. 2008), and is a requirement that cannot be waived by Congress.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576-77 (1992).  Although Congress

created the Court of Federal Claims under Article I of the Constitution,[16] this court "applies the same standing requirements enforced by other Federal courts created under Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (internal citations omitted). Because "standing is a threshold jurisdictional issue," *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002), the court must address defendant's standing argument before reaching plaintiff's motion for correction of mitigation costs, plaintiff's motion for award of tax gross up, and defendant's motion opposing plaintiff's bill of costs.

In addressing jurisdictional questions such as a motion to dismiss for lack of standing, "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (2011). Nonetheless, where such facts are controverted, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013). Moreover, in contrast to a summary judgment motion, "[i]n establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings" as long as it is relevant. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993); *see also Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011); *Diversified Main. Sys., Inc. v. United States*, 110 Fed. Cl. 612, 615 (2013).

"[T]he irreducible constitutional minimum of standing contains three elements"—there must be (1) an "injury in fact" that (2) bears "a causal connection between the injury and the conduct complained of" and that (3) is "likely . . . redressable by a favorable decision." *Lujan*, 560 U.S. at 560-61 (internal citations omitted). As the party invoking this court's jurisdiction, plaintiff bears the burden of showing standing. *Lujan*, 504 U.S. at 561.

## B. Contract Interpretation

As explained above, the resolution of defendant's motion to dismiss turns on the meaning of Schedule 3.5 of the Purchase and Assumption Agreement between JPMC and the FDIC-Receiver. As the P&A Agreement is a contract, the rules of contract interpretation apply. The trial court must begin its analysis of the disputed contract provision by examining the plain language of the agreement. *See, e.g., Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014); *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009); *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004).

If the contract language is unambiguous, then it must be given its plain and ordinary meaning, which is that which "'would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (quoting *Metric Constrs., Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999)). Although contract interpretation is a question of law, *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004), "[w]hat is reasonable in a given set of circumstances is an issue of fact." *Darwin Const. Co. v. United States*, 31 Fed. Cl. 453, 455 (1994); *see Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1574, 1579 (Fed. Cir. 1993). Reasonableness is determined by the court "on a case-by-case basis." *NVT Techs.*, 370

---

[16] *See* 28 U.S.C. § 171(a) (describing this court as an "Article I court").

F.3d at 1159 (citing *Interstate Gen. Gov't Contractors, Inc. v. Stone*, 980 F.2d 1433, 1435 (Fed. Cir. 1992)).

Federal Circuit precedent generally precludes the trial court from considering extrinsic evidence if the language of the provision in question is "clear and unambiguous." *Bell/Heery*, 739 F.3d at 1331. "If the provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1295 (Fed. Cir. 2014) (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc)). A contractual provision is not ambiguous unless it is "susceptible to more than one reasonable meaning." *Barron Bancshares*, 366 F.3d at 1375-76 (citing *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986)).

Additionally, the parol evidence rule prohibits the consideration of extrinsic evidence if the contract is fully integrated—*i.e.*, "in instances where the written agreement has been adopted by the parties as an expression of their final understanding." *Barron Bancshares*, 366 F.3d at 1375 (quoting *David Nassif Assoc. v. United States*, 557 F.2d 249, 256 (Ct. Cl. 1977)). The Federal Circuit has been especially strict in excluding extrinsic evidence when a contract contains an integration clause. "When a contract is integrated, 'barring certain exceptions (e.g., fraud), a party to a written contract cannot supplement or interpret that agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself.'" *Travelers*, 75 Fed. Cl. at 710 (quoting *Rumsfeld v. Freedom N.Y., Inc.*, 329 F.3d 1320, 1327, (Fed. Cir. 2003), *reh'g denied*, 346 F.3d 1359 (Fed. Cir. 2003)).

To be sure, in assessing the plain meaning of a contract provision, the court does not interpret the disputed term or phrase in isolation, but "construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative." *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1288 (Fed. Cir. 2008) (citing Restatement (Second) of Contracts § 203(a)); *NVT Techs.*, 370 F.3d at 1159 ("the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts").

Consistent with the Federal Circuit's rule that contractual provisions should be interpreted according to their context, the Federal Circuit also permits the use of dictionaries as interpretive aids. Such "lexicographic" aids are not considered extrinsic evidence. *See TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1340 (Fed. Cir. 2006). Concordantly, the Federal Circuit permits the trial court to consider extrinsic evidence if the language in controversy concerns some trade usage or custom, as long as the party makes a showing "that it relied reasonably on a competing interpretation of the words when it entered into the contract," because "context may well reveal that the terms of the contract . . . never were clear on their face." *Metric Constrs.*, 169 F.3d at 752. The use of extrinsic evidence to construe trade terms is best viewed as analogous to the lexicography rule for dictionaries rather than as an actual exception to the rule prohibiting extrinsic evidence for unambiguous contract provisions. *See TEG-Paradigm Envtl., Inc*, 465 F.3d at 1340 (observing that trade practice "may serve [a] lexicographic function in some cases") (citation omitted).

## C. Statute Interpretation

In interpreting statutes, the court must begin its analysis by examining the plain language of the provision, because the plain language is controlling if the meaning of text at issue is clear.

*See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009); *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1345 (Fed. Cir. 2004). The language of a particular provision should be read in light of the purpose of the statute as a whole, as evinced by the language of the statute. *Star-Glo Assoc, LP v. United States*, 414 F.3d 1349, 1357 (Fed. Cir. 2005) (citing *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 94–95 (1993)); *Chapman v. Houston Welfare Rights Org*., 441 U.S. 600, 608 (1979).

# III. DISCUSSION

## A. Defendant's Motion To Dismiss Pursuant to RCFC 12(b)(1)

Defendant advances two arguments that, in its view, entitle it to a dismissal. First, defendant argues that JPMC "is not Anchor's successor-in-interest and, therefore, lacks standing" to pursue the judgment granted by this court in its prior opinion. Def.'s Mot. Dismiss at 1. Defendant, in effect, argues that the FDIC-Receiver ("FDIC-R") did not transfer possession of the Anchor judgment to JPMC under the terms of the Purchase and Assumption Agreement, and concludes that JPMC has not suffered an injury in fact. *Id*. at 5-8; *see Lujan*, 504 U.S. at 561 (holding that plaintiff must show an injury in fact in order to establish standing). Second, defendant argues that even if the P&A agreement purported to convey the *Anchor* judgment, such a conveyance is void under the Anti-Assignment Acts. In the alternative to dismissal, defendant invites the court to reopen discovery so it may prove that JPMC is not the real party-in-interest.

Plaintiff responds by claiming that (1) RCFC 17's real party-in-interest requirement does not go to jurisdiction, and in any event was waived by the government; (2) the P&A Agreement was intended to convey the *Anchor* judgment to JPMC; and (3) the Anti-Assignment Acts do not bar the government from assigning the *Anchor* judgment. Plaintiff also opposes defendant's motion for discovery.

The court will consider these arguments as follows: First, the court will clarify the relationship between standing and RCFC 17; second, the court will explain why, as a matter of law, the plain language of the P&A agreement conveyed the *Anchor* judgment to JPMC; third the court will address defendant's motion to reopen discovery; and finally, the court will explain why the Anti-Assignment Acts do not prevent the FDIC from assigning the *Anchor* judgment to JPMC.

## 1. The Nature of Defendant's Motion To Dismiss

At the outset, before addressing the merits of defendant's standing argument, plaintiff objects to defendant's characterization of its motion to dismiss as a jurisdictional motion filed pursuant to RCFC 12(b)(1), and argues that defendant's motion is properly understood as a motion to dismiss for failure to prosecute in the name of the real party in interest, pursuant to RCFC 17(a). In support of this argument, plaintiff cites cases stating that "lack of real party in interest status is not a jurisdictional defect," but is a defense that "exists for the benefit of the defendant" and thus "may be waived."[17] Pl.'s Opp'n to Def.'s Mot. Dismiss, ECF No. 335, at 13 (quoting *Aldridge v.*

_____

[17] RCFC 8(c) states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense. Additionally, the September 18, 1996 Omnibus Case Management Order, which applies to all *Winstar*-related cases, requires the government to raise affirmative defenses within 120 days of a motion for partial summary judgment. Affirmative

*United States*, 59 Fed. Cl. 387, 390 (2004) and *Kawa v. United States*, 86 Fed. Cl. 575, 587 (2009)). Plaintiff argues that defendant waived its real party in interest argument by failing to raise it promptly.

Plaintiff's argument turns on the relationship between the doctrines of standing and real party in interest. As explained above, the doctrine of standing requires plaintiff to show that it has suffered an "injury in fact" that bears "a close connection between the injury and the conduct complained of" and that is "likely . . . redressable by a favorable decision." *Lujan*, 560 U.S. at 560-61 (internal citations omitted). In contrast, RCFC 17(a) requires that "[a]n action . . . be prosecuted in the name of the real party in interest." This rule "focuses on ensuring that the proper plaintiff is prosecuting the claim, *i.e.*, that the plaintiff is the person who possesses the right to be enforced." *Mitchell Food Products, Inc. v. United States*, 43 F. App'x 369, 369 (Fed. Cir. 2002); *see also* 6A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Fed. Prac. & Proc. Civ.* § 1543 (3d ed. 2010)).

The distinction between standing and real party of interest has already been explored in other cases. "Standing and real party in interest are two distinct concepts," and "both are necessary to prevail." *Mitchell Food Products*, 43 F. App'x at 369 (citing Wright et al. at § 1543); see also *Sys. Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 171 (2005). Although the government may waive RCFC 17(a), as the rule exists for the benefit of defendant, plaintiffs still have a burden of showing Article III standing. *See, e.g., Lujan* 504 U.S. at 561 (holding that the plaintiff has the burden of showing standing, as is the case with other jurisdictional requirements); *Textainer Equip. Mgmt. Ltd. v. United States*, 105 Fed. Cl. 69, 73-74 (2012) ("While Rule 17(a) exists for the benefit of, and therefore may be waived by, the government, it does not relieve plaintiffs of the burden of asserting jurisdiction or proving the essential elements of their cause of action"); *c.f. Mitchell Food Products*, 43 F. App'x at 369; *Aldridge v. United States*, 59 Fed. Cl. 387, 390 (2004) (holding that "[l]ack of real-party-in-interest status is not a jurisdictional defect. The person before the court simply lacks a claim on which relief can be granted because that person does not own the claim."). Therefore, plaintiff can raise the argument of waiver as an affirmative defense to a real party in interest argument, but *not* in response to a standing argument.

