# United States Court of Federal Claims

No. 95-39 C
August 31, 2015

---

**ANCHOR SAVINGS BANK, FSB,**

 *Plaintiff,*

 *Winstar*; Tax Gross Up

**v.**

**THE UNITED STATES OF AMERICA,**

 *Defendant.*

---

 *Adrian Wager-Zito*, Jones Day, Washington, DC, attorney of record for plaintiff.

 *Scott D. Austin* and *John J. Todor*, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, for defendant.

## OPINION *and* ORDER

**Block,** *Judge.*

 This is before the court to determine the amount of tax gross up that plaintiff is entitled to and to finalize the total amount to be awarded to plaintiff in this litigation.

 The following is a brief summary of the pertinent facts. For a more detailed account, see *Anchor Sav. Bank, FSB v. United States*, 121 Fed. Cl. 296 (2015) ("*Anchor V*"). In 1995, plaintiff, Anchor Savings Bank, FSB ("Anchor"),[1] filed suit in this court, claiming that the United States had breached the terms of several agreements with Anchor. Specifically, plaintiff argued that the passage of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub. L. 101-73, 103 Stat. 183 (1989), breached these contracts by rescinding the favorable accounting treatment that the United States had afforded Anchor in exchange for Anchor's agreement to buy several failing savings and loan associations. Plaintiff argued that as a result of this breach, Anchor was severely undercapitalized and was compelled to sell valuable assets at a loss to prevent regulatory closure.

---

[1] As explained in greater detail below, Anchor has undergone several changes of ownership since this suit was filed in January 1995. To avoid confusion, this opinion will continue to refer to plaintiff as "Anchor."

In 2008, this court found the United States liable for breach of contract and awarded plaintiff, Anchor $356,454,910.91 in damages, including net lost profits, damages from reduced stock proceeds, mitigation costs, damages from branch sales, and "wounded bank" damages. *Anchor Sav. Bank, FSB v. United States*, 81 Fed. Cl. 1 (2008) ("*Anchor III*"). The court also found that plaintiff was entitled to a tax "gross up" for its damages from reduced stock proceeds and mitigation costs. *Id*. at 134-35. Nonetheless, the court postponed calculating the gross up because it was uncertain at the time whether Washington Mutual would earn taxable income that year, due to its declining financial condition. Opinion and Order (June 27, 2008), ECF No. 296, at 3. Defendant appealed this judgment and plaintiff filed a cross-appeal, arguing that the court had erred in calculating the mitigation costs.

On May 10, 2010, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") denied defendant's appeal and affirmed, in part, this court's judgment. *Anchor Sav. Bank v. United States*, 597 F.3d 1356 (Fed. Cir. 2010) ("*Anchor IV*"). The Federal Circuit, unsure of the basis for this court's calculation of mitigation costs, remanded the case for clarification of this issue. *Id*. at 1373-74.

The resolution of this issue was delayed on account of complications arising out of changes of ownership undergone by plaintiff. In January 1995, Anchor merged into the Dime Savings Bank of New York. In 2002, Dime merged with Washington Mutual Bank ("WMB") and its holding company, Washington Mutual, Inc., in a "merger of equals." *Anchor V*, 121 Fed. Cl. at 308. Following this merger, ownership of the Anchor litigation passed on to WMB. *Id*. On September 28, 2008, the Office of Thrift Supervision seized WMB and placed it into a receivership with the Federal Deposit Insurance Corporation ("FDIC"). That same day, the FDIC, acting in its capacity as receiver, sold substantially all of WMB's assets, including this *Anchor* litigation, to JPMorgan Chase Bank, N.A. ("JPMC") for $1.8 billion, pursuant to the terms of a purchase and assumption agreement. *Id*. The government disputed whether this agreement actually encompassed the *Anchor* litigation, and on August 2, 2010, filed a motion to dismiss for lack of standing.