In light of this distinction, plaintiff's attempt to characterize defendant's motion to dismiss as non-jurisdictional is inapt. The cases cited by plaintiff only stand for the proposition that if a plaintiff establishes standing and the defendant fails to make a timely real party in interest argument, then the doctrine of waiver can apply to the RCFC 17(a) affirmative defense. The cited cases do not stand for the proposition that the Article III standing requirement need not be demonstrated. For instance, *Kawa v. United States*, a case cited by plaintiff, relies primarily on *Steger v. Gen. Elec. Co.*, 318 F.3d 1066 (11th Cir. 2003), a bankruptcy case. And in the bankruptcy context, it is possible for a party to have standing without being the real party in interest. *See, e.g.*, *Steger*, 318 F.3d at 1080 (commenting that "[a]lthough in bankruptcy, the trustee 'succeeds to all causes of action held by the debtor at the time the bankruptcy petition is filed,' . . . the debtor's standing to pursue the claim is not abandoned where she is asserting 'her own legal rights and

defenses may be waived if not pled in accordance with this rule, although a waiver is not effective unless plaintiff demonstrates that it has been surprised or unfairly prejudiced. *See First Annapolis Bancorp, Inc. v. United States*, 75 Fed. Cl. 280, 288 (2007) (rejecting plaintiff's waiver argument, in the context of a *Winstar* suit, on the ground that plaintiff had failed to show prejudice) (citing *Caldera v. Northrop Worldwide Aircraft Servs., Inc.*, 192 F.3d 962, 970 (Fed. Cir. 1999)).

interests rather than the legal rights and interests of third parties.'"). Thus in a bankruptcy case, the doctrine of waiver may apply to a RCFC 17(a) affirmative defense.

But in this case, should defendant prevail in showing that plaintiff has no property interest in the judgment, defendant would not only prove that plaintiff is not the real party in interest, but would also succeed in showing that plaintiff has not been injured by the government's breach of contract and thus lacks standing to pursue the Anchor claim. *See Lujan*, 560 U.S. at 560-61 (requiring an injury in fact to establish standing). Should defendant prevail on this argument, the court would have no choice but to find that JPMC lacks standing to seek the *Anchor* judgment.

In short, although the real party in interest requirement is defined by RCFC 17, defendant's motion calls into question plaintiff's standing. Defendant's argument, therefore, is jurisdictional, and properly the subject of a RCFC 12(b)(1) motion to dismiss.

## 2. The Plain Language of the Provisions of the P&A Agreement Supports JPMC's Interpretation

### a. The Plain Meaning of the Contract Provisions

Having explained the nature of defendant's motion to dismiss, the court proceeds to consider whether the P&A Agreement conveyed the *Anchor* judgment to JPMC such that JPMC has standing to prosecute this matter. For the reasons explained below, the court holds that the P&A Agreement clearly and unambiguously conveyed the *Anchor* judgment to JPMC.

As explained above, when interpreting the Purchase and Assumption Agreement, the court begins with the plain language of the Agreement. *Bell/Heery*, 739 F.3d at 1331. Section 3.1 of the P&A Agreement conveys to the "assuming bank" (JPMC) "all of the assets . . . of the Failed Bank [WMB]," except as provided under Sections 3.5, 3.6, and 4.8. P&A Agreement, ¶ 3.1, available as Def.'s Ex. A, ECF No. 329-1 (emphasis added), at 16. Sections 3.6 and 4.8 are not relevant to the interpretive question before the court. This leaves only Section 3.5, which exempts certain assets from the general sale clause of Section 3.1.

Section 3.5 of the P&A Agreement (entitled "Certain Assets Not Purchased") states that "[t]he Assuming Bank [JPMC] does not purchase, acquire or assume . . . the Assets listed on the attached Schedule 3.5." P&A Agreement, ¶ 3.5, at 11. Schedule 3.5, in turn, covers four distinct types of assets. Paragraph (1) covers professional liability insurance policies, *e.g.*, directors and officers insurance. Paragraph (2) covers lawsuits and judgments related to acts that contributed to WMB's collapse. Paragraph (3) covers bank premises and leased furniture, but gives JPMC an option to purchase those assets. Paragraph (4) covers any criminal or restitution orders issued in favor of WMB. The only part of Schedule 3.5 that is at issue is paragraph (2).

Paragraph (2) of Schedule 3.5 contains four clauses:

> *[A]ny* interest, right, action, ***claim or judgment against*** (i) any officer, director, employee, accountant, attorney . . . employed or retained by the Failed Bank . . . , (ii) any underwriter or financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person [*i.e.*, including the Federal

Government[18]] whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) ***incurred by the Failed Bank***; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing.

P&A Agreement, Schedule 3.5(2), at 37 (emphasis added).

Additionally, the P&A Agreement contains the following integration clause: "[t]his Agreement embodies the entire agreement of the parties hereto in relation to the subject matter herein and supersedes all prior understandings or agreements, oral or written, between the parties." P&A Agreement, ¶ 13.1, at 30.

The resolution of defendant's motion to dismiss for lack of standing turns on the scope of the phrase "any loss . . . incurred by the Failed Bank" in paragraph (2) of Schedule 3.5. Simply stated, the parties dispute whether Anchor's *Winstar* injuries sustained in 1989 were "incurred" by WMB when it acquired Dime, over a decade later.

Defendant argues that the Section 3.5's plain language excludes the *Anchor* claim from the assets purchased by JPMC. Def.'s Mot. Dismiss, at 5. But rather than directly addressing the phrase in question ("loss . . . incurred by the failed bank"), defendant posits the following so-called "absorption" theory:

> Anchor's complaint sought damages for losses that it allegedly suffered due to the breach, and Washington Mutual Bank *absorbed* Anchor's losses upon its merger with Dime, which had likewise *absorbed* these losses when it merged with Anchor. The agreement, therefore, excludes the Anchor claim from the assets purchased by JPMC.

*Id.* (emphasis added). Defendant concludes that "pursuant to Section 3.5 . . . of the Agreement, JPMC did not purchase from the FDIC-R, as receiver for Washington Mutual Bank, any of Washington Mutual Bank's litigation rights against the United States in the present case." Def.'s Mot. Dismiss at 6. Defendant, accordingly, suggests that the FDIC-R still retains ownership of the Anchor litigation, despite the FDIC-R's insistence that ownership of the litigation did in fact transfer to JPMC. *Id.* at 8.

Plaintiff, in response, argues that the losses suffered by Anchor in 1989 were not "incurred" by WMB over a decade later, when WMB merged with Dime. Pl.'s Opp'n to Mot. Dismiss, ECF No. 335 ("Pl.'s Opp'n"), at 7. "This is because Washington Mutual (like Dime before it) did not 'incur' those losses itself, but rather acquired Anchor in Anchor's breach-impaired condition." *Id.* Plaintiff argues that the losses stemming from the government's breach of contract were incurred

---

[18] The P&A Agreement defines "person" to include the government and any government agency. P&A Agreement, art. I, at 6.

by Anchor's shareholders, because the losses would have been reflected in a lower stock or accounting value for Anchor at the time that Dime acquired Anchor. *See* Pl.'s Opp'n, at 6-7.

The court finds that the plain meaning of the contract's language is unambiguous, and clearly supports the plaintiff's interpretation, for the following reasons.

At the outset, the court notes that the disputed portion of Schedule 3.5 only excludes from the Agreement litigation relating to "any loss . . . *incurred* by the Failed Bank," which is WMB. ¶2 of Schedule 3.5 (excerpted above). Schedule 3.5 does *not* contain the word "absorbed" or "absorption." Notably, defendant never even attempts to argue that "incur" and "absorb" are synonymous, or to explain how WMB incurred *Winstar* losses suffered by Anchor long before WMB entered the picture in 2002. Instead of addressing the actual text of the specific provision at issue, defendant presents an abstract "absorption theory" that is loosely based on the corporate law concerning mergers. Defendant, in effect, appears to conveniently substitute "absorb" for "incur." *See* Def's Mot. Dismiss at 6. The court finds defendant's approach noteworthy, in light of the Federal Circuit's command that the court begin its analysis of a contract by examining the plain language of the provision, and consider extrinsic evidence only if it finds the plain language ambiguous. *See Shell Oil*, 751 F.3d at 1295; *Bell/Heery*, 739 F.3d at 1331. Defendant's approach is especially flawed in light of the fact that the P&A Agreement contains an integration clause.[19] *See* P&A Agreement, ¶ 13.1, at 30 (excerpted above).

In accordance with Federal Circuit precedent, the court begins by considering the plain language as it actually appears in the contract, which is "any loss . . . incurred by the Failed Bank," not "any loss . . . absorbed by the Failed Bank." The court must resolve whether Anchor's *Winstar* injuries sustained in 1989 were "incurred" by WMB when it acquired Dime in 2002.

The dictionaries define "incur" synonymously. The *Concise Oxford English Dictionary* (12th ed. 2011) defines it as a verb meaning to "become subject to (something unwelcome or unpleasant) as a result of one's actions." *Webster's New Collegiate Dictionary* (1981) defines it as "to become liable or subject to: bring down upon oneself." *Black's Law Dictionary* (9th ed. 2009) defines "incur" as a verb, meaning "to suffer or bring on oneself (a liability or expense)." In all three definitions, the loss or liability or harm is associated with a particular event, at a particular time—e.g., the loss is brought about "as a result of one's actions (*Concise Oxford*), is "[brought] upon oneself" (*Webster's* and *Black's*). Consequently, one cannot "incur" the same loss multiple times. The word itself refers to a particular event, at a particular point in time.

Simply stated, WMB did not incur Anchor's *Winstar* losses because WMB was not Anchor in 1989. Even in 1995, when this action was filed, WMB was nowhere to be found. Instead, the *Anchor* litigation was then being pursued by Dime, which merged with Anchor the same day Anchor filed suit in this court. WMB did not enter the picture until 2002 when it acquired Dime. Only then, in 2002, could WMB be said to have an interest in this litigation.

Defendant's interpretation not only conflicts with the plain meaning of "incur," but with the contextual meaning of "loss" and "claim or judgment" in paragraph (2) of Schedule 3.5. Paragraph (2) excludes claims or judgments for any loss incurred by the Failed Bank, against (i) any former

---

[19] As explained above, the Federal Circuit has been especially strict in excluding extrinsic evidence when a contract contains an integration clause. *See Rumsfeld*, 329 F.3d at 1327.

officer or director of the Failed Bank, (ii) any underwriter of bonds of the Failed Bank, (iii) "any shareholder or holding company of the Failed Bank," and (iv) any other "person." It is clear from the text of paragraph (2) that these provisions refer not to any loss or claim or judgment, but only to those associated with acts or omissions that caused the collapse of WMB in 2008. Hence paragraph (2) applies "regardless of whether any such claim is made with respect to any other insurance policy of the Failed Bank," yet does not apply to "any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank," which is a circumstance unrelated to WMB's failure. P&A Agreement, Schedule 3.5, at 37. Accordingly, it would not make any sense to construe Schedule 3.5(2)(iv) as applying to persons associated with the various predecessors of WMB, who had nothing to do with WMB's 2008 failure.