On May 18, 2015, the court rejected defendant's motion to dismiss. *Id*. The court also granted plaintiff's motion for correction of its calculation of mitigation damages and found that plaintiff is entitled to a pre-gross up judgment of $419,645,910.91. *Id*. at 332. The court further held that of this amount, $228,091,000.00 is subject to a tax gross up. *Id*. The court directed the parties to confer regarding the appropriate calculation for the final gross up rate and to apprise the court of their progress by June 19, 2015. *Id*.

The Federal Circuit allows plaintiffs to seek a "tax gross up" to ensure that damages awarded effectively compensate plaintiffs for the harm caused by defendant's action. Damages awarded by this court are taxable. Therefore, to make plaintiff whole, it is appropriate for the court to "adjust[] the damages awarded to reflect tax consequences." *Home Sav. of America, FSB v. United States*, 399 F.3d 1341, 1356 (Fed. Cir. 2005). To the extent that the government's action deprived plaintiff of "monies that would not have been taxable," plaintiff is entitled to an additional award to "zero out" the ultimate tax liability. *Id. See also AmBase Corp. v. United States*, 100 Fed. Cl. 548, 578 (2011) ("Plaintiffs are entitled to a tax gross-up in an amount to be determined if and when any taxes should be imposed on the damages award, although 'if logic and pure common sense governed, it would make far greater sense for the Government to simply not tax Plaintiffs.'") (citations omitted).

A tax gross up is calculated by projecting plaintiff's liability for the portion of the award that is subject to gross up. *Anchor III*, 81 Fed. Cl. at 134-35. Although plaintiffs are required to show that they are entitled to damages with "reasonable certainty," once they have established this entitlement, the court "may 'make a fair and reasonable approximation of the damages.'" *Fifth Third Bank v. United States*, 518 F.3d 1368, 1378 (Fed. Cir. 2008) (quoting *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001)). "It is not essential that the amount [of damages] be ascertainable with absolute exactness or mathematical precision." *Bluebonnet Sav. Bank*, 266 F.3d at 1355. "[W]hen damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003).

As for the timing of the gross up award, this court has previously observed that "[t]he court will typically award the tax gross up along with compensatory damages if it is reasonably certain about the rate at which plaintiffs will pay income tax on the compensatory damages." *See Anchor*, Opinion and Order, ECF No. 296, at 2. But if the court is uncertain whether plaintiff's award or a portion of the award will be taxed, the court can deny the gross up and invite plaintiff to reopen the judgment pursuant to RCFC 60(b) in the event that the Internal Revenue Service ("IRS") does in fact tax some or all of the award. *See, e.g.*, *Bank of America, FSB v. United States*, 67 Fed. Cl. 577, 596-97 (2005).

The court now turns to the matter before it—the calculation of plaintiff's gross up award. As explained above, the court recently held that plaintiff is entitled to a pre-gross up judgment of $419,645,910.91, of which $228,091,000.00 is subject to a tax gross up, and directed the parties to submit a report regarding the gross up calculation. *Anchor V*, 121 Fed. Cl. at 332. On June 19, 2015, Anchor submitted a status report in response to the court's order. At the outset, plaintiff acknowledges that it is not entitled to gross up the entire $228,091,000.00 that is subject to gross up. Pl.'s Status Report, ECF No. 374, at 1-2. Rather, plaintiff states that it is only entitled to gross up the portion of the $228,091,000.000 that it expects to declare as a taxable gain. *Id.* Defendant concurs with this assessment. Def.'s Status Report, ECF No. 375, at 2-3.

Under U.S. federal tax law, the taxable gain for an asset is the difference between the present value of the asset and the cost or price at which the asset was acquired (adjusted for depreciation and other factors) by the party in possession. This "cost" is frequently referred to as "basis," or as "tax basis." [2] The present value of the Anchor litigation was resolved on May 18, 2015, when this court found that Anchor is entitled to a pre-gross up award of $419,645,910.91.[3]

---

[2] Under U.S. federal tax law, income derived from the appreciation of assets is taxable. *See, e.g.,* 26 U.S.C. §§ 1(h), 1222. Taxes on such appreciations, or "capital gains," are generally assessed when a "taxable event" occurs--*i.e.*, when some sort of transaction, like the sale or disposition of the asset, occurs. 26 U.S.C. § 1001(b). To determine the taxable gain on an asset that has appreciated in value, the Internal Revenue Service deducts the cost of acquiring the asset from the present value of the asset. This cost is frequently referred to as "basis," or "tax basis," and can be adjusted to take into account depreciation or losses incurred on other assets. *See generally* 26 U.S.C. § 1001. For an overview of the rules governing this calculation, see *Basis of Assets*, I.R.S. Publication 551 (Rev. December 2014), at http://www.irs.gov/pub/irs-pdf/p551.pdf.