This interpretation of paragraph (2) of Schedule 3.5 is consistent with the FDIC's historical use of purchase and assumption agreements to resolve failed banks. Despite the unprecedented scale of the WMB failure,[20] the FDIC's decision to resolve WMB by using a purchase and assumption agreement was hardly atypical—the FDIC has resolved thousands of banks, and purchase and assumption transactions are the most common method of resolving failed banks.[21] It is a longstanding FDIC practice that in resolving banks by means of a whole bank purchase and assumption agreement, "[s]ome categories of assets *never* pass to the acquirer in a P&A; they remain with the receiver. These include claims against former directors and officers, claims under bankers blanket bonds and director and officer insurance policies, prepaid assessments, and tax receivables." FDIC Resolutions Handbook, chapter 3—Purchase and Assumption Transactions, 19, at https://www.fdic.gov/bank/historical/reshandbook/ch3pas.pdf.

As explained in Part II, the court must make an initial determination regarding the plain meaning of the language without resorting to extrinsic evidence, and many of the documents provided by the parties (such as the email correspondence between the parties and FDIC) are extrinsic.[22] Nonetheless, the court does not interpret contract provisions in a vacuum, and must give them the plain meaning that "would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *TEG-Paradigm*, 465 F.3d at 1338. "What is reasonable in a given set of circumstances is an issue of fact," *see Darwin Const.*, 31 Fed. Cl. at 455, and is determined on a "case-by-case basis," *NVT Techs.*, 370 F.3d at 1159. The consideration of evidence to determine what is reasonable is a narrow exception to the rule against extrinsic evidence, *Metric Const.*, 169 F.3d at 751, although it is perhaps best viewed not as an

---

[20] *See* David Enrich, *WaMu is Seized, Sold-off to JPMorgan, in Largest Failure in Banking* History, *supra* note 11.

[21] *See* FDIC Resolutions Handbook, chapter 1--Introduction, at 1, https://www.fdic.gov/bank/historical/reshandbook/ch1intro.pdf; FDIC Resolutions Handbook, chapter 3—Purchase and Assumption Transactions, at 19, https://www.fdic.gov/bank/historical/reshandbook/ch3pas.pdf.

[22] Extrinsic evidence includes evidence outside the four corners of the contract, such as "evidence of prior negotiations between the parties, as well as the parties' subsequent course of performance under the contract." *Kogan v. United States*, 112 Fed. Cl. 253, 265 (2013) (citing *Metro. Area Transit, Inc. v. United States*, 463 F.3d 1256, 1260 (Fed. Cir. 2006); *Sylvania Electric Prods., Inc. v. United States*, 458 F.2d 994, 1005 (Ct. Cl. 1972).

exception but as analogous to the lexicography rule for dictionaries, *TEG-Paradigm Envtl., Inc*, 465 F.3d at 1340.  The court finds that "a reasonably intelligent person acquainted with the contemporaneous circumstances" would be familiar with these FDIC practices, as described in the FDIC handbook.

The court takes judicial notice of the FDIC handbook,[23] and finds that it helps confirm the court's view of the plain meaning of Schedule 3.5—as excluding the transfer of "assets [that] never pass to the acquirer in a P&A," such as claims and judgments against officers or shareholders whose actions were responsible for the failure of the Failed Bank.  *Id.*; *c.f.* P&A Agreement, paragraph (2)(i)-(iii), at 37.  Again, it only makes sense to view these losses as particular to the failure of WMB.  WMB's failure in 2008 was caused by many things (*e.g.*, poor capitalization, lack of diversification, and a catastrophic bank run), but not a 1989 *Winstar* breach.[24]

---

[23] This court adheres to Rule 201 of the Federal Rules of Evidence when invoking judicial notice. *See Osage Tribe of Indians of Oklahoma v. United States*, 96 Fed. Cl. 390, 401 (2010); *Global Computer Enterprises, Inc. v. United States*, 88 Fed. Cl. 52, 70 (2009).  According to Rule 201(c), "[a] court may take judicial notice, whether requested or not" and may take judicial notice "at any stage of the proceeding."  Fed. R. Evid. 201(c).  Judicially noticeable facts include "facts which can be accurately determined by consulting reliable sources."  Fed. R. Evid. 201(b).

Although the court is not aware of any case in which judicial notice has been taken of the FDIC Regulations Handbook, the Supreme Court and the Federal Circuit have taken judicial notice of the policies of government organizations, as well as social, political and economic facts. *See, e.g.*, *United States v. Penn Foundry & Mfg. Co.*, 337 U.S. 198, 215-16 (1949) (taking judicial notice of Naval policy, which had been revealed in official communications with Congress); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1352 (2005) (taking judicial notice of a policy letter written by the Office of Federal Procurement Policy); *Precision Pine and Timber, Inc. v. United States.*, 81 Fed. Cl. 235, 277-79 (2007) (taking judicial notice of the United States Forest Service Handbook, and rejecting defendant's argument that the court may not consider the Handbook because it is not a regulation and therefore not binding on the parties), *aff'd in part, rev'd in part* on other grounds, 596 F.3d 817 (Fed. Cir. 2010).

[24] In its reply brief, defendant argues, for the first time, that plaintiff's interpretation is contrary to the general purpose of purchase and assumption agreements, which is for the FDIC-R to "keep the 'bad assets,' like the failed bank's ongoing lawsuits, while the purchaser obtains title to the good assets."  Def.'s Reply, ECF No. 337, at 4.  The only authority plaintiff cites for this broad proposition is *Gaff v. Fed. Deposit Ins. Corp.*, 919 F.2d 384, 385 n.1 (6th Cir. 1990), which concerns a dispute over whether the FDIC or shareholders had priority in a lawsuit directed against the failed bank's officers and directors.  The Comptroller of the Currency had closed the bank in 1984, *i.e.*, twenty-four years prior to the closure of WMB.  But defendant quotes *Gaff* out of context.  The court, in *Gaff*, does not state as a general principle that the government always retains "bad assets."  Rather, the lengthy footnote quoted in part by the government actually details a number of different strategies the FDIC used, at the time, "to ensure that the insured depositors gain their money."  Moreover, the court finds this purported FDIC strategy, dating back to the mid-1980s, to be of little relevance in interpreting a P&A Agreement formed in 2008, especially in light of the fact that the theory conflicts with the actual language in the P&A Agreement before the court, as well as the more up to date FDIC Handbook.

Defendant attempts to explain its absorption theory by citing Del. Code Tit. 8 § 259, which provides that "the separate existence of" two corporations ceases "[w]hen any merger or consolidation shall have become effective." Def.'s Reply, ECF No. 337, at 3-4. Under § 259, defendant suggests that the losses incurred by WMB are the same losses that were incurred by Dime, and thus, the same losses that were incurred by Anchor. But defendant provides no reason why the court should construe paragraph (2) in light of the Delaware law of mergers, especially when such a construction conflicts with the plain meaning of "incur" and "loss," as well as the purpose of Schedule 3.5, as evinced by the text and relevant context.

Moreover, even if the court were to accept defendant's application of § 259, plaintiff would still prevail. The word "when" in § 259 clearly indicates that the separate existence of the merging companies ceases to exist only *after* the merger becomes effective. In other words, § 259 is not retroactive in its effect; the merging companies are treated as one going forward, not backward. As explained above, the damage caused by the government's *Winstar* breach had already been reflected in Anchor's reduced stock price at the time of the Anchor-Dime merger.[25] Accordingly, WMB did not incur a loss when it merged with Dime, in 2002. Read this way, § 259 supports the court's plain language reading of the word "incur."

The court notes, in conclusion, that the Court of Federal Claims frequently deals with situations in which a contracting party attempts to create an ambiguity where none exists. *See, e.g.*, *M.G. Const, Inc. v. United States,* 67 Fed. Cl. 176 (2005); *Frazier v. United States*, 67 Fed. Cl. 56 (2005). To do this, that party typically points to some form of extrinsic evidence, trade usage or custom, or surrounding circumstance and claims that in the context of that evidence, an otherwise unambiguous term is ambiguous. This particular case is unusual only due to the fact that the party seeking to introduce the extrinsic evidence is not even a party to the contract. The court declines defendant's invitation to consider extrinsic evidence or to rewrite the plain language of the P&A Agreement, and finds that Schedule 3.5 does not apply to the *Anchor* litigation.

### b. The Extrinsic Evidence Proffered by Defendant in Its Motion for Judicial Notice Is Irrelevant

Defendant has requested the court to take judicial notice of various filings made in other Washington Mutual cases, as well as several other documents. Def.'s Mot. Judicial Notice, ECF No. 331. In particular, defendant directs the court's attention to the following items:

(1) the FDIC's motion to dismiss in *Mintz v. FDIC*, Def.'s Ex. A, ECF No. 331-1;

(2) the district court's opinion in *Mintz*, Def.'s Ex. B, ECF No. 331-2;

(3) the FDIC-R's proof of claim submitted to the bankruptcy court that is handling the WMI bankruptcy, Def.'s Ex. C, ECF No. 331-3;

---

[25] That Anchor's share price was negatively affected by the breach is uncontroverted. As explained above, this court, in 2005, awarded Anchor $111,619,000.00 in net lost profits from the sale of RFC, $42,000,000.00 in damages from reduced stock proceeds, $185,900,000.00 in mitigation costs for the purchase of NAMCO, $8,146,125.00 in damages for the sale of branch offices, and $8,789,785.91 in "wounded bank" damages. *Anchor III*, 81 Fed. Cl. at 153.

(4) the bankruptcy court's recent opinion regarding WMI, App. Pt. One, ECF No. 346-1; App. Pt. Two, ECF No. 346-2;

(5) the certificate of interest filed with the United States Court of Appeals for the Federal Circuit on September 22, 2008, which names WMI, not WMB as the real party-in-interest, Def.'s Rep. at 12;

(6) the proposed Global Settlement Agreement, which—in its view—purports to transfer *Anchor* to JPMC for the first time. *Id.* at 8–10, and

(7) Plaintiff's 2008 tax return, *see* Def.'s Reply, ECF No. 337, at 10; Pl.'s Opp'n to Def.'s Mot. for Award of a Tax Gross-Up, ECF No. 332, at 6.