[3] As explained above, a tax gross up is an additional sum awarded to "zero out" any additional tax liability for the underlying judgment. Accordingly, the underlying value of the litigation, for

To calculate Anchor's taxable gain on the $228,091,000.00, the parties agree that it is necessary to determine the price that JPMC paid to acquire the *Anchor* litigation as well as the marginal rates at which JPMC's award will be taxed.  Pl.'s Status Report at1-2; Def.'s Status Report, ECF No. 375, at 2-3.

As for the basis of the litigation, it must be noted that JPMC did not acquire the *Anchor* litigation piecemeal, at a specific price; rather, it acquired Anchor's assets (including the *Anchor* litigation) as part of a package that was sold by the FDIC Receiver, under the terms of the purchase and assumption agreement.  *See Anchor V*, 121 Fed. Cl. at 314-18.  Nonetheless, plaintiff argues that the cost of the *Anchor* litigation can be readily determined by referring to the Litigation Tracking Warrants ("LTWs") [4] for the *Anchor* litigation, which were publicly trading on the day of acquisition.  According to plaintiff, an examination of the LTWs establishes that the fair market value, or tax basis, of the *Anchor* litigation was $55,385,946.36.

As explained above, taxable gain is calculated by deducting the basis from the present value of an asset, which for purposes of this calculation, is $419,645,910.91.  Nonetheless, plaintiff argues that it would be inappropriate deduct the entire basis of $55,385,946.36 from $419,645,910.91 because only a portion of the court's award—*i.e.*, only $228,091,000.00 of $419,645,910.91—is subject to a gross up.  Plaintiff calculates that this portion is 54.3% of the underlying, pre-gross up judgment.  Accordingly, plaintiff states that only 54.35% of the basis should be deducted from the prejudgment amount.  54.35% of $55,385,946.36 (the basis) is $30,104,036.67.  Deducting $30,104,036.67 from $228,091,000.00, plaintiff calculates that it will realize a taxable gain of $197,986,963.33.

Plaintiff also calculates that its combined federal and state marginal rate is 37.535%.  Plaintiff reaches this rate by combining its federal tax rate of 35% with its unitary state tax rate, which adjusted for applicable tax deductions, is 2.535%.[5]  *See* JPMC Responses to DOJ Information Request, Def.'s Ex. 2, ECF No. 376, at 3.  Applying this 37.535% rate to the projected taxable gain of $197,986,963.33, plaintiff concludes that the appropriate gross up is $118,969,673.71.[6]

---

purposes of calculating the gross up, is the pre-gross award of $419,645,910.91, and does not include the gross up award.

[4] On December 22, 2000, Dime Bancorp, Inc., the successor-in-interest to Anchor Savings Bank, issued litigation tracking warrants ("LTWs") to its existing shareholders, representing the value of the *Anchor* litigation.  *Anchor*, 2012 WL 387024, at *1 (Fed. Cl. Aug. 31, 2012).  When Washington Mutual, Inc ("WMI") acquired Dime in 2002, WMI ratified the LTW Agreement, thereby stepping into the shoes of Dime.  *Id.*  According to plaintiff, these LTW "were actively traded on the NASDAQ market and therefore can serve as a basis to determine the fair market value of the contingent judgment as of the date of the acquisition of Dime by WMI."  Pl.'s Status Report, ECF No. 374, at 2 n.1.

[5] JPMC is taxed in multiple state jurisdictions.  According to JPMC, "[t]he rate for all unitary jurisdictions is 3.9%.  But, since state and local taxes are deductions for Federal Tax purposes, the 3.9% becomes 2.535% (3.9% x 65%)."  JPMC Responses to DOJ Information Request at 3.