Defendant cites all of these items as evidence of "discordant claims of ownership." Def.'s Mot. Judicial Notice, at 6. Although it will grant defendant's unopposed motion for the court to take judicial notice of these filings and judicial opinions, the court cannot agree that these items affect its interpretation of the P&A agreement.

Extrinsic evidence is irrelevant when, as here, the court has given legal effect to plain and unambiguous contract language. *See Bell/Heery*, 739 F.3d at 1331. Nor may extrinsic evidence be used to alter the terms of, or inject ambiguity into, a plain and unambiguous agreement. *Metric Constrs.*, 169 F.3d at 751. Moreover, even if there were an ambiguity in the P&A Agreement, defendant's seven pieces of extrinsic evidence (see above) lack even an elementary level of persuasive value as to the contract's meaning.

First, defendant argues that the FDIC's view of the P&A Agreement conflicts with the FDIC's purported litigation posture in *Mintz*. *See* Def.'s Mot. Dismiss at 6 n.11; Def.'s Mot. Judicial Notice at 3. The plaintiffs in *Mintz* argued that they owned the right to the litigation owned by Dime Bancorp. Inc., a bank holding company that WMI had subsequently acquired, which was also in bankruptcy. Defendant asserts that the FDIC-R's motion to dismiss in the *Mintz* case effectively "assert[s] that FDIC-R is the rightful owner of the Anchor claim." Def.'s Request Judicial Notice at 1. Defendant supports this assertion by quoting the following language from the *Mintz* motion to dismiss:

The FDIC-Receiver is the successor by operation of law to "all rights, titles, powers, and privileges of" WMB. . . . WMB, in turn, is the successor by merger to the rights and interests of Dime Savings . . . and is the rightful plaintiff in the *Anchor Savings Bank* litigation.

*Id.* (quoting Ex. A, ECF No. 331-1, at 11-12). But defendant mischaracterizes the position taken by the FDIC-R in *Mintz*. In its motion to dismiss in *Mintz*, the FDIC-R simply stated that WMB— as opposed to WMI—owned the right to the Anchor litigation, and that this right had been transferred to the FDIC-R *when* OTS had closed WMB. The FDIC-R's assertion that it was "the successor by operation of law to 'all rights, titles, powers, and privileges of' WMB" at the time

when OTS closed WMB has no bearing on whether the FDIC-R *subsequently* transferred the Anchor litigation to JPMC under the terms of the P&A Agreement.[26]

Regarding the second item proffered by defendant, the court finds that the district court's opinion in *Mintz* is irrelevant. In this opinion, the court simply acknowledges that when OTS closed WMB, it transferred WMB's assets to the FDIC-R. The opinion says nothing regarding the FDIC-R's disposal of these assets after this initial transfer. *See* Def.'s Ex. B, ECF No. 331-2, at 8-10.

In regard to the third item, the court finds that the FDIC-R's Proof of Claim is irrelevant to the interpretive question before the court. On its face, the Proof of Claim explicitly states that "nothing in this proof of claim . . . should be construed as reflecting the FDIC-Receiver's interpretation of the P&A Agreement, including without limitation the assets or rights related to claims that may have been sold, or that JPMC may claim to have been sold, pursuant to the P&A Agreement." *See* Pl.'s Opp'n to Def.'s Mot. Dismiss at 11 (quoting FDIC's Proof of Claim in the WMI bankruptcy, Ex. C, ECF No. 331-3, at ¶4).

Fourth, the bankruptcy court's 139 page opinion in *WMI* only mentions the *Anchor* judgment in one sentence—it simply states, in the background section, that "Under the P&A, JPMC obtained substantially all of the assets of WMB for $1.88 billion plus the assumption of more than $145 billion in deposit and other liabilities of WMB. The FDIC, as the receiver of WMB, retained claims that WMB held against others." ECF No. 346-1, app two, at 2. This passing reference has no bearing on this court's interpretation of the plain language of the P&A Agreement, nor is it inconsistent with the court's interpretation of Schedule 3.5. As explained above, the purpose of Schedule 3.5 was not to retain all claims generally, but to retain claims held by the FDIC-R against directors and officers of WMB whose actions or omissions contributed to the collapse of WMB.

Fifth, the certificate of interest filed with the Federal Circuit, which names WMI rather than WMB as the real party-in-interest, does not purport to be a claim of ownership of the *Anchor* judgment. In fact, defendant concedes in its own briefs that after the OTS closed WMB, ownership of WMB's assets passed to WMB. *See* Def.'s Mot. Dismiss at 5 (stating that upon receivership, "Washington Mutual Bank [*i.e.*, not WMI] ceased to own the *Anchor* claim"); *Id.* at 7 ("FDIC-R did not transfer its *Anchor* claim to JPMC").

Sixth, the proposed[27] Global Settlement Agreement does not contradict this court's interpretation of the P&A Agreement; if anything, it merely acknowledges or ratifies the *Anchor* judgment's sale to JPMC. The proposed Global Settlement Agreement between the FDIC and

---

[26] As the court explained above, OTS closed WMB and placed it into a receivership with the FDIC on September 25, 2008. Later that same day, the FDIC-R transferred, pursuant to a P&A Agreement, all assets previously owned by WMB except those excluded under Schedules 3.5, 3.6, and 4.8 of the Agreement.

[27] N.B., in January 2011, the Bankruptcy Court rejected the proposed Global Settlement Agreement. *See In re Washington Mutual, Inc.,* 2011 WL 5711, at *44 (Bankr. D. Del. Jan. 7, 2011).

WMI explicitly states that "the WMI Entities, the FDIC Receiver and FDIC Corporate shall be deemed to have sold, transferred and assigned, as of September 26, 2008,[28] to JPMC any and all right, title and interest such Parties may have in the Anchor Litigation . . . ."  Global Settlement Agreement, Ex. B, ECF No. 329-2, at § 2.13(b).

Finally, defendant argues that JPMC's failure to file an amended Form 8594 allocating the portion of the WMB sales price attributable to the Anchor judgment casts doubt on JPMC's interpretation of the P&A Agreement.  Def.'s Reply at 10-11.  The court disagrees.  As plaintiff points out, "Washington Mutual Bank had over $300 billion in assets, of which the judgment in this case represented barely one-tenth of one percent of the value."  Pl.'s Sur-Reply, ECF No. 339-1, at 8.  In light of the plain language of Schedule 3.5 and the complexity of accounting for all of JPMC's assets, the court finds that JPMC's failure to file an amended tax form does not alter the court's interpretation of the P&A Agreement.

Thus, even if the court considered defendant's extrinsic evidence when it interpreted the P&A Agreement, it still would not have changed the outcome: the P&A Agreement still would have transferred ownership of the *Anchor* judgment to JPMC.

### c. The Extrinsic Evidence Proffered by Plaintiff Confirms the Court's Interpretation

In contrast to the irrelevant documents attached by defendant in a vain effort to imply discordant claims of ownership, plaintiff points to email correspondences among FDIC, JPMC, and DOJ officials that expressly state that no such discordant claims exist in this particular case.  Although the court does not rely on plaintiff's extrinsic evidence in reaching its conclusion regarding the plain meaning of the disputed provision of the P&A Agreement, the court notes that plaintiff's evidence clearly confirms the court's interpretation.

To begin with, as plaintiff points out, FDIC officials clearly agree with plaintiff that the P&A Agreement transferred the Anchor claim from FDIC-R to JPMC.  In a February 25, 2009 email by Stephen J. Pruss, an FDIC attorney, to Gregory Isbell, an attorney for JPMC, Pruss stated unequivocally that the P&A Agreement had transferred the Anchor litigation to JPMC:

> I have had this matter reviewed at a senior level and it has been determined that all of the Winstar litigation (including the Anchor Savings matter) DID and was intended to pass as an asset to [JPMC] under the [P&A Agreement].  I am sorry for any delay our confusion on this issue may have caused JPMC.

---

[28] Defendant points out that there is a discrepancy between the effective date of the P&A Agreement (Sept. 25, 2008) and the date referenced in § 2.13(b) of the Global Settlement Agreement (Sept. 26, 2008).  Def.'s Reply, ECF No. 337, at 8-9.  Nonetheless, the court does not find any reason to conclude that this discrepancy alters the nature of the Global Settlement Agreement or creates a new assignment.  The wording of Section 2.13(b) ("shall be deemed") clearly indicates that the provision is a stipulation.  Moreover, defendant's characterization of the global settlement agreement is belied by the failed efforts made by defendant's counsel to convince the FDIC to avoid stipulating, in the Global Settlement Agreement, that JPMC owned the rights to the *Anchor* claim.  *See* August 30, 2010 Letter by Jacob A. Schunk to Thomas R. Califano, Pl.'s Ex. 6, ECF No. 335-1, discussed *infra* in Part III.A.2.c.

Pl.'s Ex. 2, ECF No. 335-1 (original emphasis).

Moreover, in a subsequent letter by Colleen J. Boles, the Assistant General Counsel of the FDIC, to Jeanne E. Davidson, who at the time was the Director of the Commercial Litigation Branch of the Civil Division of DOJ, Boles clarified that there never had been any "confusion" over the matter in the first place within the FDIC—rather, any confusion stemmed from disagreement between the DOJ and the FDIC.

> Nearly two years ago, in the months after the P&A transaction, there were conversations between DOJ staff and FDIC attorneys in which DOJ was advised that the claim had been transferred to [JPMC].  DOJ staff at that time disagreed with FDIC's interpretation of the P&A [Agreement], but deferred to the FDIC and did not pursue it further.

Pl.'s Ex. 5, ECF No. 335-1.  In that very letter, Boles expressly rejected the very arguments made by the DOJ in its motion to dismiss (regarding the meaning of Schedule 3.5 and the applicability of the Assignment of Claims Act), and reiterated that ownership of the litigation had passed to JPMC.

> [WMB] owned the Anchor claim at the time that [WMB] failed and the FDIC was appointed receiver.  At that point, FDIC Receiver succeeded to ownership of the Anchor claim.  FDIC Receiver then entered into a whole bank purchase and assumption agreement . . . with [JPMC] and conveyed the Anchor claim to [JPMC] as part of the P&A [Agreement].