[6] This figure is reached by calculating the difference between the projected taxable gain (*i.e.*, $197,986,963.33) and the taxable gain grossed up by 37.535% (*i.e.*, $316,956,637.045).  Thus $316,956,637.045 − 197,986,963.33 = $118,969,673.71.

Consistent with these calculations, plaintiff stipulates that "[s]ubject to any unforeseen events, JPMC intends to report $197,986,963.33 as a taxable gain. Similarly, JPMC intends to report the tax gross up (either $118,969,672.81, or such other amount as awarded by the Court), as taxable income." Def.'s Status Report, ECF No. 376, at 1-2 (quoting JPMC Responses to DOJ Information Request, Def.'s Ex. 2, at 1). Plaintiff further stipulates that "if the full amount of the award is ultimately not taxed, JPMC will repay to the government any portion of the gross up attributed to the portion that is not taxed." Id. Finally, plaintiff states that it intends "to [retroactively] amend Form 8594 for the 2008 tax year. For the subsequent years' tax returns, JPMC will either file affirmative audit adjustments or will file amended returns to reflect the consequences of the reallocation of basis." Id. at 3.

On June 19, 2015, defendant filed a motion requesting an enlargement of time of 30 days to obtain additional documentation from plaintiff's counsel regarding plaintiff's calculation, the anticipated timing of plaintiff's payment of taxes, and plaintiff's anticipated amendment to its 2008 tax return.[7] Def.'s Status Report, ECF No. 375. The court granted this extension, and on July 20, 2015, defendant submitted a status report addressing plaintiff's gross up calculation. See Def.'s Status Report, ECF No. 376. Notably, defendant maintains that "[a]fter considering Anchor's responses . . . we are not aware of a basis to challenge Anchor's calculation at this time." Id. at 1. Defendant also "conclude[s] that the calculations appear to be internally consistent." Id. at 2. Defendant does not challenge JPMC's projection of a 37.535% rate. See Def.'s Status Report, ECF No. 375 at 2–3 ("the only remaining question with respect to the accuracy of [plaintiff's] calculation is whether Anchor's estimate of [JPMC's] tax basis in the Anchor lawsuit was correct").

Nonetheless, defendant states that "it would be preferable to have Anchor file for gross up under Rule 60(b) [of the Rules of the U.S. Court of Federal Claims] rather than making the gross up part of the initial award due to the numerous variables and ambiguities inherent in assessing [JPMC's] future tax liability." Def.'s Status Report, ECF No. 376, at 1. Defendant supports its argument for deferral of the award by raising the possibility that the IRS may choose a different method of evaluating the fair market value of the Anchor litigation and come to a different valuation of Anchor's tax basis. Id. at 3-4. As the government points out, should the IRS conclude that the Litigation Tracking Warrants understated the real value of the Anchor litigation, Anchor's basis would be higher, and hence the appropriate tax gross up award would be smaller. Id.; Def.'s Status Report, ECF No. 375, at 3 (suggesting that plaintiff may have underestimated the value of the Anchor litigation "due to possible depression of the market value of the LTWs relative to the value of the underlying Anchor lawsuit as of September 2008 due to Washington Mutual, Inc.'s imminent bankruptcy").

---

[7] In its reply brief in defense of its motion for gross up, Anchor stated its intention to "retroactively amend[] its Form 8594 for the 2008 tax year to allocate a portion of the purchase price paid for Washington Mutual Bank's assets to the Anchor judgment." Pl.'s Reply, ECF No. 338, at 3. In other words, since JPMC acquired the Anchor litigation in 2008, JPMC plans to amend its tax form so that it properly reflects the tax basis (i.e., the purchase price). On July 6, 2015, Anchor reaffirmed its intention to amend its 2008 tax form. See JPMC Responses to DOJ Information Request at 3.