*Id.*

Additionally, the letter by Ms. Boles sheds light on the purpose of Schedule 3.5. Specifically, the letter states that "Schedule 3.5 does not exclude 'litigation claims' generally . . . but only certain specific categories of matters, mostly claims against directors, officers, professionals, and other fiduciaries."  Letter by Colleen Boles, Pl.'s Ex. 5, ECF No. 335-1.  The court finds this explanation persuasive, as it is consistent with other provisions of paragraph (2) of Schedule 3.5, which exclude the transfer of claims or judgments against (i) any former officer or director of the Failed Bank, (ii) any underwriter of bonds of the Failed Bank, and (iii) "any shareholder or holding company of the Failed Bank."  As discussed above, this interpretation is also consistent with the FDIC's historical use of whole bank purchase and assumption agreements to resolve failed banks.[29]

Plaintiff also submits evidence showing that Jacob D. Schunk, the DOJ trial attorney who is counsel for defendant in this very case, had attempted to influence the settlement negotiations between the parties in *Mintz v. Federal Deposit Ins. Corp.*, No. 09-01904 (D.D.C.) and *Washington Mutual, Inc.*, No. 08-12229 (Bankr. D. Del.), in an effort to bolster the motion to dismiss.  *See* August 30, 2010 Letter by Jacob A. Schunk to Thomas R. Califano, Pl.'s Ex. 6, ECF No. 335-1. Specifically, the Mr. Schunk attempted to persuade Thomas R. Califano of the DLA Piper law firm—the FDIC's attorney in those two cases—to avoid stipulating in the Global Settlement

---

[29] *See FDIC Resolutions Handbook*, chapter 3, at 27, http://www.fdic.gov/bank/historical/reshandbook/ch3pas.pdf, discussed above in Part I.E.

Agreement for those two cases that JPMC owned the rights to the Anchor litigation.  *Id.*  Schunk also requested that Califano file a motion "to substitute FDIC-R for JPMC as the real party in interest in the Anchor litigation." *Id.*

Califano, in response to the letter sent by Schunk, attached a copy of the letter that the FDIC Assistant General Council (Ms. Boles) had already written to Schunk, contradicting DOJ's interpretation of the P&A Agreement.  *See* August 30, 2010 letter by Thomas R. Califano to Jacob A. Schunk, Pl.'s Ex. 7, ECF No. 335-1.   And despite defendant's efforts, the proposed Global Settlement Agreement ultimately stipulated that the FDIC-R had transferred the Anchor litigation to JPMC, under the terms of the P&A Agreement:

> [T]he WMI Entities, the FDIC Receiver and FDIC Corporate shall be deemed to have sold, transferred and assigned, as of September 26, 2008, to JPMC any and all right, title and interest such Parties may have in the Anchor Litigation . . . .

Proposed Global Settlement Agreement, Ex. B, ECF No. 329-2, at § 2.13(b).

In short, the court finds that the letters written by the FDIC Assistant General Counsel and other FDIC attorneys amount to nothing less than a "smoking gun" in favor of plaintiff's interpretation of the P&A Agreement because they demonstrate that *all* of the parties to the P&A Agreement —namely, the FDIC and JPMC—understood the agreement as encompassing the Anchor litigation.  *See A. R. F. Products, Inc.*, 388 F.2d at 696 (holding that "the court gives great, if not controlling, weight to the interpretation placed by the parties themselves upon the contract as evidenced by their statements and conduct prior to the time when the contract becomes the subject of controversy").

Finally, defendant argues that its interpretation of Schedule 3.5 should prevail over the FDIC-R's simply because the DOJ is representing the government in this matter.  See Def.'s Reply, ECF No. 337, at 11 (citing *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994)).

Defendant's briefs do not make clear whether it is claiming to speak for the FDIC *post hoc*, or whether it is merely citing to 28 U.S.C. § 516 for the purposes of the Anti-Assignment Act and Assignment of Claims Act. To the extent that defendant purports to speak for the FDIC, this court rejects that contention outright. Such a contention is unsupported by our jurisprudence, which has allowed the FDIC to intervene as a plaintiff in cases wherein the original plaintiff had standing independent of the FDIC.  *See Ambase Corp.*, 61 Fed. Cl. at 797 (stating that "the Federal Circuit, along with this Court, have found the FDIC receiver could intervene *against* the United States."); *Am. Heritage Bancorp*, 53 Fed. Cl. 723, 730 (2002).

Defendant's reliance on *O'Melveny & Myers* is also misplaced.  In *O'Melveny*, the Supreme Court refused to credit the FDIC's interpretation of the scope of its own statutory power, especially in light of the fact that DOJ disagreed with the FDIC's view on the matter.  But at issue in this case is not the FDIC's interpretation of a federal law (a legal question that the DOJ may disagree with), but the interpretation of a contract between FDIC-R and JPMC.

In any event, the court's finding that the P&A conveys the Anchor claim to JPMC is based on the court's interpretation of the plain language of the P&A, not the FDIC-DOJ correspondence. And to the extent that the court gives any consideration to the extrinsic evidence of the parties, the

court finds the FDIC letters useful not just because they are written by the FDIC, but because the views expressed in those letters best cohere with the plain language of the P&A Agreement. As explained above, the court credited the FDIC-R's explanation of the purpose of Schedule 3.5, which is to retain claims or judgments against directors, officials and shareholders of the failed bank, who through their negligent, reckless or criminal actions, caused the failure of that bank.

### 3.   The Court Denies Defendant's Motion To Reopen Discovery

Defendant argues, in its reply brief, that should the court find the disputed language of the P&A Agreement to be ambiguous, the court should reopen discovery in order to clarify who owns the right to the *Anchor* judgment. Def.'s Reply at 5. Defendant requests discovery for the general purpose of "allow[ing] the Government to understand the basis for JPMC's interpretation of the 2008 P&A Agreement and the parties' intent at the time of the transaction." Def.'s Reply, ECF No. 337, at 5. The government expresses concern that "ongoing litigation regarding ownership of the claim" might render it vulnerable to multiple judgments. *Id*. The government points out that several other entities "have made discordant claims of ownership of the Anchor claim," including WMI and FDIC-R. *Id*. at 6-8.

For the reasons explained above, the court has already found that the plain language of the Settlement Agreement clearly shows that JPMC is the real party in interest, and likewise found defendant's concerns over discordant ownership to be without merit. *See supra*, Part III.A.2.b. The court therefore denies defendant's motion to reopen discovery.

### 4.   The Assignment of Claims Act Does Not Bar the Transfer of the Anchor Claim to JPMC

Defendant argues, in the alternative, that even if the FDIC intended to transfer ownership of the *Anchor* claim to JPMC, the Assignment of Claims Act prohibits such an assignment. Def.'s Mot. Dismiss at 9. Plaintiff, in response, contends that the Assignment of Claims Act only bars assignments made by third parties—*i.e.*, not assignments made by the government—and that even if the Act did apply, the ratification and operation of law exceptions would also apply and save the assignment from "the prohibitory mandate of the [A]ct." *Patterson v. U.S., Nw. Nat. Bank of Minneapolis*, 354 F.2d 327, 329 (Ct. Cl. 1965); *see also* Pl.'s Opp'n, ECF No. 335, at 14-17.

Defendant, in turn, insists that the FDIC is not the government for purposes of the Anti-Assignment Acts. Defendant argues, in effect, that the FDIC has no authority to transfer or assign any claim without the permission of the DOJ, because "any agreement to transfer the claim would violate 28 U.S.C. § 516, which vests exclusive authority in the Department of Justice to litigate and settle claims upon behalf of the United States, and the Assignment of Claims Act, 31 U.S.C. § 3727(a), which limits FDIC-R's ability to assign or transfer a claim against the United States." Def.'s Resp. to Pl.'s Sur-Reply, ECF No. 340, at 4-5; Letter to Thomas R. Califano, DLA Piper, from Jacob A. Schunk, Department of Justice, Pl's Ex. 6, ECF No. 335-1.

The court disagrees with defendant for three reasons. First, the Assignment of Claims Act simply does not apply to assignments made by the government, which without question includes the FDIC acting in its corporate capacity. Second, the court finds that even if the Assignment of Claims Act were otherwise applicable, both the ratification and operation of law exceptions to the Act apply. Finally, the court notes that even if the Assignment of Claims Act otherwise applied,

it would be superseded by a separate and more specific provision of the Federal Deposit Insurance Act ("FDI Act"), which confers on the FDIC the authority to resolve banks without interference from other agencies.

### a. The Assignment of Claims Act Only Applies to Assignments of Claims Against the Government Made by Private Parties

Defendant argues that the Assignment of Claims Act bars any purported assignment of the Anchor claim by the FDIC to JPMC.  At the outset, the court disagrees and finds that the Assignment of Claims Act has no bearing on this case because the Act simply does not apply to assignments made by the government, which without question include the FDIC acting in its corporate capacity.

But before explaining the court's reasoning, a brief background of the dual capacities of the FDIC is in order.  The FDIC is an independent agency of the United States, 12 U.S.C. § 1819(b)(1), which was created in 1933 in response to the thousands of bank failures that occurred over the course of the Great Depression.[30]  The FDIC plays a dual role: in its corporate capacity ("FDIC-C"), it acts as insurer, regulator and supervisor of FDIC insured banks.  But the FDIC also acts as receiver ("FDIC-R") for failed national banks and federal thrifts that have been seized and closed by the OCC.  12 U.S.C. § 1821(c).  "The FDIC as receiver is functionally and legally separate from the FDIC acting in its corporate role as deposit insurer, and the FDIC as receiver has separate rights, duties, and obligations from those of the FDIC as insurer."  FDIC Resolutions Handbook, chapter 7, at 27.  When the FDIC operates in its capacity as receiver, the FDIC "steps into the shoes" of the failed bank, and is thus not the United States. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994).  Although this distinction has generated much litigation, it is of little consequence in this particular case, because the P&A Agreement was signed by the FDIC, acting in *both* capacities.[31]  Accordingly, the court finds that the United States is a party to this agreement.

Turning to the statute in question, the Assignment of Claims Act, 31 U.S.C. § 3727(a)(1)-(b) is generally read in conjunction with the Assignment of Contracts Act, 41 U.S.C. § 6305(a) (formerly 41 U.S.C. § 15(a)).  *See Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1349 (Fed. Cir. 2002).  Taken together, these two statutes—referred to collectively as the "Anti-Assignment Acts"—bar the assignment of a claim against the government, a government contract, or some lesser or future interest in a government contract, subject to certain exceptions.  *Id.*

The relevant portion of the Assignment of Claims Act provides that:

An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.  The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses.  The person making the assignment shall acknowledge it before an

---

[30] James W. Brewer and Elaine Childress Lee, B*ank Failure and the FDIC: A Survey of Legal Rights and Relationships of the Client and the Insolvent Bank*, 18 TEX. TECH L. REV. 1193, 1194 (1987).

[31] The P&A Agreement identifies three parties to the Agreement: FDIC-Receiver, FDIC-Corporate, and JPMC.  *See* Def.'s Ex. A, ECF No. 328-1, at 33.

official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

31 U.S.C. §3727(b).

The court finds that the conveyance by FDIC of the Anchor claim against the United States is clearly an "assignment" for the purposes of the Assignment of Claims Act, which is "a transfer or assignment of any part of a claim against the United States Government or an interest in the claim . . . ." 31 U.S.C. § 3272(a). Nonetheless, the court finds that the Act does not apply to assignments made by government agencies (like FDIC-C), for the following reasons.