The court does not find this purported uncertainty sufficient to justify delaying plaintiff's gross up award.  As explained above, a tax gross up award is awarded based on a *projection* of plaintiff's tax liability, which inevitably entails a certain degree of uncertainty.  The Federal Circuit does not require "absolute exactness or mathematical precision."  *Bluebonnet Sav. Bank*, 266 F.3d at 1355.  "[W]hen damages are hard to estimate," as they are here due to the absence of an actual purchase price for the Anchor Litigation, "the burden of imprecision does not fall on the innocent party."  *LaSalle Talman Bank*, 317 F.3d at 1374.  In this case, the court finds that the litigation tracking warrants provide a reasonable proxy for the tax basis of the Anchor litigation.  As plaintiff points out, these ownership interests in the Anchor litigation were actively traded on the NASDAQ market on the day that JPMC acquired them.  The courts have, in other contexts, accepted the notion that information about the value of a corporation or asset is reflected in the value of a stock.  *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 242-43 (1988).

Moreover, as defendant acknowledges, the court has, in the past, accepted such stipulations by plaintiffs, despite the fact that the gross up reflects an estimate of a future tax rate that would eventually apply once the judgment was received and the tax actually paid.  Def.'s Status Report, ECF No. 376, at 2 (citing *Fifth Third Bank v. United States*, 71 Fed. Cl. 56, 97 (2006)).  In fact, the Court of Federal Claims has routinely included gross ups in *Winstar* cases as part of the judgment, based on projections of future tax liability.  *See, e.g., American Federal Bank, FSB v. United States*, 72 Fed. Cl. 586, 624-26 (2006), *aff'd*, 295 F.3d App'x 368 (Fed. Cir. 2008); *Fifth Third Bank*, 71 Fed. Cl. at 94-97, *aff'd*, 518 F.3d 1368; *La Salle Talman Bank, F.S.B. v. United States*, 64 Fed. Cl. 90, 114-18 (2005), *aff'd*, 462 F.3d 1331, 1338; *Home Sav. of America, F.S.B. v. United States*, 57 Fed. Cl. 694, 729-31 (2003), *aff'd*, 399 F.3d 1341, 1356 (Fed. Cir. 2005).

Admittedly, the court has, on occasion, deferred calculation of the gross up and authorized the plaintiff to file a motion, pursuant to Rule 60(b) of the Rules of the Court of Federal Claims ("RCFC"), if and when tax was paid on the judgment.  Nevertheless, the court has only resorted to this approach when there was uncertainty about whether plaintiff's award would be taxable in the first place.  For instance, in *Bank of America, FSB v. United States*, the court deferred calculation of the gross up because it was uncertain whether the recovery would be taxed.  67 Fed. Cl. 577, 596-97 (2005).  The court deferred calculation of the gross up for similar reasons in *Suess v. United States*, 74 Fed. Cl. 510, 514 (2006) and *Slattery v. United States*, 73 Fed. Cl. 527, 531 (2006).  In this case, however, the government does not dispute the taxability of the relevant portion of plaintiff's award or plaintiff's projection that the award will be taxed at a combined federal and state marginal rate for JPMC is 37.535%.

Finally, the court notes that delaying the gross up award is prejudicial to plaintiff, as this court lacks authority to award plaintiffs any interest.  *See, e.g., England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372, 1379 (Fed. Cir. 2004) (explaining that the absence of an express statutory authorization precludes plaintiffs from recovering interest costs).  The court finds no justification for further delay, and accordingly denies defendant's request to defer the calculation of gross up award.

For the reasons set forth above, the court finds that plaintiff is entitled to a gross up award of $118,969,673.71.  This court previously held, on May 18, 2015, that plaintiff is entitled to a pre-gross up judgment of $419,645,910.91.  In sum, plaintiff is entitled to recover a total of $538,615,584.62.  Accordingly, the Clerk is hereby directed to enter judgment, and take the necessary steps to dismiss this matter.

Additionally, plaintiff's counsel is directed to report to the court at such time as JPMC has amended its 2008 tax return and has paid the tax on the award.  Accordingly, the Clerk is directed to enter judgment as setout herein.

**IT IS SO ORDERED.**

s/ *Lawrence J. Block*

Lawrence J. Block
Judge