To begin with, the Assignment of Contracts Act only prohibits government contractors from assigning public contracts—the provision barring assignments expressly applies only to "[t]he party to whom the Federal Government gives a contract or order." 41 U.S.C. § 6305(a). In contrast, the relevant portion of the Assignment of Claims Act does not explicitly state which parties are prohibited from assigning claims against the government, as it is written in the passive voice—"an assignment may be made only after . . . ." 31 U.S.C. §3727(b). Nonetheless, as explained above, the Assignment of Claims Act is commonly read in conjunction with and in harmony with the Assignment of Contracts Act, *Fireman's Fund Ins. Co.*, 313 F.3d at 1349, which only bars assignments made by "[t]he party to whom the Federal Government gives a contract or order," 41 U.S.C. § 6305(a).

Additionally, it is clear from the purpose the Assignment of Claims Act that this Act only bars assignments made by private contractors. The Assignment of Claims Act "has long been cited as having three main purposes: [1] to prevent trafficking in claims by those who could use them to improperly influence officers of the government, [2] to prevent multiple payment of claims by the government and allow the government to deal solely with the original claimant, and [3] to preserve the government's defenses against the transferee." *Nat'l Australia bank v. United States*, 54 Fed. Cl. 238, 240 (2002) (citing *United States v. Shannon*, 342 U.S. 288, 291-92(1952); *MDS Assocs., Ltd. v. United States*, 31 Fed. Cl. 389 (1994)). "The [Assignment of Claims] Act is thus not mechanically applied where the assignment in question does not implicate any of these purposes." *Centers*, 71 Fed. Cl. at 534 (citing *Rel-Reeves, Inc. v. United States*, 221 Ct. Cl. 263, 273 (1979)). "When an assignment, or class of assignments, has been found not to pose those risks, the Act has ordinarily been held inapplicable." *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 84 Fed. Cl. 768, 776 (2008) (quoting *Keydata Corp. v. United States*, 504 F.2d 1115, 1119 (1974) (quotation marks omitted).

None of these purposes is implicated by an assignment made by the government—presumably, a government entity, such as the FDIC-C, would not do business with another company if it suspected that the company was buying up claims against the United States. Nor is there any risk of discordant claims, as discussed above, in Part III.A.2.b.

Finally, the court's view that the Assignment of Claims Act does not bar government entities from assigning claims against the government is consistent with the exception to the Act for waiver or ratification. "If . . . the government concludes that it is appropriate and in its best interest to accept the assignment, it may do so. . . . the 'Government's recognition and acceptance

of such an assignment makes it a valid assignment.'" *Delmarva*, 542 F.3d at 894 (citation omitted); *see also D & H Distrib. Co. v. United States*, 102 F.3d 542, 546 (Fed. Cir. 1996), *Banco Bilbao Vizcaya-Puerto Rico v. United States*, 48 Fed. Cl. 29, 34 (2000).

In short, the Assignment of Claims Act does not apply when the government is the assignor. In this case, the assignment of the Anchor litigation to JPMC was made by the FDIC, acting in both its corporate capacity and as receiver. The FDIC-C is part of the government, as explained above. Accordingly, the Assignment of Claims Act is inapplicable in this case.

*b. The Ratification Exception*

Plaintiff argues, *inter alia*, that the Assignment of Claims Act does not bar the transfer of the *Anchor* claim because the government assented to the transfer agreement and then ratified the transfer after the fact. Defendant, in response, argues that the ratification exception does not apply because the FDIC is not the government for purposes of the Anti-Assignment Acts. *See, e.g.,* Def.'s Resp. to Pl.'s Sur-Reply, ECF No. 340, at 4-5; Letter to Thomas R. Califano, DLA Piper, from Jacob A. Schunk, Department of Justice, Pl's Ex. 6, ECF No. 335-1. According to defendant, "any agreement to transfer the claim would violate 28 U.S.C. § 516, which vests exclusive authority in the Department of Justice to litigate and settle claims upon behalf of the United States, and 31 U.S.C. § 3727(a), which limits FDIC-R's ability to assign or transfer a claim against the United States."

The court notes, at the outset, that the government's position on the matter is paradoxical. On the one hand, defendant asserts that it has litigation authority and standing to challenge JPMC's interest in the *Anchor* claim by virtue of the fact that "the FDIC-C, a party to the P&A Agreement, is an agency of the United States." Def.'s Reply, ECF No. 337, at 15. On the other hand, defendant asserts that the ratification exception does not apply because the FDIC-R is not a government agency, despite the fact that, by the government's own admission, both FDIC-R and FDIC-C signed the P&A Agreement. *Id.*; *c.f.* Def.'s Resp. to Pl.'s Sur-Reply, ECF No. 340, at 4-5.

In any event, the court finds that the ratification exception applies. The Assignment of Claims Act does not apply if the government ratifies the assignment by giving its "clear assent." *D & H Distrib. Co.*, 102 F.3d at 546. Such assent need not be explicit, but can be implied. *Ins. Co. of the W.*, 2011 WL 4014295 at *8 ("[E]ven if the government does not expressly waive the Anti–Assignment Acts, implied waiver can still be found based on the government's conduct) (citing *Tuftco Corp. v. United States*, 222 Ct. Cl. 277, 287–88 (1980)).

The court also finds that the FDIC, acting in its corporate capacity,[32] provided clear assent by explicitly transferring the Anchor claim to JPMC. As explained above, the P&A Agreement conveyed all of WMB's assets except for those listed in Schedules 3.5, 3.6, and 4.8. P&A Agreement, ¶ 3.1. The court has found that none of these Schedules includes the *Anchor* claim. Therefore, the court can only conclude that the FDIC assented to the transfer. The court notes that the FDIC's decision to sign the P&A Agreement was made prior to and outside the scope of this litigation, and therefore falls outside the DOJ's litigation authority. Finally, the court finds that

---

[32] The P&A Agreement identifies three parties to the Agreement: FDIC-R, FDIC-C, and JPMC. *See* Def.'s Ex. A, ECF No. 328-1, at 33.

the FDIC ratified the transfer after the fact, as explained above.  *See* August 30 Letter from Colleen Boles, Pl.'s Ex. 5, ECF No. 335-1.  The court notes that Colleen Boles, the Assistant General Counsel of the FDIC, was not purporting to write solely on behalf of the FDIC in its capacity as receiver.  Therefore, this letter also constitutes ratification by the government.

### c. Transfers by Operation of Law Do Not Implicate the Anti-Assignment Acts

The Supreme Court has generally held that the Assignment of Claims Act precludes voluntary assignments, but does not apply to transfers by operation of law.  *Dominion Res., Inc. v. United States*, 641 F.3d 1359, 1366 (Fed. Cir. 2011) (citing *United States v. Dow*, 357 U.S. 17, 20 (1958), and *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 375–76 (1949)).  Transfers by operation of law include transfers by "intestate succession, bankruptcy transfers, subrogation, assignments by judicial order, and a business merger, consolidation, or other change in business structure."  *Holland v. United States*, 62 Fed. Cl. 395, 400 (2004); *see also First Federal Sav. And Loan Ass'n of Rochester v. United States*, 58 Fed. Cl. 139, 156 (2003) ("This pending claim passed by agreement and operation of law when First Federal merged into Marine Midland. As plaintiff points out, First Federal "ceased to exit" by virtue of the merger only in the sense that two entities combined.").

Plaintiff argues that the transfer by operation of law exception to the Assignment of Claims Act applies, and that transfers by the FDIC-R are analogous to transfers made by a bankruptcy trustee.  *See* Pl.'s Opp'n, ECF No. 335, at 15-17.  *See also* FDIC Resolutions Handbook, chapter 7, at 67-68 ("Like a bankruptcy trustee, a receiver steps into the shoes of an insolvent party.  The receiver may liquidate the insolvent institution or transfer some or all of its assets to an acquiring institution.  Although many of the concepts central to the operation of an FDIC receivership are similar to those of the bankruptcy process, federal law grants the FDIC additional powers that lead to critical differences between bankruptcy and the FDIC receivership law.").  In fact, the FDIC agrees with plaintiff that exception for transfers by operation of law applies in this case.[33]

Defendant, in response, argues that the operation of law exception only applies to receivers in the bankruptcy context, and not to claims sold by the FDIC receiver.  Def.'s Reply, ECF No. 337, at 17.  Defendant also cites *Westinghouse* for the proposition that the sale of assets is a voluntary act not covered by the exception for transfers by operation of law.  Def.'s Mot. Dismiss at 9 (citing *Westinghouse Elec. v. United States*, 56 Fed. Cl. 564, 570 (2003).

The court rejects defendant's restrictive interpretation of the operation of law exception.  First, the court notes that the operation of law exception has never been strictly limited to the bankruptcy context, but applies to a variety of transfers by operation of law, including business mergers and consolidations.  *See, e.g., Holland*, 62 Fed. Cl. at 400.  As the court explained above, the Anti-Assignment Acts are "not mechanically applied when the assignment in question does not implicate any of [the Act's] purposes," *Centers*, 71 Fed. Cl. at 534, such as protecting the government from trafficking of claims and to prevent multiple payments of claim, *Nat'l Australia Bank*, 54 Fed. Cl. at 240.  Since the Bank Resolution process advances similar interests as the bankruptcy process, *see* FDIC Handbook at 67-68, and does not implicate any of the concerns

---

[33] *See* August 30, 2010 Letter from Boles to Davidson   Pl.'s Ex. 5, ECF No. 335-1 (stating that "Transfers of the Anchor claim first to [Dime] and then to [WMB] were results of mergers and thus fall within this [operation of law] exception.") (citing *Holland*, 62 Fed. Cl. at 400).

underlying the Assignment of Claims Act, *see supra* Part III.A.4.b, the court finds that the exception applies.

The court also disagrees with defendant's application of *Westinghouse*. The matter before the court is not a situation like the one in *Westinghouse*, in which some assets of the business unit were sold while others were retained. *Westinghouse*, 56 Fed. Cl. at 570 ("[T]his case does not involve a change in business structure. The entire [business] entity responsible for [performing] the GEN-14 contract was not sold."). Rather, this case involves a *whole bank* purpose and assumption agreement; it purports to sell nothing less than the largest financial institution of its kind in American history—Washington Mutual Bank. *See also L-3 Commc'ns Integrated Systems, L.P. v. United States*, 84 Fed. Cl. 768, 777 n.15 (2008) (distinguishing *Westinghouse*, and holding that "[w]here a transfer is incident to the sale of *an entire business or the sale of an entire portion of a business*, the transfer is considered to have occurred 'by operation of law,' and the assignment is exempted from the anti-assignment statute."). Additionally, the court notes that the assignment at issue in both *Westinghouse* and *L-3* was an assignment made by a contractor rather than a government agency.

### d. The FDIC Has Independent Statutory Authority To Resolve Failed Banks

Finally, even if the Assignment of Claims otherwise applied to the transfer of the Anchor claim, the court finds that the Act simply does not apply to the FDIC acting in its capacity as receiver ("FDIC-R") because FDIC-R has independent statutory authority to resolve banks. When the FDIC engineers a P&A agreement, like the one at issue here, it does so under 12 U.S.C. § 1821(d)(2)(G)(i)(II). *See Caires v. JP Morgan Chase Bank*, 2011 WL 3501756, *3 (N.D. Cal. 2011) (citing § 1821(d)(2)(G)(i) for the proposition that the FDIC can transfer assets and liabilities of failed institutions via purchase and assumption transactions); *cf. Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 701 (D.C. Cir. 1997) (noting that this section applies to the FDIC, as the successor to the Resolution Trust Corporation, to sell assets "in its capacity as a conservator or receiver . . . without obtaining any prior approval."); *Payne v. Sec. Sav. & Loan Ass'n, F.A.*, 924 F.2d 109, 112 (7th Cir. 1991).

Section 1821(d)(2)(G)(i)(II) provides as follows:

(I) In general

    The corporation may, as conservator or receiver—

        . . .

(II) subject to clause (ii), transfer any asset or liability of the institution in default (including assets and liabilities associated with any trust business) without any approval, assignment, or consent with respect to such transfer.

The statute also provides that "[w]hen acting as conservator or receiver . . . the [FDIC] *shall not be subject to the direction or supervision* of any other agency or department of the United States or any State in the exercise of the Corporation's rights, powers, and privileges." 12 U.S.C. § 1821(c)(2)(C) (emphasis added).

Since the assignment in question was clearly a "transfer [of an] asset . . . of the institution in default" by the FDIC-R, the FDIC-R has clear statutory authority to transfer the claim.  But to the extent that the Assignment of Claims Act applies, the court finds that it is superseded by the FDI Act, for the following reasons.

It is a canon of statutory construction that when two laws of equal dignity conflict with one another, the more specific provision prevails (*generalia specialibus non derogant*).  *See, e.g., Nitro-Lift Technologies, L.L.C. v. Howard*, 133 S. Ct. 500, 504 (2012); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 183-88 (2012).  Both laws in question are acts of Congress, and therefore of equal dignity.  Moreover, the canon applies regardless of which statute came first—"Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) (holding that the Equal Employment Act of 1972 did not supersede the employment preference for Native American employees in the Bureau of Indian Affairs, which had been created pursuant to The Indian Reorganization Act of 1934).

Therefore, even if defendant were correct in arguing that the Assignment of Claims Act applies, the FDIC's transfer of the *Anchor* claim is not void because the FDI Act specifically confers on the FDIC-R statutory authority to "transfer any asset or liability of the institution in default," and to do so without being "subject to the direction or supervision of any other agency." 12 U.S.C. § 1821(c)(2)(C); § 1821(d)(2)(G)(i)(II).  Concordantly, the statute expressly states that in the exercise of its powers, the FDIC "shall not be subject to the direction or supervision" by any other agency.  12 U.S.C. § 1821(c)(2)(C).

Any other finding would require the court to hold that the FDIC is allowed, under its authority in 12 U.S.C. §§ 1821(d)(2)(G)(i)(II) and (c)(2)(C), to enter into a whole bank purchase and assumption agreement with third party suitors like JPMC, but only with a contingency attached that the DOJ could come in and challenge the suitor's rights to certain assets after the fact by invoking the Anti-Assignment Acts.  Such a holding would undercut the purpose of section 1861(d)(2)(G)(i)(II), which is designed to provide for a quick sale in which the suitor takes on a risk that it is going acquire bad assets in exchange for some sort of uncertainty discount and strip the FDIC of its preferred method of bank resolution.  Such a result would render bank resolutions even more costly to the government's deposit insurance regime.

\* \* \* \* \*

The incredulity of the government's argument here cannot be overstated.  The FDIC entered into this P&A Agreement to the benefit of the public and the government. The FDIC's future ability to engage in cost-effective P&A contracts, like the one here, depends upon the ability of the FDIC to be bound to the contracts it enters into.  Without a third-party suitor like JPMC, the FDIC would have to resort to using its deposit insurance fund to resolve the failures of massive banks like WMB.[34]  And yet, despite the great benefit inured to the government from such

---

[34] Sheila Bair, the FDIC chairman at the time of WMB's failure, emphasized that WMB's collapse "could have posed significant challenges without a ready buyer."  Referring to JPMC's willingness to absorb WMB's questionable assets amid uncertainty over the bailout package, Bair added: "Some are coming to Washington for help, others are coming to Washington to help."  *See* David

transactions, the Department of Justice advances a series of near-frivolous legal arguments that would undermine the FDIC's ability to carry out its statutory mission and remove any incentive from major banks like JPMC help the FDIC resolve failed banks.

For the foregoing reasons, the court holds that the Assignment of Claims Act did not bar the FDIC-R from transferring the Anchor Litigation to JPMC under the terms of the P&A Agreement.

## B. Plaintiff's Motion for Correction of Award of Mitigation Costs

Having dispensed with defendant's jurisdictional arguments, the court now turns to the issue before the court on remand from the Federal Circuit—whether this court erred in calculating Anchor's mitigation costs.

As discussed above, the court did not award the entire purchase price of NAMCO as mitigation costs. Instead, the court first adjusted the purchase price downward by deducting the proceeds from the RFC sale. This resulted in an adjusted purchase price of $351 million. The court then further offset the NAMCO purchase price by deducting NAMCO's cumulative retained earnings between 1990 and 1997, which the court estimated to be $165,100,000. After deducting $165,100,000 from $351,000,000, the court awarded Anchor $185,900,000 in mitigation costs. *See Anchor 1*, 81 Fed. Cl. at 133-34.

Plaintiff contends that since the court awarded Anchor lost profits only for the years of 1990 through 1995, the court erred by deducting NAMCO's cumulative retained earnings from 1990 to 1997 from the adjusted purchase price of NAMCO. Instead, plaintiff argues, the court should have deducted only the retained earnings between 1990 and 1995, which according to NAMCO's 1996 Annual Report, amounted to $101,909,000.[35] "Thus, the NAMCO purchase price of $351,000,000 should have been offset by only $101,909,000, rather than $165,100,000—a differential of $63,191,000—thereby increasing the award of mitigation costs from $185,900,000 to $249,091,000." Pl.'s Mot. for Correction, ECF No. 320, at 4-5.

Defendant, in response, argues that the offset chosen by the court was a "deliberate judgment" made in light of Anchor's failure to prove lost profits for RFC for 1996 and 1997. Def.'s Resp. to Pl.'s Mot. for Correction, ECF No. 325, at 1, 4. Defendant also argues that Anchor is not entitled to a reduced offset due to its failure to prove RFC's earnings during the period of 1996 and 1997. *Id.* at 4-5.

---

Enrich and Dan Fitzpatrick, *WaMu is Seized, Sold-off to JPMorgan, in Largest Failure in Banking History*, THE WALL STREET JOURNAL (Sept. 26, 2008), at http://online.wsj.com/article/SB122238415586576687.html.

[35] As plaintiff points out, NAMCO's Dec. 31, 1996 annual report, which this court cited in its opinion on damages, reported that NAMCO had accrued "$131,425,000 in retained earnings" at year-end 1996, "up $29,516,000 from the year before." *Anchor III*, at 133. Subtracting NAMCO's retained earnings in 1996 ($29,516,000) from the cumulative retained earnings at year-end 1996 ($131,425,000) yields cumulative retained earnings at year-end 1995 of $101,909,000.

The confusion over this matter stems from the court's extensive recapitulation of a portion of the testimony of Dr. Andrew Carron, one of the defendant's expert witnesses. The following is the relevant portion of the court's previous opinion:

> Dr. Carron concluded that if the court were to award plaintiff damages *based on RFC's lost profits from 1990 to 1997*, it would be duplicative to also reimburse the full purchase price of NAMCO since much of that purchase price simply liquidated the shareholder equity (including retained earnings) that built up over the same 1990-97 period. . . .  In other words, such a damage award would provide plaintiff with RFC's profits *and* NAMCO's profits *over the same period*. Because the court has concluded that it is appropriate to award plaintiff lost profits in this case, it would be improper to also reimburse plaintiff for the costs it incurred in liquidating NAMCO's cumulative retained earnings to shareholders. *It would be a windfall for plaintiff*.

*Anchor III*, 81 Fed. Cl. at 133 (emphasis added).

The parties dispute whether the court fully adopted Dr. Carron's reasoning in calculating Anchor's mitigation costs. According to plaintiff, "[t]he court stated that the offset should reflect NAMCO's earnings 'over the same period' as Anchor's lost profits award, *agreeing with Dr. Carron* that 'if the court were to award plaintiff damages based on RFC's lost profits from 1990 to 1997, it would be duplicative to also reimburse' the retained earnings 'that built up over the same 1990-97 period.' . . . By the court's own analysis, inclusion of retained earnings for 1996 and 1997 in the offset was therefore in error." Pl.'s Mot. for Correction at 3-4 (emphasis added) (quoting *Anchor*, 81 Fed. Cl. at 133). Defendant, on the other hand, suggests that in this part of the opinion, the court was merely restating Dr. Carron's position; the court's real conclusion was simply that "awarding any NAMCO retained earnings would result in a 'windfall for plaintiff.'" Def.'s Resp. to Pl.'s Mot. for Correction at 6 (quoting *Anchor III*, 81 Fed. Cl. at 133).

Plaintiff's understanding of the court's rationale is accurate. The court's conclusion that a failure to offset the mitigation costs would be a "windfall for plaintiff" came immediately after the court's lengthy restatement of Dr. Carron's position, and logically follows from it. *See Anchor III*, 81 Fed. Cl. at 133. Moreover, after observing that there were certain factual gaps in Dr. Carron's testimony, the court stated that it was "convinced that Dr. Carron's theoretical approach to this issue is sound." *Id*. That the court adopted Dr. Carron's reasoning is also evident from its comment in the conclusion of the section on mitigation costs that the purpose of offsetting Anchor's mitigation costs was "to avoid any duplicative award." *Id*. at 134.

Moreover, defendant's argument that Anchor is not entitled to a reduced offset due to its failure to prove RFC's earnings during the period of 1996 and 1997 confuses the issue by mixing damages for lost profits with damages for mitigation. As the court explained in its previous opinion, mitigation costs are direct costs, not consequential costs, and thus may be awarded "*together with* any incidental and consequential damages," such as lost profits. *Id*. at 126 (internal citations removed). At trial, Anchor successfully proved it is entitled to mitigation costs. Anchor is not seeking "an enhancement of lost profits," as defendant suggests, but a reduction in the offset of the mitigation costs.

NAMCO's cumulative retained earnings were part of the purchase price for NAMCO paid by Anchor to mitigate its damages. Therefore, *Anchor is entitled to NAMCO's cumulative retained profits, to the extent that there is no duplication with the lost profits awarded for RFC*. Since this court held that Anchor was not entitled to lost profits for the years 1996 and 1997, the court erred in including retained earnings for 1996 and 1997 as part of the offset. Although plaintiff's inability to reliably quantify its lost profits for 1996 and 1997 bars it from being awarded lost profits for those two years, that failure simply has no bearing on the issue of mitigation costs.

Finally, the court agrees that the proper offset can be calculated "from evidence already existing in the trial record." Pl.'s Mot. for Correction at 4. In its previous opinion, the court elected not to subtract NAMCO's retained earnings because the court had no evidence revealing what those earnings were in the final nine months before Anchor acquired NAMCO. The court therefore elected to award only the $185.9 million accounted for as goodwill "as a conservative best estimate of NAMCO's cumulative retained earnings" between 1996 and 1997. *Anchor III*, 81 Fed. Cl. at 134. Such an estimate, however, is unnecessary now, because the court does have an accurate account of NAMCO's cumulative retained earnings between 1990 and 1995—according to NAMCO's 1996 Annual report, those earnings amount to $101,909,000. *See* Pl.'s ex. A, ECF No. 320-1; *Anchor III*, 81 Fed. Cl. at 133. The court therefore finds that this figure constitutes the proper offset for the award of RFC's lost profits for the period 1990 to 1995.

For the foregoing reasons, the court concludes that NAMCO's purchase price of $351,000,000 should be offset by $101,909,000 rather than $165,100,000. Anchor is accordingly entitled to total mitigation costs of $249,091,000.

## C. Plaintiff's Motion for the Award of a Tax Gross-up

The Federal Circuit allows plaintiffs to seek a "tax gross-up" to ensure that the damages awarded effectively compensate plaintiffs for the harm caused by defendant's action. Damages awarded by this court are taxable. Therefore, to the extent that the government's action deprived plaintiff of "monies that would not have been taxable," plaintiff is entitled to an additional award to "zero out" the ultimate tax liability. *Home Savings of America, FSB v. United States*, 399 F.3d 1341, 1356 (Fed. Cir. 2005).

The court previously found that stock sale proceeds are not taxable in the ordinary course of business, and that Dime was not entitled to any income tax deduction for the NAMCO acquisition in 1997 because NAMCO was purchased with after-tax dollars. The court accordingly held that plaintiffs were entitled to a tax gross-up for the damages awarded for these two injuries— $42 million and $185.9 million respectively. *See Anchor III*, 81 Fed. Cl. at 134-35. Adding together these two figures and deducting the $63 million sale price from NAMCO's $185.9 million mitigation costs, the court found that $164.9 million of plaintiff's damages were subject to gross-up.

Nonetheless, as the evidence before the court had been presented in 2005, and the *Anchor III* opinion was not issued until 2008, the court postponed any calculation of plaintiff's tax gross-up. "[T]here is no evidence in the record concerning how and what factors the court should consider in determining the gross-up for the current tax year of 2008. This evidence still must be adduced." *Id*. at 135. The court, accordingly, ordered the parties to reconvene to determine the appropriate final gross-up calculation. *Id*. at 153.

By 2008, however, Washington Mutual found itself in a poor financial condition, and could no longer confidently project that it would earn taxable income that year. Thus no tax gross-up would have been appropriate at the time. Nonetheless, the court agreed to allow plaintiff to file for a tax gross-up "at such time as Washington Mutual actually pays taxes upon the award in this case," and accordingly ordered that Anchor could seek "an equitable result with regard to the tax gross-up if appropriate at a later date." Opinion and Order (June 27, 2008), ECF No. 296, at 3. Defendant did not raise the issue of plaintiff's tax gross-up on appeal.

The court must now consider plaintiff's motion for a tax gross-up, filed on June 11, 2010. Plaintiff presented expert testimony to the effect that JPMC's combined federal and state marginal tax rate was 38.757%. Pl.'s Mot. Tax Gross-up. Plaintiff, however, subsequently conceded that "it is appropriate to defer calculation of the gross-up until [JPMC], the successor in interest to the *Anchor* judgment, determines the portion of the purchase price paid for Washington Mutual's assets that should be allocated to the judgment for tax purposes." Pl.'s Reply, ECF No. 338, at 1. Plaintiff, nonetheless, requests the court to rule on the issue of "whether the additional mitigation damages sought by Anchor on remand . . . are subject to a tax gross-up." *Id.* Since the court is granting plaintiff's request to correct the calculation of mitigation costs, this issue is now ripe for consideration.

Defendant argues that "[a] gross-up upon the $63.2 million additional award would be unjust because the $63.2 million would have been taxable in the normal course of business." Def.'s Resp., ECF No. 332, at 10. This argument misconstrues the nature of the additional $63.2 million award by characterizing it as income or lost profits—as explained above, the additional $63.2 million award is not an award of lost profits but stems from a reduction of the offset; it is accordingly part of the court's award of mitigation costs. Since mitigation costs are subject to a tax gross-up, the court finds that plaintiff is entitled to a gross-up of the additional $63.2 million, in addition to the $164.9 million that the court identified in its prior opinion as subject to gross-up. Overall, then, $228.1 million of the damages awarded to plaintiff are subject to a tax gross-up.

## D. Defendant's Motion Opposing Plaintiff's Bill of Costs

RCFC 54(d)(1) allows "the prevailing party" to claim "costs—other than attorney's fees . . . to the extent permitted by law." Such "bills of costs" must be filed "within 30 days after the date of final judgment." RCFC 54(d)(1)(B)(i). The requirements of RCFC 54 mirror some of the conditions listed in the Equal Access to Justice Act ("EAJA"). *See* RCFC 54(d)(1)(A)-(B); *see also First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 88 Fed. Cl. 572, 593 (2009) (noting that "one of the motivations behind RCFC 54(d)(1) was to synchronize the timing rules of the Court of Federal Claims with respect to recovery of fees and costs with the timing rules of the EAJA"). Although on its face, RCFC 54(d)(1)(B)(i) appears to require litigants to file a bill of costs "within 30 days of final judgment" without expressly barring the filing of such a bill before final judgment has been granted, 28 U.S.C. § 2517(a) of the Tucker Act requires a "final judgment" before any payment can be made.

On June 2, 2010, plaintiff submitted a bill of costs amounting to a total of $148,467.12. These costs include filing fees, fees of the reporter for trial transcripts, costs incidental to the taking of depositions, and costs for duplication of papers necessarily obtained for use in the case. Pl.'s Bill of Costs, ECF No. 312. On June 7, 2010, defendant filed a motion to dismiss the bill of costs

as premature, on the ground that "there is no final judgment because remand proceedings are still pending before this court." Def.'s Mot. Dismiss Costs, ECF No. 316, at 101; Def.'s Reply, ECF No. 322, at 2 ("there has been no final judgment in this case because remand proceedings are still pending and the respective rights of the parties remain in dispute").

Plaintiff, in response, argues that there has been a final judgment because the remand proceedings "can only increase the damages owed by the government" to Anchor. Pl.'s Opp'n to Def.'s Mot. Dismiss Costs, ECF No. 319, at 1. According to plaintiff, "Anchor's $356 million damages award is fixed—it is 'final and not appealable'—because all that can happen on remand is that Anchor's damages may be increased." *Id*. at 3.

It is undisputed that Anchor is the "prevailing party"—the Federal Circuit expressly denied defendant's appeal, and the only question remanded to the Court of Federal Claims is whether Anchor is entitled to *additional* damages. The issue here is whether the Federal Circuit's affirmance in part constitutes a "final judgment" for the purposes of RCFC 54(d) and 28 U.S.C. § 2517(a). The court is unaware of any opinion by the Court of Federal Claims or Federal Circuit that expressly addresses this issue.

Pursuant to 28 U.S.C. 2412(d)(2)(G), a "final judgment" is "a judgment that is final and not appealable, and includes an order of settlement." As plaintiff points out, on March 10, 2010, the Federal Circuit affirmed this court's $356 million judgment in favor of plaintiff. The government's 90 day window of opportunity to file a petition for panel rehearing or rehearing *en banc* expired on May 3, 2010. *See* RCFC 54(d)(1)(B)(i). The 90 day deadline for filing a petition for writ of certiorari also expired on that same day. *See* Sup. Ct. R. 13.1.

Nonetheless, there will be no final judgment as to the total quantum of damages awarded to Anchor until this opinion is no longer appealable, and the court is reluctant to allow piecemeal litigation over costs at each stage of the litigation. Moreover, the Supreme Court has defined final judgment "for the purposes of 28 U.S.C. § 2412(d)(1)(B)" as "a judgment rendered by a court that *terminates* the civil action for which EAJA fees may be received." *Melkonyan v. Sullivan*, 501 U.S. 89, 96 (1991) (emphasis added) (holding that the 30-day EAJA clock begins to run after a final judgment has been issued by a court, and that this deadline does not apply to administrative judgments).

For the foregoing reasons, the court grants defendant's motion to dismiss plaintiff's bill of costs, and orders plaintiff to submit a new bill of costs once the court has issued a final judgment setting plaintiff's total award.

## III. CONCLUSION

For the reasons set forth above, defendant's MOTION to dismiss under RCFC Rule 12(b)(1) is DENIED, defendant's MOTION for additional discovery is DENIED, defendant's MOTION for judicial notice is GRANTED, plaintiff's MOTION for correction of mitigation costs is GRANTED, defendant's MOTION to strike bill of costs is GRANTED, and plaintiff's MOTION for a tax gross-up is GRANTED-IN-PART and DENIED-IN-PART.

Plaintiff is entitled to additional mitigation costs of $63,191,000. In sum, the total Anchor is entitled to recover, before the addition of the gross-up figure, is **$419,645,910.91**. The court

also finds that $227.1 million of these damages are subject to a tax gross-up.  The parties are hereby directed to meet to determine the appropriate calculation for the final gross-up rate, and submit a status report to the court by Friday, June 19, 2015.

**IT IS SO ORDERED.**

_s/ Lawrence J. Block_

Lawrence J. Block
Judge